IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

WINSTON DAVIS,
        PETITIONER,

v.                                      L: 06-CV-842 MHT.
                                        PETITIONER REQUEST
                                        ORAL ARGUMENT.

STATE OF ALABAMA, ET AL.,
        RESPONDENTS.

MOTION TO AMEND\SUPPLEMENT THE RECORDS
TO SHOW CAUSE AS WHY THIS COURT
SHOULD NOT DENY THIS INSTANT PETITION
PURSUANT TO TITLE 28 USC. § 2244.

1.

COMES NOW PETITIONER IN THE ABOVE-STYLED CAUSE AND MOVES THIS HONORABLE COURT TO ISSUE ORDER ALLOWING PETITIONER TO AMEND \ SUPPLEMENT THE RECORDS TO SHOW CAUSE AS WHY THIS COURT SHOULD NOT DENY THIS INSTANT PETITION, AND FOR GOOD CAUSE STATES THE FOLLOWING AS GROUNDS FOR SAID ORDER.

"_INTRODUCTION_"

TO GENEVA COUNTY CIRCUIT COURT CRIMINAL CASE NUMBER CC-99-126 FOURTY-YEAR SENTENCE:

PETITIONER ASSERTS THAT AS EARLY AS 1985, A "CONSPIRACY" EXISTED BETWEEN DONALD MINOR, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEIBENHENER, (AND OTHER UNKNOWN INDIVIDUALS) WHO OWN STOCK IN HARTFORD FINANCIAL CORPORATION, WHO WHOLLY OWN CITY BANK OF HARTFORD, NICK HOLLEY, STATE FARM'S AGENT, BOB JONES, STATE FARM'S SUPERTENDANT OF CLAIMS, HENRY F.

2.

LEE II SOUTH TRUST BANK \ WACHOVIA
BANK N\A'S ATTORNEY ON RETAINER,
TO DEFRAUD STATE FARM INSURANCE
COMPANY OUT OF HUNDERDS OF
THOUSANDS OF DOLLARS, AND EACH,
INDIVIDUALS ROLE AND PARTICIPATION
IN THE ENTERPRISE AFFAIR ARE HERE
SET FORTH:

1. ON OR ABOUT July 1, 1994, DONALD MINER,
PAUL R KENNEDY, WILLIAM KENNEDY, WALLACE
DOWLING, RILEY SEILBENHENER, STOCKHOLDERS
OF HARTFORD FINANCIAL CORPORATION, WHO
WHOLLY OWN CITY BANK OF HARTFORD,
PURCHASED THE HOME "LOCATED AT 500
HILCREST DRIVE HARTFORD, AL 36344,
UNDER AN ASSUMED NAME OF LIFELINE
HOLDING COMPANY" FROM THE GENEVA
COUNTY TAX OFFICE FOR BACK TAXES DUE
( SEE: PETITIONER'S EXHIBITS 25 AT P.1,
EXHIBIT 24 AT P.2.) WITH INTENT TO
OBTAIN A FULL REPLACEMENT COST FIRE
POLICY ON SAID HOME AND HAVE GRADY
TOLLEY BURN THE HOME BEYOND REPAIR,
CITY BANK OF HARTFORD AS LIENHOLDER

3.

WOULD COLLECT $53,100.00 ( SEE: PETITIONERS EXHIBIT 21 (B) ) AND LAUNDRY OVER $53,100.00 THROUGH CITY BANK OF HARTFORD BACK TO THE STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD FOR THEIR OWN PERSONAL GAIN.

2. ON July 28, 1994, DONALD MARR, PAUL KENNE  WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEIZBENHENER, STOCK-HOLDERS OF HARTFORD FINANCIAL CORPORATION, WHO WHOLLY OWN CITY BANK OF HARTFORD ISSUED A MORTGAGE TO GARDY/TOLLEY A K A "WILEY HOWARD" IN THE AMOUNT OF $24,000.00 ( SEE: PETITIONERS EXHIBITS 25 (A) P. 1,) AND LAUNDRYED THAT MONEY THROUGH CITY BANK OF HARTFOR FOR THEER OWN PERSONAL GAIN.

3. ON OR ABOUT MAY 1, 1995, PETITIONER A SELF EMPLOYEED CONTRACTOR IN AND FOR THE STATE OF TEXAS, LICENSED TO PRACTICE IN THE FIELD OR 700MMODATIONS, REMODELING, RENOVATIONS, AND SPECALLING IN

4.

STORM RELATED INSURANCE REPAIR, MOVED
TO GENEVA, ALABAMA. SO HIS WIFE
COULD BE NEAR HER AGED MOTHER.

4. SHORTLY THEREAFTER, PETETEONER OBTAINED
HIS ALABAMA CONTRACTOR'S LICENSE.

5. ON SEPTEMBER 11, 1995, NECK HOLLEY,
   STATE FARM'S AGENT, ISSUED GRADY TOLLEY
   A FULL REPLACEMENT COST FIRE POLICY ON
   THE HOME LOCATED AT 500 HILCREST DRIVE
   HARTFORD, AL 36344, ( SEE; PETETEONER'S
   EXHIBIT 21 (C) ) WITH INTENT THAT
   GRADY TOLLEY WOULD START AND MAINTAIN A
   FIRE TO DESTROY SAID HOME, CITY
   BANK OF HARTFORD AS LIENHOLDER WOULD
   COLLECT $53,100.00 TO BE LAUNDERED THROUGH
   CITY BANK OF HARTFORD BACK TO THE
   STOCKHOLDERS TO BE DISBURSED TO
   ALL PARTIES.

6. ON SEPTEMBER 16, 1995, GRADY TOLLEY
   STARTED AND MAINTAINED A FIRE IN THE
   HOME LOCATED AT 500 HILCREST DRIVE
   HARTFORD, AL 36344, WITH INTENT TO
   DEFRAUD STATE FARM OUT OF OVER $33,000.00

FOR HES CRACKER BOX FURNITURE / CONTENTS
( SEE: PETETOWER'S "EXHIBITS 21 (E)
PARAGRAPH 3 ".

7. ON OCTOBER 4, 1995, HURRICANE OPAL
WITH HIGH WINDS EXCEEDING 100 M.P.H.
CAME THROUGH SOUTH EAST ALABAMA, CAUSING
WIND AND WATER DAMAGES TO OVER 80%
OF THE HOMES AND BUSINESS'S IN AND
AROUND GENEVA COUNTY, ALABAMA.

8. ON OCTOBER 12, 1995, PETETOWER BLEW THE
WHISTLE ON CINDY TOLLEY FOR STARTING
THE FIRE IN THE HOME LOCATED AT
500 HILLCREST DRIVE HARTFORD, AL 36344.
BY MAKING IT APPEARED HES CLOTHES
DRYER SHORTED ( SEE: PETETOWER'S
EXHIBIT 21 (D) ) TO BOB JONES, STATE
FARM'S SUPERINTENDANT OF CLAIMS DOTHAN,
ALABAMA.

9. SHORTLY AFTERWORDS, BOB JONES, CALLED
NICK HOLLEY, STATE FARM'S AGENT AND
INFORMED HIM THAT PETETOWER HAD
BLEW THE WHISTLE ON THE ARSON RING,

6.

10. SHORTLY THEREAFTER. NICK HOLLEY, STATE FARM'S AGENT CALLED, DONALD MARR, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEEBENHENER, STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION, WHO WHOLLY OWN CITY BANK OF HARTFORD AND ADVISED THEM TO BE AWARE THAT PETITIONER HAD BLEW THE WHISTLE THE ARSON RING

11. ON OCTOBER, 14, 1995 DONALD MARR, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEEBENHENER, "FURTHERED" THE EXISTING CONSPIRACY WHEN THEY OBTAINED A CREDIT REPORT FROM EQUIFAX, ON PETITIONER, WINSTON JONES UNDER FALSE PRETENCE IN A DIRECT VIOLATION OF THE FAIR CREDIT REPORTING ACT 15 USCS §§ 1681 et seq" (SEE: PETITIONER'S EXHIBITS 28 AT P.7. WHICH STATES IN PERTINENT PART: "THE TOLLEY'S DID NOT HAVE DAVIS TO DO THE WORK ON THEIR HOUSE") (SEE: EXHIBIT 25 AT C-48-59-61-64-C-82 THROUGH 85") (EXHIBIT 27 AT R-83, 84 WHICH STATES IN PERTINENT PART:

7.

QUESTION WAS PUT TO DONALD MARCH,

"DID YOU REQUEST A CREDIT CHECK ON MR. DAVIS?"

"YES" ANSWERED DONALD MARCH.,

QUESTION WAS PUT TO DONALD MARCH, "ISN'T IT TRUE THAT HE HAD ALREADY ENTERED INTO A CONTRACT WITH THE TOLLEYS AND WAS SUPPOSED TO START WORK AND WAS SUPPOSED TO RECEIVE A PART OF THIS $10,000.00?"

"NOT TO MY KNOWLEDGE, NO SIR", ANSWERED DONALD MARCH..."

R. ON OCTOBER 18, 1995, BOB JONES, STATE FARM'S SUPERTENDANT OF CLAIMS, CALLED NICK HOLLEY, STATE FARM'S AGENT AND ADVISED HIM TO CALL DONALD MARCH, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DONALD, RILEY SEIBENHENER, STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD TO

8.

HAVE GRADY TOLLEY SIGN A CONTRACT WITH CONTRACTOR CLAUDE BARWICK "TO READ" WELL DO THE WORK TO THE FIRE DAMAGED HOME LOCATED AT 500 HILCREST DRIVE HARTFORD, ALABAMA FOR THE AMOUNT STATE FARM PAID (SEE: PETITIONER, EXHIBIT 21(E) WHICH STATES IN PERTINENT PART: PARAGRAPH 1. '" THE FULL REPLACEMENT COST HAS BEEN PAID FOR DWELLING REPAIRS IN THE AMOUNT OF "$34,436.69." THIS PAYMENT WAS BASED ON OUR REPAIR ESTIMATE.

YOUR SIGNED CONTRACT WITH CLAUDE BARWICK INDICATE THAT HE CAN DO THE WORK DESCRIBED ON HIS CONTRACT FOR THE AMOUNT PAID BY STATE FARM..."') AND THEN INFORM CONTRACTOR CLAUDE BARWICK THAT WELL STATE FARM ONLY PAID $21,000.00 SEE: PETITIONER'S EXHIBIT 25(B).

13. ON OR ABOUT OCTOBER 20, 1995, PETITIONER WINSTON DAVES GOES TO CITY BANK OF HARTFORD TO SEE DONALD MARR, DURING THIS MEETING PETITIONER PUT DONALD

9.

MAIL ON NOTICE OF PETITIONER'S INTENT
TO SUE HIM AND CITY BANK FOR OBTAINING
AN UNAUTHORIZED CREDIT REPORT WITHOUT
LEGAL REASON OR CAUSE. (SEE. PETITIONER'S
EXHIBIT 25 AT C 57-58").

14. ON OR ABOUT OCTOBER 26, 1995, DONALD
NARZA, PAUL KENNEDY, WILLIAM KENNEDY,
WALLACE DOWLING, RILEY SEIBENHENER,
STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION
WHO WHOLLY OWN CITY BANK OF HARTFORD,
NICK HOLLEY, STATE FARM'S AGENT,
BOB JONEY, STATE FARM'S SUPERINTENDENT
OF CLAIMS, AND HENRY F. LEE III,
SOUTH TRUST BANK \ WACHOVIA BANK
N\A. ATTORNEY ON RETAINER, "FURTHERED"
THE EXISTING CONSPIRACY TO DESTROY
PETITIONER'S BUSINESS WHEN
HENRY F. LEE III TERMINATED PETITIONER'S
WRITTEN CONTRACT WITH RICHARD
LEWELLYN WITHOUT LEWELLYN'S KNOWLEDGE
WITHOUT LEGAL REASON OR CAUSE
(SEE. PETITIONER'S EXHIBIT 26 AT
PP. 14 AND 15 AT PARAGRAPH 8") AND

10.

INTERFERED WITH OVER 300,000.00
WORTH OF STORM RELATED CONTRACTS
DUE TO HURRICANE OPAL, DATED
OCTOBER 4, 1995, FORCING PETITIONER
INTO CHAPTER 13 BANKRUPTCY.
(SEE: PETITIONER'S EXHIBIT 15 ").

15. ON DECEMBER 7, 1995, DONALD WINER,
PAUL KENNEDY, WILLIAM KENNEDY, WALLACE
DONALD, RILEY SEIBENHENER, CLOSED
OUT THE "LIFELINE ACCOUNT" WHERE
THE STATE FARM INSURANCE PROCEEDS
WERE DEPOSITED AND TRANSFERED $3,917.88
INTO GRADY TOLLEYS PERSONAL ACCOUNT
(SEE: PETITIONER'S EXHIBIT 24 AT PP 2,3 AND
4"), TO DRAW OUT CASH TO EITHER
PAY NECK HOLLEY STATE FARM'S AGENT,
BOB JONES, STATE FARM'S SUPERINTENDANT
OF CLAIMS, OR WAS THIS "$3,917.88"
USED TO BRIBE THE GENEVA COUNTY
DISTRICT ATTORNEY DAVID EMERY, AND/OR
THE CIRCUIT COURT JUDGE CHARLES L.
WOODS FOR PROTECTION? . . (SEE:
PETITIONER'S EXHIBIT 21 (E) ").

11.

16. ON OR ABOUT DECEMBER 7, 1995, DONALD MANN, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEEBENHEN, STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD UNDER ASSUMED NAME "LIFE LINE HOLDING COMPANY" PURCHASED AN OLD FARM BUILDING LOCATED AT ROUTE 3 COUNTY RD. HARTFORD, AL 36344, FROM THE GENEVA COUNTY TAX OFFICE FOR BACK TAXES DUE, WITH INTENT TO OBTAIN A FULL REPLACEMENT COST FIRE POLICY AND HAVE GANDY TOLLEY ("A.K.A. WILEY TOLLEY" (SEE: PETITIONER'S EXHIBIT 22 AND 22(A)") BURN SAID HOME BEYOND REPAIR, CITY BANK OF HARTFORD AS LIENHOLDER WOULD COLLECT $50,000.00 AND LAUNDERED THROUGH CITY BANK OF HARTFORD BACK TO THE STOCK-HOLDERS OF HARTFORD FINANCIAL CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD TO BE DISBURSED TO THE ARSON RING.

17. ON OR ABOUT DECEMBER 20, 1995, NICK HOLLEY, STATE FARM'S AGENT, ISSUED

12.

GRADY TOLLEY AKA WILEY TOLLEY A FULL REPLACEMENT COST FIRE POLICY WITH INTENT THAT GRADY TOLLEY WOULD START AND MAINTAIN A FIRE IN THE HOME LOCATED AT ROUTE 3 COUNTY RD. 55 HARTFORD AL 36344 TO COMPLETLY DESTROY SAID HOME, CITY BANK OF HARTFORD AS LIENHOLDER WOULD COLLECT 50,000.00 TO BE LAUNDERED THROUGH CITY BANK BACK TO THE STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION TO BE DISBURSED TO THE ARSON RING.

R. ON JANUARY 1, 1996, DONALD MARR, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DONALD, RILEY SEEBENHENER, STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD PLACED THE HOME LOCATED AT 500 HILCREST DRIVE ON THE MARKET FOR SALE.

19. ON FEBRUARY 20, 1996, PETITIONER HIRED ATTORNEY SHEETS OF DOTHAN, ALABAMA TO FACE CHAPTER 13, BANKRUPCY PROCEEDING ("SEE PETITIONER'S EXHIBIT 15")

13.

20. THEREIN ATTORNEY SHEETS LISTED PETITIONER'S ACCOUNTS RECEIVABLE IN THE AMOUNT OF $44,533.55 (SEE: PETITIONER'S EXHIBIT 15 AT P. 85").

21. THEREIN ATTORNEY SHEETS FILED PETITIONER'S MOTION TO STAY PROSECUTION FOR CHARGES FOR NONSUFFICIENT FUND CHECKS, THAT THE GENEVA COUNTY, HOUSTON COUNTY DISTRICTS ATTORNEYS ARE ACTING AS DEBT COLLECTORS, IN VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT 15 USCS §§ 1692 et seq. (SEE: PETITIONER'S EXHIBIT 15 AT P. 87, )

22. THEREIN SAID BANKRUPTCY IS PROCEEDING, HONORABLE A. POPE GORDON, UNITED STATES BANKRUPTCY JUDGE ISSUED ORDER, TREATING PETITIONER'S MOTION TO STAY PROSECUTION FOR CHARGES FOR NON-SUFFICIENT FUND CHECKS AS A COMPLAINT, AND ORDERED A PRELIMINARY HEARING ON PETITIONER'S COMPLAINT. (SEE: PETITIONER'S EXHIBIT 15 AT P. 87,

14.

23. ON MAY 7, 1996, A PRELIMINARY HEARING BY TELEPHONE WAS HELD ON PETITIONER'S COMPLAINT, HONORABLE A. POPE GORDON, UNITED STATES BANKRUPTCY JUDGE ISSUED ORDER ALLOWING PETITIONER TO PAY HIS NON SUFFICIENT FUND CHECKS THROUGH HIS CHAPTER 13 BANKRUPTCY PROCEEDING "AS A DEBT." (SEE; PETITIONER'S EXHIBIT 15 AT P. 88 "),

24. SHORTLY THERE AFTER, DONALD WALD, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEIBENHENER, STOCKHOLDERS OF HARTFORD FINANCIAL CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD, NICK HOLLEY, STATE FARM'S AGENT, BOB JONES, STATE FARM'S SUPERINTENDANT OF CLAIMS, HENRY F. LEE III, SOUTH TRUST BANK \ WACHOVIA BANK N. \A-S ATTORNEY ON PETITIONER FURTHERED THE EXISTING CONSPIRACY" BY ENCOURAGING DAVID EMERY, GENEVA COUNTY DISTRICT ATTORNEY, HIS INVESTIGATOR JIMMY HAND TO DEPRIVE PETITIONER OF HIS EQUAL RIGHTS, AND FURTHER.

15,

ACT ONE:

25. ON AUGUST 2, 1996. AS A MEMBER OF THE
EXECUTIVE BRANCH OF STATE GOVERNMENT
DAVID EMERY, THE GENEVA COUNTY DISTRICT
ATTORNEY WITH CORRUPT MOTIVES, AND
BAD INFLUENCES, ABUSED HIS STATUTORILY
VESTED POWER WHEN HE BROUGHT AN
UNCONSTITUTIONAL APPLICATION OF THE
WORTHLESS CHECK ACT CODE OF ALABAMA
1975 13A-9-13 TO A INTENT CRIMES
AS FOLLOWS:

(A)            CC-96-219

ON AUGUST 2, 1996, THE GRAND JURY OF
SAID COUNTY CHARGE THAT, BEFORE THE
FINDING OF THIS INDICTMENT ON OR ABOUT
"10-21-95", ONE WINSTON DAVIS DID, KNOWINGLY
OBTAIN, BY DECEPTION "UNAUTHORIZED"
CONTROL OVER LABOR AND PERSONAL
SERVICES, FROM JOE THOMAS, "BY
MAKING A FALSE PROMISE" TO PAY
AND PRESENTING A WORTHLESS CHECK,
NUMBER 183, IN THE AMOUNT OF
$375.00. TO JOE THOMAS WITH THE

16.

"INTENT TO DEPRIVE" JOE THOMAS OF
SAID LABOR AND PERSONAL SERVICES, IN
VIOLATION OF "SECTION 13A-8-4" OF THE
CODE OF ALABAMA, "AGAINST THE PEACE
AND DIGNITY OF THE STATE OF ALABAMA."

(B)            CC-96-220

THE GRAND JURY OF SAID COUNTY CHARGE
THAT, BEFORE THE FINDING OF THIS
INDICTMENT ON OR ABOUT "10-20-95",
ONE WINSTON DAVIS DID, KNOWINGLY
OBTAIN, BY DECEPTION "UNAUTHORIZED"
CONTROL OVER PLUMBING SUPPLIES, WORK
AND LABOR FROM KIRKLAND PLUMBING, BY
MAKING A "FALSE PROMISE TO PAY" AND
PRESENTING A WORTHLESS CHECK, NUMBER
180 IN THE AMOUNT OF $ 4,900.00,
WITH THE "INTENT TO DEPRIVE" THE
OWNER OF SAID PROPERTY, IN VIOLATION
OF SECTION "13A-8-3" OF THE CODE OF
ALABAMA, "AGAINST THE PEACE AND DIGNITY
OF THE STATE OF ALABAMA."

17.

(C)          CC-96-221

THE GRAND JURY OF SAID COUNTY CHARGE
THAT, BEFORE THE FINDING OF THIS
INDICTMENT ON OR ABOUT "10-9-95," ONE
WINSTON DAVIS DID, KNOWINGLY OBTAIN
BY DECEPTION "UNAUTHORIZED" CONTROL
OVER BUILDING MATERIALS FROM DOWLING
LUMBER ("OWNER, WALLACE DOWLING,
STOCK HOLDER OF HARTFORD FINANCIAL CORP.,
PART OWNER OF CITY BANK OF HARTFORD,
WHO OBTAINED A CREDIT REPORT FROM
EQUIFAY ON PETITIONER "UNDER FALSE
PRETENCE IN A DIRECT VIOLATION OF
15 USCS § 1681 Q") BY MAKING "A FALSE
PROMISE" TO PAY AND PRESENTING A
WORTHLESS CHECK NUMBER 167, IN THE
AMOUNT OF $ 1,607.20 TO DOWLING
LUMBER "WITH INTENT TO DEPRIVE"
DOWLING LUMBER OF SAID BUILDING MATERIALS,
IN VIOLATION OF "SECTION 13A-8-4 "OF
THE CODE OF ALABAMA, "AGAINST THE
PEACE AND DIGNITY OF THE STATE OF
ALABAMA."

18.

## ACT TWO:

26. ON OR ABOUT NOVEMBER 15,1996, PETITIONER HIRED ATTORNEY KENNETH C. SHEETS, THE SAME ATTORNEY WHO HAD OBTAINED A UNITED STATES BANKRUPTCY JUDGE ISSUE ORDER (SEE: PETITIONER'S EXHIBIT 15 TH.P. NOT TO PROSECUTE PETIONER TO REPRESENT HIM IN CASES CC-96-219, 220 + 221.

27. ON DECEMBER 3, 1996, ATTORNEY SHEETS FILED NOTICE OF APPEARANCE AND REQUEST FOR PRODUCTION BY STATE. (SEE: PETITIONER'S EXHIBIT "30").

28. SHORTLY THERE AFTER, DONALD MINER, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLZIX, RILEY SEEBE HENER, STOCKHOLDER OF HARTFORD FINANCIAL CORPORATION, WHO WHOLLY OWN CITY BANK OF HARTFORD, NICH HOLLEY, STATE FARM'S AGENT, BOB JONES, STATE FARM'S SUPERTENDANT OF CLAIMS, HENRY F. LEE III, SOUTH TRUST BANK \ WACHOUZIA BANK N \ A, IS ATTORNEY ON

19.

PETITIONER, "ENCOURAGED," THE GENEVA COUNTY DISTRICT ATTORNEY, DAVID EMERY, HIS INVESTIGATOR, JIMMY HUD, THE CIRCUIT COURT JUDGES CHARLES L. WOODS AND P.B. MCLAUGHLIN P.J. OF GENEVA COUNTY CIRCUIT COURT EXERTED UNDUE INFLUENCE OVER PETITIONER'S RETAINED ATTORNEY, KENNETH C. SHEETS WHEN THEY ADVISED HIM TO INFORM PETITIONER TO "SIGN A WAIVER OF ARRAIGNMENT AND ENTER A PLEA OF NOT GUILTY." (SEE: PETITIONER'S "EXHIBIT 2 AT P-6, 7 AND 8")

29. ON DECEMBER 5, 1996, PETITIONER'S RETAINED ATTORNEY KENNETH C. SHEETS JOINED THE EXISTING CONSPIRACY TO DEPRIVE PETITIONER OF HIS SIXTH AMENDMENT RIGHTS TO HAVE EFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL, AND AT TRIAL, AND ON DIRECT APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS, AND DEPRIVED PETITIONER OF HIS FOURTEENTH AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION TO HAVE A FUNDAMENTAL FAIR TRIAL AND DUE PROCESS OF LAW, WHEN HE ADVISED

20.

PETITIONER TO ENTER HIS PLEA OF
NOT GUILTY AND WAIVER OF ARRAIGNMENT
(SEE, PETITIONER'S "EXHIBIT 30") TO
DEBAR PETITIONER FROM ATTACKING
THE THREE INDICTMENTS CC-96-219, 220 & 221,
WHICH WERE FATALLY DEFECTIVE.

30. SHORTLY THEREAFTER, THE GENEVA COUNTY
DISTRICT ATTORNEY DAVID EMERY, HIS
INVESTIGATOR, TOMMY HAND, THE
GENEVA COUNTY CIRCUIT COURT JUDGE
CHARLES L. WOODS, THE GENEVA COUNTY
CIRCUIT COURT P.J. P.B. McLAUGHLIN,
FURTHERED THE EXISTING CONSPIRACY TO
DEPRIVE PETITIONER OF HIS FOURTEENTH
AMENDMENT RIGHTS TO THE UNITED
STATES CONSTITUTION TO HAVE A
FUNDAMENTAL FAIR TRIAL AND DUE
PROCESS OF LAW WHEN THEY EXERTED
UNDUE INFLUENCES OVER PETITIONER'S
RETAINED ATTORNEY KENNETH C. SHEETS
TO FILE MOTION TO WITHDRAW AS COUNSEL
FOR CASES CC-96-219, 220 AND 221, AFTER
HE HAD BEEN PAID.

21.

31. ON DECEMBER 26 1996, HENRY F. LEE III
SOUTH TRUST BANK \ WACHOVIA BANK N\A
ATTORNEY ON RETAINER (SEE: PETITIONER'S
"EXHIBIT 27 AT R-113") FURTHERED
THE EXISTING CONSPIRACY TO DEPRIVE
PETITIONER OF HIS FOURTEENTH
AMENDMENT RIGHTS TO THE UNITED
STATES CONSTITUTION TO HAVE A
FUNDAMENTAL FAIR TRIAL AND DUE
PROCESS OF LAW WHEN HE OBTAINED
COPIES OF CHECK WHICH SOUTH TRUST
BANK \ WACHOVIA BANK N\A, PAID
PETITIONER ON SEPTEMBER 1, 1995,
SEPTEMBER 29, 1995, "FROM CITICORP"
(SEE: PETITIONER'S EXHIBIT 26 AT P.P.
9 AND 10") AND SUBMITTED COPIES OF
THESE TWO (2) CHECKS TO THE GENEVA
COUNTY DISTRICT ATTORNEY DAVID EMERY
"ALONG WITH THE RICHARD LEWELLYN
REALESTATE LOAN FILE AND A COPY OF
PETITIONER'S WRITTEN CONTRACT WITH
RICHARD LEWELLYN AND SOUTH TRUST
BANK \ WACHOVIA BANK N.\A. (SEE:
PETITIONER'S EXHIBIT 27 AT R-"14-118")


26.

32. ON MARCH 7, 1997, PETITIONER'S RETAINED ATTORNEY KENNETH C. SHEETS, FURTHERED THE EXISTING CONSPIRACY TO DEPRIVE PETITIONER OF HIS SIXTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS TO HAVE EFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL AND ON DIRECT APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS WHEN HE TOOK PETITIONER'S MONEY AND FILED A MOTION TO WITHDRAW AS COUNSEL FOR CASES CC-96-219, 220 AND 221, (SEE: PETITIONER'S "EXHIBIT 30").

33. ON MARCH 28, 1997, PETITIONER WINSTON DAVIS HIRED ATTORNEY ROBERT C. FAIRCLOTH OF TROY, ALABAMA, TO FILE A CIVIL COMPLAINT AGAINST GARDY TOLLEY, MARSHA A. TOLLEY, "DONALD MINER, AND CITY BANK OF HARTFORD FOR INVASION OF PRIVACY BY OBTAINING A CREDIT REPORT ON WINSTON DAVIS WITHOUT LEGAL REASON OR CAUSE", CASE NO: CV-97-049 (W) IN GENEVA COUNTY CIRCUIT COURT.

23.

34. On March 14, 1997, Petitioner, while living in Harvest, Alabama, filed in open court his Pro Se motion to extend court date, defendant seeking new counsel for cases CC-96-219, 220 and 221. (See: Petitioner's "Exhibit 30")

35. Shortly thereafter, the Geneva County District Attorney David Emery, his investigator, Jimmy Hand, the Circuit Court Judge, Charles L. Woods, and the Geneva County Circuit Court P.J. P.B. McLaughlin furthered the existing conspiracy to deprive Petitioner of his Sixth and Fourteenth Amendment rights to have effective assistance of counsel (during trial) and on direct appeal to the Alabama Court of Criminal Appeals, when they conspired to have Petitioner arrested and housed in the Geneva County Jail, and forced into indigent and then appoint counsel who would assist in their objective (See: Petitioner's "Exhibits 30" "Exhibit 2 at 2-6" Exhibits 6 and 7")

24.

37. ON JUNE 3, 1997, THE MADISON COUNTY SHERIFF CAME TO PETITIONER'S HOME LOCATED 4356 OLD RAILROAD BED HARVEST, ALABAMA" TO ARREST "PETITIONER FOR" HIS FAILURE TO APPEAR AT TRIAL FOR CASES CC-96-219, 220 AND 221, SCHEDULED MAY 16, 1997, PETITIONER SHOWED THE MADISON COUNTY ALABAMA SHERIFF, THE LETTER FROM THE GENEVA COUNTY CLERK MS. THOMLEY SHOWED TRIAL DATE SCHEDULED FOR JUNE 9, 1997, (SEE; PETITIONER'S "EXHIBIT 30") AND PETITIONER "WAS NOT" ARRESTED.

38. ON JUNE 3, 1997, PETITIONER, HIRED ATTORNEY ROBERT C. FAIRCLOTH OF TROY, ALABAMA TO REPRESENT HIM IN CASES CC-96-219, 220 & 221.

39. ON JUNE 5, 1997, ATTORNEY FAIRCLOTH FILED NOTICE OF APPEARANCE AND MOTION TO CONTINUE (SEE; PETITIONER'S EXHIBIT 30.

40. ON JUNE 9,97 THE WARRANT WAS RECALLED. (SEE: PETITIONER'S EXHIBIT 30 ")

41. ON JUNE 10, 1997 MOTION TO PRODUCE OF DEFENDANT FILED FAIRCLOTH. (SEE: PETITIONER'S "EXHIBIT 30 ")

42. ON SEPTEMBER 15, 1997, DEFENDANTS SUPPLEMENTAL MOTION FOR DISCOVERY, FILED BY ATTORNEY FAIRCLOTH. (SEE: PETITIONER'S EXHIBIT 30 ")

43. ON SEPTEMBER 30, 1997, PETITIONER GOES TO TRIAL FOR CASES CC-96-219-220, AND 221, "WITHOUT AND DISCOVERY," CC-96-221

44. THE STATE CALLED WALLACE DOWLING OWNER OF DOWLING, LUMBER COMPANY, (HOLDER OF PETITIONER'S BUSINESS CHECK NO. 167 IN THE AMOUNT OF 607.20 "RETURNED NONSUFFICIENT FUNDS.") STOCKHOLDER OF HARTFORD FINANCIAL CORPORATION WHO OWNS PART OF CITY BANK OF HARTFORD,

26.

STATE WITNESS WALLACE DONIVIN
TESTIFIED THAT HE HAD ENTERED
INTO "A BUSINESS ARRANGEMENT"
WITH PETITIONER ON OCTOBER 9, 1995
(SEE: PETITIONER'S EXHIBIT 27 AT
"R-17")

"CC-96-220"

45. THE STATE CALLED LAMAR KIRKLAND
OWNER OF KIRKLAND PLUMBING AND
ELECTRIC COMPANY OF SLOCOMB, ALABAMA
HOLDER OF PETITIONER'S BUSINESS
CHECK NO. 180 IN THE AMOUNT OF
$4,900.00, "RETURNED NON SUFFICIENT FUNDS"

STATE WITNESS LAMAR KIRKLAND
TESTIFIED THAT HE HAD ENTERED
INTO A BUSINESS AGREEMENT ON
OR AROUND 10/10/95 WITH PETITIONER
(SEE: PETITIONER'S EXHIBIT 27 AT "R-
43, 44, AND 45")

27.

"CC-96-219"

46. THE STATE CALLED ASHLEY JOE THOMAS, HOLDER OF PETITIONER'S BUSINESS CHECK NO. 183, IN THE AMOUNT OF $372.00 RETURNED NONSUFFICIENT FUNDS

STATE WITNESS ASHLEY JOE THOMAS TESTIFIED THAT HE HAD ENTERED INTO A BUSINESS AGREEMENT WITH PETITIONER DURING THE FALL OF '95 AND HE BEGAN WORK ON RICHARD LEWELLYN'S NEW HOME AFTER IT HAD ALREADY BEEN FRAMED UP. (SEE: PETITIONER'S "EXHIBIT 27 AT R-57 AND 58.")

47. PETITIONER'S RETAINED ATTORNEY FAIRCLOTH BASED PETITIONER'S DEFENSE ON THE REASON HIS BUSINESS CHECKS NO'S 167, 180, AND 183, WAS THAT RICHARD LEWELLYN BREACHED HIS CONTRACT AND DIDN'T PAY DUES, AND THEREFORE THERE WAS NO INTENT TO DEPRIVE. (SEE: PETITIONER'S "EXHIBIT 27 AT R-70. — AND R-114" R-112")

28.

48. THE STATE BASED ITS PROSECUTION WHOLLY ON SURPRISE WITNESS HENRY F. LEE III SOUTH TRUST BANK \ WACHOVIA, BANK N | A.'S ATTORNEY ON PETITIONER, FALSE TESTIMONY AS FOLLOWS:

STATE SURPRISE WITNESS HENRY F. LEE, III TESTIFIED THAT BETWEEN JULY 28 AND AUGUST 16, 1995, RICHARD LEWELLYN'S MOTHER-IN-LAW GAVE PETITIONER $13,000.00 FOR RICHARD LEWELLYN ( SEE: PETITIONER'S EXHIBIT 27 AT X-115, ) AND SOUTH TRUST BANK PAID PETITIONER $13,000.00 (= $26,000.00 ) ON SEPTEMBER 1, 1995, AND AGAIN PAID PETITIONER $29,000.00 ( = $55,000.00 ) ON SEPTEMBER 29, 1995, ( SEE: PETITIONERS EXHIBIT 27 AT X-117" ) AND FURTHER,
HENRY F. LEE, III TESTIFIED THAT THE CONTRACT AMOUNT BETWEEN WINSTON DAVIS AND RICHARD LEWELLYN WAS $82,400.00 ( $55,000.00 = $27,400.00 ), ( SEE: PETITIONER'S EXHIBIT 27 AT X-117, 118" ) AND FURTHER,

29.

HENRY F. LEE III TESTIFIED THAT
THE $82,400.00 INCLUDED THE
$13,000.00 THAT RICHARD LEWELLYN'S
MOTHER-IN-LAW GAVE PETITIONER
FOR RICHARD LEWELLYN, AND FURTHER

HENRY F. LEE III TESTIFIED THAT
HE NOTIFIED PETITIONER OF WHY
HE WAS BEING TERMINATED, "DAVIS
HAD LEFT THE JOB (SEE, PETITIONER'S
"EXHIBIT 26 AT P.4") BECAUSE HE WAS
DEMANDING MORE MONEY, AND THE BANK
UPON THEIR INSPECTION WAS SAYING
DAVIS HADN'T EARNED THE MONEY HE
HAD ALREADY BEEN PAID( SEE, PETITIONER'S
EXHIBIT 27 AT R-120") AND FURTHER

HENRY F. LEE, III TESTIFIED THAT
AFTER DAVIS HAD LEFT THE JOB
DEMANDING MORE MONEY AND THE BANK
WAS SAYING HE HADN'T EARNED THE
MONEY HE HAD ALREADY BEEN PAID IT
COST RICHARD LEWELLYN AN ADDITIONAL
$50,000.00 TO COMPLETE HIS NEW
HOME ($27,400.00 BALANCE $50,000.00 TO

30.

COMPLETE HIS NEW HOME = — $22,600.00
TO MUCH. (SEE: PETETIONER'S
"EXHIBIT 27 AT π-119")

49. ON CROSS EXAMINATION OF STATE
SUPPOSE WITNESS HENRY F. LEE, III
BY MR. FAIRCLOTH:

QUESTION WAS PUT TO HENRY F. LEE III
ISN'T IT TRUE, THAT RICHARD LEWELLYN'S
MOTHER-IN-LAW GAVE MY CLIENT JUST
SLIGHTY IN EXCESS OF $9,000.00 ?

"NOT TO MY KNOWLEDGE, NO SIR."
ANSWERED HENRY F. LEE, III,

QUESTION WAS PUT TO HENRY F. LEE, III,
ISN'T IT TRUE THAT DONALD
MAIER AND OTHER BOARD MEMBERS OF
CITY BANK OF HARTFORD OBTAINED THE
COPIES OF CHECKS PAID TO MY CLIENT
BY MR. LEWELLYN'S MOTHER-IN-LAW
WAS OBTAINED FROM HER CHECKING
ACCOUNT AT CITY BANK OF HARTFORD
WITHOUT HER KNOWLEDGE, TO BE

31.

USED TO "PROSECUTE" MY CLIENT, BECAUSE
OF HIS CIVIL SUIT AGAINST DONALD
MARR AND CITY BANK OF HARTFORD
ISN'T THAT TRUE? (CV-97-049(W))

"YES" ANSWERED HENRY F. LEE, III
SOUTH TRUST BANK OF ALABAMA
WACHOVIA BANK N\A'S ATTORNEY,
ON RETAINER. (SEE PT. EX. 26 AT P. 6.")

MR FAIRCLOTH:
        YOUR HONOR, I SUBMIT
DEFENDANT'S EXHIBIT 6 (SEE PETITIONER
EXHIBIT 27 AT C-131) TO PROVE
THE STATE FAILED TO PROVE A
PRIMA FACIE CASE THAT WHEN
MY CLIENT WROTE THOSE CHECKS
HE FULLY AND EXPECTED SOUTH
TRUST BANK TO HONOR HIS CONTRACT
AND PAY MY CLIENT, HIS SUB-
CONTRACTORS AND MATERIAL SUPPLIERS
FOR WORK, LABOR AND MATERIAL
FURNISHED TO RICHARD LEWELLYN'S
NEW HOME AFTER THE SEPTEMBER
PAYMENT OF $29,000.00,

                    32.

YOUR HONOR, THE REASON MY
CLIENT'S BUSINESS CHECKS
WERE BAD IS BECAUSE RICHARD
LEWILLYN'S BREACHED HIS CONTRACT
AND DIDN'T PAY MY CLIENT
THEREFORE THERE WAS NO INTENT
TO DEPRIVE.

AND WE MOVE FOR A
JUDGMENT OF ACQUITTAL.

THE COURT: "DENIED"

50. AT THE CONCLUSION OF TRIAL
AND THE JURY WERE IN THE
ACT OF DELIBERATING THEIR VERDICTS,
THE GENEVA COUNTY DISTRICT ATTORNEY
DAVID EMERY "FURTHERED" THE EXISTING
CONSPIRACY TO DEPRIVE PETITIONER
OF HIS FOURTEENTH AMENDMENT RIGHT
UNDER THE UNITED STATES CONSTITUTION
TO HAVE A FUNDAMENTAL FAIR TRIAL
AND DUE PROCESS OF LAW, WHEN HE
WALKED OUT OF THE FRONT DOOR OF THE
COURT, AROUND BACK THROUGH THE COUNTY,
JAIL UP STAIRS INTO THE JURY ROOM

33.

AND WAS HEARED BY PETITIONER'S RETAINED COUNSEL ROBERT C. FAIRCLOTH SCREAMING AT THE JURIORS TO RETURN VERDICTS FENDING PETITIONER WINSTON DAVIS GUILTY AS CHARGED IN THE INDICTMENTS AND THE JURIORS DID. (SEE: PETITIONER'S EXHIBITS 30 AND EXHIBIT 8 AT R-382")

51. SHORTLY THERE AFTER ATTORNEY FAIRCLOTH GOES TO INFORM THE GENEVA COUNTY CIRCUIT COURT JUDGE, CHARLES L. WOODS OF THE WILLFULL MISCONDUCT OF THE DISTRICT ATTORNEY DAVID EMERY, AND THE TRIAL COURT JUDGE CHARLES L. WOODS "EXERTED UNDUE INFLUENCE" OVER PETITIONER'S RETAINED TRIAL COUNSEL NOT TO PRESUE ARGUMENT FOR A NEW TRIAL AND OTHER RELIEF PETITIONER WAS ENTITLED.

34.

52. ON OCTOBER 31, 1997, THE GENEVA COUNTY CIRCUIT COURT JUDGE, CHARLES L. WOODS SENTENCED PETITIONER TO FOUR YEARS IN THE STATE PENITENTIARY IN EACH CASE AND THE SENTENCES WERE ORDERED TO RUN CONCURRENTLY AND PETITIONER WAS PLACED ON THREE (3) YEARS PROBATION, PETITIONER WAS ORDERED TO PAY RESTITUTION TO ASHLEY JOE THOMAS CC-96-219, KIRKLAND PLUMBING COMPANY, CC-96-220 AND DOWLING LUMBER CC-96-221 (SEE: PETITIONER'S "EXHIBITS 17 AND 18".)

53. ON NOVEMBER 4, 1997, ATTORNEY FAIRCLOTH FILED PETITIONER'S NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS ("FOR FREE")

54. ON NOVEMBER 4, 1997, DONALD MAUR, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEIBENHENER, STOCK-HOLDERS OF HARTFORD FINANCIAL CORP.

35.

WHO WHOLLY OWN CITY BANK OF HARTFORD "INSTRUCTED" GRADY TOLLEY A.K.A. WOLEY TOLLEY" (SEE: PETITIONER'S EXHIBET 22 AND 22(A)) "TO BURN THE OLD FARM BUILDING LOCATED AT ROUTE 3 COUNTY ROAD 55 HARTFORD, AL 36344" TO THE GROUND, CITY BANK OF HARTFORD AS LIENHOLDER WOULD COLLECT "50,000.00" AND THAT MONEY WOULD BE LAUNDRYED THROUGH CITY BANK OF HARTFORD TO THE PARTIES OF THE ARSON RING. (SEE: PETITIONER'S EXHIBET 22(A) WHICH STATES IN PERTINENT PART:

"BLACK DEPARTMENT ADVISED THEY CAME TO THE RESIDENCE ON FRIDAY TO A FIRE THAT WAS CONFINED TO THE LAUNDRY ROOM AREA — SEE: PETITIONER'S EXHIBET 21(D)")

55. ON NOVEMBER 8, 1997, DONALD MAER, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEEBENHENER, STOCKHOLDERS OF HARTFORD FINANCIAL CORP. WHO WHOLLY OWN CITY BANK OF

36.

HARTFORD INSTRUCTED "GRADY TOLLEY
A.K.A. WILEY) TOLLEY" TO USE
"GASOLINE" AND BURN THE OLD FARM
BUILDING LOCATED AT ROUTE 3 COUNTY
ROAD HARTFORD, ALABAMA TO THE
GROUND AND HE DID (SEE: PETITIONER'S
"EXHIBIT 2C AND 22(7)") AND "DEFRAUDED"
STATE FARM INSURANCE COMPANY OUT
OF $50,000.00

56. ON OR ABOUT DECEMBER 1, 1997, THE
GENEVA COUNTY CIRCUIT COURT
JUDGES CHARLES L. WOODS, AND
P.B. MCLAUCHLEN EXERTED UNDUE
INFLUENCE OVER RACHAL HOOD, COURT
REPORTER TO "OMITT" PETITIONER
RETAINED COUNSEL FAIRCLOTH'S
ARGUMENT WITH HENRY F. LEE III
SOUTH TRUST BANK | WACHOVIA BANK
N\A'S ATTORNEY) AND COURT REPORTER
"RACHAL HOOD JOINED THE CONSPIRACY
TO DEPRIVE PETITIONER OF HIS
FOURTEENTH AMENDMENT RIGHT TO THE
UNITED STATES CONSTITUTION TO HAVE
A FULL AND FAIR HEARING AT THE

37.

ALABAMA COURT OF CRIMINAL APPEALS
(SEE: PETITIONER'S EXHIBIT 27 AT
R- ?????... "JUST DISAPPEARED.)

57. SHORTLY THERE AFTER, NEGIL HOLLEY,
STATE FARM'S AGENT, ISSUED GRADY
TOLLEY A FULL REPLACEMENT COST
FIRE POLICY ON THE HOME LOCATED
AT 500 HILCREST DRIVE HARTFORD,
AL 36344 (SIE: PETITIONER'S
"EXHIBIT L(A)") WITH INTENT THAT
GRADY TOLLEY WOULD BURN THE HOME
TO THE GROUND, CITY BANK OF
HARTFORD AS LIENHOLDERS WOULD
COLLECT OVER $60,000.00 TO BE LAUNDRYED
THROUGH CITY BANK TO BE DISBURSED
TO THE PARTIES OF THE ARSON RING.

58 SHORTLY THEREAFTER, DAVID EMERY,
GENEVA COUNTY DISTRICT ATTORNEY
SENT APPELLEES, "ALABAMA ATTORNEY
GENERAL, BILL PRYOR AND HIS ASSISTANT
ATTORNEY, JEAN A. THERKELSEN"
EVIDENCE HE "SUPPRESSED" FROM
PETITIONER DURING TRIAL FOR CASES

38.

CC-96-219, 220 AND 221, "TO ASSIST HIM IN THE DEPRIVATION OF PETITIONER'S CIVIL RIGHTS."

58. ON OR ABOUT JANUARY 8, 1998, PETITIONER OBTAINED HIS EXHIBITS 22 AND 22(A) AND GOES TO STATE FARM'S CLAIMS OFFICE IN DOTHAN, ALABAMA, MET MS. WANDA NETHERFORD, CLAIMS ADJUSTER, AND SUBMITTED A COPY OF HIS EXHIBIT 22 AND 22(A). DURING THIS MEETING WE DISCUSSED NICK HOLLEY, STATE FARMS AGENT, WRITING POLICYS TO GRADY TOLLEY UNDER ASSUMED NAMES, THERE FORE HE IS A PARTY TO THE ARSON RING, WHICH INVOLVES CITY BANK OF HARTFORD BOARD MEMBERS.

59. SHORTLY THEREAFTER, PETITIONER GOES TO THE GENEVA COUNTY DISTRICT ATTORNEY, DAVID EMERY, SUBMITTED A COPY OF HIS EXHIBIT 22 AND 22(A) AND DEMANDED AN INVESTIGATION INTO THE ARSON RING. DURING THIS MEETING

39.

DISTRICT ATTORNEY DAVID EMERY
ADVISED PETITIONER TO GET THE
HELL OUT OF HIS OFFICE AND FOR
PETITIONER TO MIND HIS OWN
DAMNED BUSINESS.

60. ON OR ABOUT FEBRUARY 26, 1998,
PETITIONER'S APPELLATE COUNSEL
ROBERT C. FAIRCLOTH OF TROY, ALABAMA
"JOINED THE EXISTING CONSPIRACY"
TO DEPRIVE PETITIONER OF HIS
SIXTH AMENDMENT TO THE UNITED
STATES CONSTITUTION TO HAVE
EFFECTIVE ASSISTANCE OF COUNSEL
ON DIRECT APPEAL TO THE ALABAMA
COURT OF CRIMINAL APPEALS WHEN
HE "WILLFULLY AND INTENTIONALLY"
FAILED TO PRESENT ARGUMENT
THAT THE GENEVA COUNTY DISTRICT
ATTORNEY" DAVID EMERY TAMPERED
WITH THE JURY' AND THAT
"SUBSTANTIAL PORTIONS OF THE TRIAL
COURT TRANSCRIPT ON DIRECT APPEAL
WERE OMITTED," WHEN HE FAILED

40.

APPELLATE BRIEF AND ARGUMENT
(SEE: PETITIONER'S EXHIBITS 27
AT P- ???? EXHIBIT 28 AT P. 3 ")
"ACT THREE:"

61. ON MARCH 11, 1998, APPELLEES, ALABAMA
ATTORNEY GENERAL Bell PRYOR AND
HIS ASSISTANT ATTORNEY, JEAN A.
THERKELSEN "JOINED THE EXISTING
CONSPIRACY TO DEPRIVE PETITIONER
OF HIS FOURTEENTH AMENDMENT
RIGHT TO THE UNITED STATES
CONSTITUTION TO DUE PROCESS OF
LAW TO HAVE A FULL AND FAIR HEARING
AT THE ALABAMA COURT OF CRIMINAL
APPEALS WHEN THEY FILED APPELLEE'S
BRIEF AND ARGUMENTS AND THEREIN
AT PAGE 7 WHICH STATES IN PERTINENT
PART:

" DAVIS WAS TERMINATED IN A
LETTER SENT BY THE BANK ON
NOVEMBER 17, 1995 " CITING
TRIAL COURT TRANSCRIPT ON DIRECT
APPEAL " R-119 " ( SEE: PETITIONER'S
" EXHIBIT 27 AT R-119 " STATES IN
PERTINENT PART:

41.

"AND YOU WERE INVOLVED IN
THE TERMINATION OF MR. DAVIS
WERE YOU NOT?

YES SIR, I WROTE MR. DAVIS
A LETTER FOR MR. LEWELLYN
"EARLY IN NOVEMBER OF 1995"
SAYS HENRY F. LEE, III, SOUTH
TRUST BANK OF ALABAMA \ WACHOVEA
BANK N\A'S ATTORNEY ON RETAINER..."

PETITIONER ASSERTS THAT THE
TRIAL COURT RECORDS ON DIRECT
APPEAL IS DEVOID OF THE DATE
NOVEMBER 17, 1995, BUT THAT
DATE IS FOUND IN SOUTH TRUST
BANK RECORDS OF RICHARD LEWELLYN'S
LOAN FILE SEE: PETITIONER'S
"EXHIBIT 26 AT PAGES 14 AND 15"
WHICH STATES IN PERTINENT PART:

"LAW OFFICE OF HENRY F. LEE, III
        DATED NOVEMBER 17 1995"
"ABSOLUTE PROFF" THAT THE GENEVA

42.

COUNTY DISTRICT ATTORNEY DAVID EMERY "SUPPRESSED" SOUTH TRUST BANK RECORDS DURING TRIAL, AND FORWARDED THE SAME TO ALABAMA ATTORNEY GENERAL, BILL PRYOR AND HIS ASSISTANT ATTORNEY, JEAN A THERKELSEN TO PROTECT THE ARSON RING".

Q. ON MARCH 25, 1998, PETITIONER'S APPELLATE COUNSEL, ROBERT C. FAIRCLOTH, FURTHERED THE EXISTING CONSPIRACY TO DEPRIVE PETITIONER OF HIS CIVIL RIGHTS WHEN "HE WILLFULLY AND INTENTIONALLY FAILED TO FILE A REBUTTAL BRIEF OF APPEAL AND PRESUE ARGUMENT THAT APPELLEES ARE CITING THINGS NOT FOUND IN THE TRIAL COURT TRANSCRIPT ON DIRECT APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS, "ABSOLUTE PROOF," APPELLATE COUNSEL WAS PROTECTING THE ARSON RING.

43.

63. ON AUGUST 19, 1998, PETETROWER, WHILE LIVING IN MADISON, ALABAMA ENTERED INTO A WRITTEN CONTRACT WITH A LADY FROM DESTIN, FLORIDA ALICE N. KELLY FOR HOME IMPROVEMENT TO A HOME LOCATED AT 115 E. CAMPBELL AVE. GENEVA, ALABAMA, THAT ALICE N. KELLY PURCHASED FOR HER AGED MOTHER.

64. ON AUGUST 28, 1998, THE ALABAMA COURT OF CRIMINAL APPEALS ISSUED A MEMORANDUM OPINION AFFIRMING DAVIS'S CONVICTION FOR CASES CC-96-219, 220 AND 221, BASED WHOLLY ON FRAUD AND MISREPRESENTION OF MATERIAL FACTS SUBMITTED IN APPELLEE BRIEF AND ARGUMENT OF ALABAMA ATTORNEY GENERAL BILL PRYOR AND HIS ASSISTANT ATTORNEY, JEAN A. THERKELSEN (SEE; PETETROWER'S "EXHIBIT 28").

44.

## ACT FOUR:

65. ON AUGUST 29, 1998, APPELLATE COUNSEL ROBERT C. FAIRCLOTH, FURTHERED THE EXISTING CONSPIRACY TO DEPRIVE PETITIONER OF HIS FOURTEENTH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION WHEN HE "WILLFULLY AND INTENTIONALLY" FAILED TO INFORM PETITIONER THAT THE ALABAMA COURT OF CRIMINAL APPEALS HAD AFFIRMED PETITIONER'S CONVICTIONS UNTIL THE TIME TO SEEK A PETITION FOR WRIT OF CERTIORARI TO THE ALABAMA SUPREME COURT HAD EXPIRED PURSUANT TO RULE 39 (B) ALABAMA RULES OF APPELLATE PROCEDURE, AND DEPRIVED PETITIONER OF HIS RIGHT TO FILE A PETITION FOR CERTIORARI TO THE UNITED STATES SUPREME COURT.

66. ON OCTOBER 17, 1998, DONALD MINER, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEIBENHENER, STOCKHOLDERS OF HARTFORD FENWICK CORP. WHO WHOLLY OWN CITY BANK OF HARTFORD

45.

Who wholly own City Bank of Hartford, Neil Holley, State Farm's Agent, Henry F. Lee, III, South Trust Bank \ Wachovia Bank Attorney on Retainer, the Geneva County District Attorney, David Emery, His Investigator, Jimmy Hard, the Geneva County Circuit Court Judges, Charles L. Woods and P.B. McLauchlen instructed Gandy Tolley the Arsonist to Burn the House Located at 500 Hillcrest Drive Hartford, AL 36344 to the Ground, City Bank of Hartford as Lienholder would Collect over $60,000.00 from State Farm, and that money was Laundered through City Bank of Hartford and Disbursed to the Above Parties. (See: Petitioner's "Exhibit 1(A)".)

46.

67. ON OCTOBER 18, 1998, PETETEONER, STAYING AT A MOTEL IN GENEVA, ALABAMA, WHILE WORKING ON ALICE R. KELLY'S HOME, PETETEONER SEE'S CANDY TOLLEY AND HIS FAMILY STAYING AT THE SAME MOTEL, TOLLEY BOST THAT HE HAD A FIRE AND STATE FARM IS PAYING HIS BILLS, PETETEONER GOES TO STATE FARM'S CLAIMS OFFICE IN DOTHAN, ALABAMA AND INFORMED MRS. RETHERFORD CLAIMS ADJUSTER THAT HE DEMANDED AN INVESTIGATION INTO THE ARSON RING, MRS. RETHERFORD INFORMED PETETEONER TO GO BACK TO HIS MOTEL AND SHE WOULD HAVE SOMEONE TO CALL PETETEONER REGARDING THE ARSON RING, PETETEONER DID.

68. ON OCTOBER 18, 1998, MR. GARY CANTEE, INVESTIGATOR FOR THE ALABAMA FIRE MARCHAL'S OFFICE CALLED PETETEONER, PETETEONER GAVE A TAPED RECORDED STATEMENT AS TO

47.

WHO WAS A PARTY TO THE ARSON
RING,

69. ON OCTOBER, 19, 1998, CARY CRATEE,
INVESTIGATOR FOR THE ALABAMA
FIRE MARSHAL'S OFFICE GOES TO
GENEVA COUNTY DISTRICT ATTORNEY DAVID
EMERY AND OBTAINED A WARRANT FOR
THE ARREST OF GANDY TOLLEY FOR
ARSON IN THE SECOND-DEGREE
(SEE; PETITIONER'S EXHIBIT I (A)


"ENCORE"


70. BETWEEN NOVEMBER 30,1998, THROUGH
?-2- 1999, DURING THE TIME PETITIONER
HAD HIS HERNIA OPERATION, THE
GENEVA COUNTY DISTRICT ATTORNEY
DAVID EMERY, AND HIS INVESTIGATOR
JIMMY HAND SEEKED OUT ALICE R. KELLY,
GOES TO THE JOB SITE, TELLS ALICE
R. KELLY THAT PETITIONER "HAD NOT"
DONE $30,000.00 WORTH OF WORK ON HER
HOUSE (SEE; PETITIONER'S "EXHIBIT 20 AT

48.

pp. 86, 87-94, 95, 96") CAUSING ALICE R. KELLY TO BE FRUSTRATED, AGGRAVATED AND SUFFER MENTAL ANGUISH (SEE: PETITIONER'S EXHIBIT 3 AT PP. 16 AND 17") CAUSING ALICE R. KELLY TO BREACH HER CONTRACT WITH PETITIONER, OWING PETITIONER OVER $25,000.00 (SEE: PETITIONER'S "EXHIBIT 13 AT C-30 THROUGH 34")

71. ON JULY 14, 1999, PETITIONER GAVE A TAPED RECORDED STATEMENT TO THE GENEVA COUNTY DISTRICT ATTORNEY'S INVESTIGATOR, JIMMY HAND, REGARDING PETITIONER'S WRITTEN CONTRACT WITH ALICE R. KELLY, DURING THIS INTERVIEW, INVESTIGATOR HAND ATTEMPTED TO "EXTORT" MONEY FROM PETITIONER OR FACE CRIMINAL PROSECUTION OF A FICTITIOUS CHARGE OF THEFT BY DECEPTION (SEE: PETITIONER "EXHIBIT 20 AT PP. 61 THROUGH 67, AND THEN REVIEW PAGES 94, 95. WHICH

49.

STATES IN PERTINENT PART:

HAND: WELL, "HERE IS MY ONLY
POINT MINE AND THE D.A.";
WE WENT AROUND THERE
AND LOOKED AT THE HOUSE.
THE LITTLE HOUSE IS NOT
WORTH - -

DAVES: "THAT'S NOT MY PROBLEM.
THEY TOLD ME WHAT THEY
WANTED AND I CHARGED THEM
A PRICE AND THEY AGREED
UPON IT..."

DAVES: "I HAD A LOT OF WORK
IN THERE TRYING TO - -

HAND: WELL, "I'M NOT ARGUING THAT
MY POINT ABOUT IT IS THAT
YOU GOT PAID $ 31,000.00...?

PETITIONER'S ARGUMENT IS, IF
THE GENEVA COUNTY DISTRICT ATTORNEY

50.

DAVID EMERY, AND HIS INVESTIGATOR, TOMMY HAND'S "ONLY POINT WAS PETITIONER WAS PAID $ 31,000.00" AND UPON REVIEW OF PETITIONER'S EXHIBITS 16, 17 AND 18, PETITIONER'S RESTITUTION FUNDS OF $1,280.00 FOR CRIMINAL CASES CC. 96-219, 220 & 221, WAS DEPOSITED INTO A WORTHLESS CHECK ACCOUNT PURSUANT TO CODE OF ALABAMA § 12-17-224 AS MEMBERS OF THE WORTHLESS CHECK UNIT STOLE THAT MONEY FOR THEIR OWN PERSONAL GAIN, ONE CAN ONLY BELIEVE THAT THE DISTRICT ATTORNEY AND HIS INVESTIGATOR WAS ATTEMPTING TO "EXTORT $3,100.00 FROM PETITIONER TO AVOID PROSECUTION OF A FICTITIOUS CRIMINAL CHARGE..."

51.

22. ON OR ABOUT AUGUST 1, 1999, DONALD MINER, PAUL KENNEDY, WILLIAM KENNEDY, WALLACE DOWLING, RILEY SEELBENHENER, STOCKHOLDERS OF HARTFORD FENWICK CORPORATION WHO WHOLLY OWN CITY BANK OF HARTFORD, NICK HOLLEY, STATE FARM'S AGENT, HENRY F. LEE, III SOUTH TRUST BANK OF ALABAMA \ WACHOVIA BANK N\A'S ATTORNEY ON RETAINER, THE GENEVA COUNTY DISTRICT ATTORNEY, DAVID EMERY, HIS ASSISTANT ATTORNEY DAVID ATWELL, HIS INVESTIGATOR TOMMY HAWD. AND THE CIRCUIT COURT JUDGES, CHARLES L. WOODS, P. B. MCLAUGHLIN, EXERTED UNDUE INFLUENCES OVER THE GENEVA COUNTY CHIEF DEPUTY SHERIFF, KEN TICE TO ARREST PETITIONER WINSTON DAVIS "WITHOUT A WARRANT," "WITHOUT A SIGNED COMPLAINT" (SEE: PETITIONER'S "EXHIBIT 20(C)") WITHOUT PROBABLE CAUSE.

52.

73. ON AUGUST 5, 1999, CHIEF DEPUTY
SHERIFF, "KEN TECE JOINED THE
EXISTING CONSPIRACY TO MURDER
PETITIONER" WHEN HE ARRESTED
PETITIONER WITHOUT PROBABLE
CAUSE, BOOKED PETITIONER INTO
THE COUNTY JAIL, PETITIONER
REQUESTED A COPY OF THE COMPLAINT,
A COPY OF THE WARRANT, OFFICER
TECE INSTRUCTED PETITIONER TO
SEE THE SHERIFF GREG WARD,
PETITIONER DID, SHERIFF WARD
SAYS HE HAD NO WARRANT,
SHERIFF WARD, PETITIONER GOES
TO THE CLERK MS THOMLEY, SHE SAYS
SHE HAS NO WARRANT NOR A
COMPLAINT, SHERIFF WARD, PETITIONER
AND MS THOMLEY GOES TO THE
DISTRICT ATTORNEY DAVID EMERY,
HE SAYS HE HAS NO COMPLAINT,
NOR A COPY OF THE WARRANT FOR
PETITIONERS ARREST,

"PETITIONER ASSERTS THAT HE
FILED AN AFFIDAVIT, EX. A AND IS STILL
UNDER OATH Winata Dennis

S3.

PETITIONER WAS RELEASED ON A $50,000.00
PROPERTY BOND WHICH WAS POSTED BY
HIS SISTER AND UNEXPECTED.

74. ON AUGUST 6, 1999, THE GENEVA COUNTY
DISTRICT ATTORNEY DAVID EMERY,
AND HIS ASSISTANT ATTORNEY DAVID
ATWELL, HIS INVESTIGATOR, JIMMY
IAND, THE CIRCUIT COURT JUDGES
CHARLES L. WOODS AND P. B. MCLAUGHLIN
CAUSED THE INDICTMENT CC-99-186
TO BE ISSUED "WITHOUT A GRAND
JURY" (SEE: PETITIONER'S EXHIBIT 31 ")
FOUND IN THE TRIAL COURT TRANSCRIPT
ON DIRECT APPEAL TO THE ALABAMA
COURT OF CRIMINAL APPEALS AT C-227-
228 AND 229."

75. ON AUGUST 30, 1999, "GREG HUGHES
ALABAMA BOARD OF PARDONS AND PAROLES
OFFICER JOINED THE EXISTING CONSPIRACY
TO MURDER PETITIONER WINSTON DAVIS
WHEN HE RECOMMENDED TO THE COURT
TO SET A $50,000.00 REVOCATION OF
PROBATION BOND FOR CASES CC-96-219, 220 + 221

54.

(SEE: PETITIONER'S "EXHIBIT 2 AT R-3")

76. ON JANUARY 25, 2000, COURT APPOINTED TRIAL COUNSEL CHARLES W. BLANKENEY "JOINED THE EXISTING CONSPIRACY TO MURDER PETITIONER (SEE: PETITIONER'S EXHIBITS ATTACHED TO THIS INSTANT PETITION EXHIBITS 5,6,7,8,9 AND 10")

77. ON MAY 8, 2000, RESPONDENT, ALABAMA ATTORNEY GENERAL, BILL PRYOR, HIS ASSISTANT ATTORNEY JEAN A. THERKELSEN "JOINED THE EXISTING CONSPIRACY TO MURDER PETITIONER WINSTON DAVIS" WHEN THEY MADE FALSE STATEMENTS TO THIS COURT THAT PETITIONER (SEE: PETITIONER'S EXHIBIT 29 AT P9, PARAGRAPH 11,") DAVIS MAY HAVE ISSUES THAT ENTITLED HIM TO AN OUT-OF-TIME APPEAL KNOWING THAT PURSUANT TO CODE OF ALA 1975 § 12-12-19C CASES CITED THEREIN THAT THERE IS NO SUCH CREATURE AS AN OUT OF TIME APPEAL. CITING <u>CoolSBY V. STATE</u>

55.

374 SO.2D 927 (ALA CRIM. APP 1978")

78. ON OR ABOUT JUNE 30, 2000, COURT APPOINTED APPELLATE COUNSEL'S TRACY BIXSONG AND L. SCOTT JOHNSON JR. JOINED THE CONSPIRACY TO MURDER PETITIONER WINSTON DAVIS WHEN THEY WERE APPOINTED APPELLATE COUNSEL'S ON JUNE 30, 2000, AND WILLFULLY AND INTENTIONALLY FAILED TO ASSURE PETITIONER'S APPEAL TO THE CONVICTION AND SENTENCE OF 40-YEARS WAS DOCKETED WITH THE ALABAMA COURT OF CRIMINAL APPEALS IN A TIMELY MANNOR. AND FILED A BRIEF OF APPELLATE KNOWING THE CIRCUIT COURT HAD NO POWER TO EXTEND THE TIME FOR FILING THE RECORDS IN THE CRIMINAL APPEALS (PURSUANT TO CODE OF ALABAMA 1975 § 12-12-19C ) AND THEN FILED AN ANDERS BRIEF STATING THE COULD FIND NO ERRIORS IN THE RECORDS ( SEE: PETITIONER'S EXHIBITS 9 AT R-405, EXHIBIT 11 DATE OF NOTICE OF APPEAL 10/10/2000)

56.

79. ON OCTOBER 26, 2000, PETITIONER GAVE NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS FROM THE DENIAL OF DEFENDANTS MOTION TO ARREST JUDGMENT, (SEE: PETITIONER'S EXHIBIT 12")

80. SHORTLY THEREAFTER THE GENEVA COUNTY CLERK MRS THROMLEY JOINED THE EXISTING CONSPIRACY TO MURDER PETITIONER WHEN SHE WILLFULLY AND INTENTIONALLY FAILED TO DOCKET PETITIONER'S NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS.

81. ON MARCH 9, 2001, THE ALABAMA COURT OF APPEALS AFFIRMED DAVIS'S CONVICTION OF FIRST-DEGREE THEFT IN A MEMORANDUM OPINION.(SEE: ANSWER TO SHOW CAUSE FOUND IN THIS INSTANT PETITION AT PP. 2 Y 3 PARAGRAPH 5")

57.

82. ON OR ABOUT MARCH 20, 2001, PETITIONER FILED A PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS ATTACHED A RULE 39(K) AND RULE 40 PURSUANT TO ALA R. APP. PROCEDURE (SEE: PETITIONER'S "EXHIBIT 32")

83. ON JUNE 10, 2001, PETITIONER WITH MENTAL CUSTODY HOUSED AT ELMORE CORRECTIONAL CENTER WAS TRANSPORTED TO DRAPER CORRECTIONAL CENTER A LEVEL 4 WITHOUT LEGAL REASON OR CAUSE, WHICH WAS LOCKED DOWN FOR TWO TO THREE WEEKS, WITHOUT ACCESS TO THE LAW LIBRARY.

84. ON OR ABOUT JUNE 23, 2001, PETITIONER RECEIVED HIS EXHIBIT 32 WHICH STATES IN PERTINENT PART:

CERTIFICATE OF JUDGMENT

THE PETITION FOR WRIT OF CERTIORARI IS DENIED FOR LACK OF COMPLIANCE WITH RULE 39, ALA. RULES OF APP. PRO.

57

85 ON FEBRUARY 18, 2004, PETITIONER WAS GRANTED PAROLE 4 1/2 YEARS EARLY AND WAS REQUIRED TO REGISTER AS AN A CONVICTED FELON (SEE: PETITIONER'S "EXHIBIT 33")

86. ON FEBRUARY 28, 2004, PETITIONER FOUND HIS "EXHIBITS 20, 20(A) 20(B) 20(C) AT HIS SISTER' JUDY SNYDER HOUSE, 519 SANTOLEAR RD. DOTHAN, AL 36303 SENT TO HER FROM COURT APPOINTED TRIAL COUNSEL CHARLES C. BLAKENEY POST MARKED SEPT. 01, 2000.

87. ON JUNE 3, 2004, PETITIONER RECEIVED (HIS EXHIBIT 15,")

88. ON AUGUST 20, 2004, PETITIONER RECEIVED HIS "EXHIBIT 13".

89. ON FEBRUARY 2, 2005, PETITIONER RECEIVED HIS EXHIBITS 17 AND 18

PETITIONER TIME AND TIME AGAIN GOES TO THE GENEVA COUNTY CLERK'S

58.

OFFICE AND DEMANDED COPIES OF
CHECKS PAID TO THE SO CALLED
VICTIMS, LAMAR KIRKLAND - CC-96-220.
WALLACE DOWLING CC-96-221,
TIME AND TIME THE GENEVA
COUNTY CLERK GAYLE LAYE DENIED
PETITIONER'S DEMANDS.

90. ON FEBRUARY 2, 2006, PETITIONER
OBTAINED HIS "EXHIBIT 19"

91. ON SEPTEMBER 21, 2006, PETITIONER
FILED THIS INSTANT PETITION
AND ACCUSED THE CIRCUIT COURT
JUDGE CHARLES L. WOODS OF
"OUTRAGEOUS ACTS" HE COMMITTED
AGAINST PETITIONER; WHILE ACTING
UNDER THE COLOR OF THE STATE'S
AUTORITY AND DEPRIVED PETITIONER
OF EQUAL ENJOYMENT OF RIGHTS
SECURED BY LAW TO ALL, FOURTEENTH
AMENDMENT TO THE UNITED STATES
CONSTITUTION . . . "

59.

92. ON SEPTEMBER 27, 2006, THIS COURT ISSUED ORDER TO RESPONDENTS ALABAMA ATTORNEY GENERAL TROY KING TO SHOW CAUSE.

93. ON OCTOBER 27, 2006, RESPONDENTS ALABAMA ASSISTANT ATTORNEY GENERAL JEAN A. THERKELSEN FURTHERED THE EXISTING CONSPIRACY TO DEPRIVE PETITIONER OF HIS CIVIL RIGHTS WHILE ACTING UNDER THE STATE'S AUTHORITY TO DEPRIVE PETITIONER OF RIGHTS SECURED BY LAW TO ALL UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION..." WHEN SHE WILLFULLY AND INTENTIONALLY FAILED TO SUBMIT PETITIONER'S EXHIBIT 32, (SEE: RESPONDENTS ANSWER, IS DEVOID OF ANY PETITION FOR WRIT OF CERTIORARI") HOWEVER, RESPONDENTS "DID NOT DENY" THE OUTRAGEOUS ACTS THAT THE TRIAL COURT COMMITTED AGAINST PETITIONER AND BASED THE STATE'S DEFENCE

60.

ON PETITIONER'S PETITION WAS FILED OUTSIDE OF THE ONE-YEAR LIMITATION PERIOD PURSUANT TO TITLE 28 U.S.C. § 2244 (D)(1).

94. ON NOVEMBER 1, 2006 THIS COURT ISSUED ORDER (DOCUMENT # 11:1) ON MOTION, WHICH STATES IN PERTINENT PART: AT P. 2.

"UPON REVIEW OF THE PLEADING IN THIS CASE AND THE LAW OF THIS CIRCUIT, IT APPEARS THAT PETITIONER'S § 2254 PETITION IS PRECLUDED FROM REVIEW BY THIS COURT AS IT WAS FILED OUTSIDE THE APPLICABLE PERIOD OF LIMITATION." AND FURTHER,

AT P. 4
" ORDERED THAT ON OR BEFORE NOVEMBER 21, 2006, PETITIONER SHALL SHOW CAUSE WHY HIS FEDERAL HABEAS PETITION SHOULD NOT BE DENIED - - - "

61.

95. ON NOVEMBER 16, 2006, PETITIONER FILED HIS RESPONSE TO RESPONDENTS ANSWER, PURSUANT TO THIS HONORABLE COURT'S ORDER TO SHOW CAUSE AS TO WHY HIS FEDERAL HABEAS CORPUS PETITION SHOULD NOT BE DENIED UNDER "EXTRAORDINARY CIRCUMSTANCES" PETITIONER WITHOUT FILING A MOTION TO AMEND THIS INSTANT PETITION, SUBMITTED EXHIBITS NUMBERS 14 THROUGH 23 ATTACHED TO SHOW THAT WILLFUL AND INTENTIONAL DEPRIVATIONS CAUSED THE CONVICTION OF AN INNOCENT PERSON.

96. ON DECEMBER 20, 2006, PETITIONER FILED MOTION TO EXTEND THE TIME FOR FILING MOTION TO AMEND THIS INSTANT PETITION MOTION TO CORRECT HIS ERRORS.

97. ON JANUARY 4, 2007 THIS COURT ISSUED ORDER (DOCUMENT # 19-1) GRANTING PETITIONER'S MOTION FOR

62.

EXTENTION OF TIME. TO AMEND THIS PETION.

98. ON OR ABOUT DECEMBER 9, 2007,
PETITIONER FILED SECOND MOTION
FOR EXTENTION OF TIME TO AMEND
( DOCUMENT # 21 )

99. ON JANUARY 11, 2007, THIS COURT
GRANTED PETITIONER'S MOTION TO
( DOCUMENT # 22-1 ) AMEND AND IS
DUE JANUARY 22, 2007.

63.

GROUNDS OF THIS PETITION

## GROUND THREE:

CONSPIRACY; AGAINST PETITIONER
WINSTON DAVIS'S CIVIL RIGHTS.
CONSPIRACY: TO DEPRIVE PETITIONER,
WINSTON DAVIS' OF HIS CIVIL RIGHT
WHILE ACTING UNDER THE COLOR
OF STATE LAW).

PETITIONER INSERTS THAT THE CONVICTIONS
FOR GENEVA COUNTY CIRCUIT COURT
CASES CC-96-219, 220, 221, CC-99-126
ARE IN A DIRECT VIOLATION OF CONSTITUTIONAL
LAWS AND TREATIES OF THE UNITED
STATES AND THE STATE OF ALABAMA
AND PETITIONER HAS SUBMITTED
STRICT PROOF THEREOF AS DEMANDED
BY RESPONDENTS ALABAMA ASSISTANT
ATTORNEY GENERAL JEAN A. THERKELSEN
(SEE: "ANSWER OF RESPONDENTS TO
THIS INSTANT PETITION AT P.2- PARAGRAPH
2 AND 3.") AS FOUND IN PARAGRAPHS 8 THROUGH

64.

93 ABOVE. AND FURTHER,

PETITIONER ASSERTS THAT HIS
FEDERAL HABEAS CORPUS PETITION
§ 2254 PURSUANT TO TITLE 28 U.S.C.
§ 2244 (D) (1) WAS FILED OUTSIDED
OF THE ONE-YEAR STATUTE OF
LIMITATION. AND PETITIONER ASSERTS
THAT THIS WAS PART OF THE CONSPIRACY
TO "PRECLUDE" PETITIONER FROM
SEEKING RELIEF FROM THE UNITED
STATES SUPREME COURT AS THE STATE
DID PETITIONER IN CASES CC-96-219,
220 AND 221, AS FOUND IN PARAGRAPHS
18 THROUGH 65 ABOVE. AND

PETITIONER FURTHER ASSERTS THAT
"CONSPIRACYS" ARE MENT TO BE "SECRET"
AND DUE TO "INTERFERENCE BY OFFICALS"
"DESPITE PETITIONER'S REASONABLE
DILIGENCE HE WAS UNABLE TO UNTANGLE
THE SKEIN  CONNECTING THE "CONSPIRATORS"
TOGETHER WHO "CONSPIRED TO DEPRIVE
PETITIONER OF HIS CIVIL RIGHTS
UNTIL MARCH 21, 2006." AND FURTHER,

65.

PETITIONER ASSERTS THAT PURSUANT
TO TITLE 28 USC. "[ SECTION
2244 ] PERMITS EQUITABLE TOLLING
' WHEN A MOVANT UNTIMELY FILES
HIS FEDERAL HABEAS CORPUS PETITION
BECAUSE OF EXTRAORDINARY
CIRCUMSTANCES THAT ARE BOTH
BEYOND HIS CONTROL AND UNAVOIDABLE
WITH DILIGENCE'" AS THE COURTS
HELD IN STEED V. HEAD 219 F.3D
1298, 1300 ( 11TH CIR. 2000 ) QUOTING
SANDVIK V. UNITED STATES, 177 F.3D
1269, 1271 ( 11TH CIR 1999 ) ( PERCURIAM ));
WYZYKOWSKI V. DEPARTMENT OF
CORRECTIONS, 226 F3D 1213, 1216 ( 11TH
CIR. 2000 )


PETITIONER RESPECTFULLY REQUEST
THIS HONORABLE COURT TO ACCEPT
HIS FEDERAL HABEAS CORPUS PETITION
AS TIMELY FILED, AND ALLOW HIS
MOTION TO AMEND AND ALLOW PETITIONER
TO SUBMIT HIS EXHIBITS 14 THROUGH
33, AND ALLOW THIS MOTION TO BE


66.

ATTACHED TO HIS RESPONSE TO
RESPONDENTS ANSWER AND RESPONCE
TO SHOW CAUSE AS WHY THIS
INSTANT PETETION" SHOULD NOT BE
DENIED,

## RELIEF SOUGHT

ISSUE ORDER TO RESPONDENT, ALABAMA
ATTORNEY GENERAL HONORABLE TROY
KING TO RELIEVE HIS ASSISTANT
ATTORNEY JEAN A. THERKELSEN FROM
ANY FURTHER INVOLVEMENT IN
THIS INSTANT PETETION, AND

ISSUE ORDER ALLOWING RESPONDENT
HONORABLE TROY KING TO HAVE
OPPERTUNITY TO REBUTT PETETIONER'S
FEDERAL HABEAS PETETION.

PETETIONER WINSTON DAVIS RESPECTFULLY
REQUEST THIS HONORABLE COURT
TO GRANT PETETIONER'S PLEA TO
ACCEPT PETETIONER'S HABEA CORPUS
AS TIMELY FILED SO THAT JUSTICE

67.

MAY BE SERVED.

PETITIONER RESPECTFULLY REQUEST THIS COURT TO ISSUE ORDER TO THE UNITED STATES ATTORNEY TO BRING AN INVESTIGATION INTO THE CONSPIRACY AGAINST HIS CIVIL RIGHTS, CONSPIRACY TO DEPRIVE PETITIONER'S CIVIL RIGHTS WHILE ACTING UNDER THE COLOR OF THE STATES AUTHORITY, PURSUANT TO TITLE 18 U.S. CODE SECTION 241, 242.

DONE JAN. 25 2007

RESPECTFULLY SUBMITTED
Winston Davis
519 SANTOLINA RD
DOTHAN, AL 36303
334 797-9091

68.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT I HAVE PLACED A COPY OF THE FOREGOING ATTACHED WITH EXHIBITS PROPERLY ADDRESSED TO ALABAMA ATTORNEY GENERAL 11 SOUTH UNION STREET MONTGOMERY, AL 36130-0152 IN THE UNITED STATES MAIL POSTAGE PREPAID FIRST CLASS MAIL, ON THES JAN. 25. 2007.

Winston Davis

69.

68

## IN THE CIRCUIT COURT OF GENEVA COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                 *
                                     *
VS.                                  *    CASE NO. CC-99-126
                                     *
WINSTON DAVIS,                       *
                                     *
    DEFENDANT.                 *

## PETITION FOR EXTRAORDINARY EXPENSES TO PAY ATTORNEY'S FEES

*COMES NOW,* the court-appointed attorney for the Defendant, and requests that this Court Order that the extraordinary expenses of additional attorneys fees be paid to said attorney by the State of Alabama for his representation of the Defendant in this cause.

1.    The Defendant is charged with Theft of Property in the First Degree by Deception, a Class B Felony.

2.    The Defendant has been convicted of three prior felony charges.

3.    If convicted, the Defendant faces a possible sentence of life imprisonment.

The Attorney submits his calculation of attorney's fees to-date for this Honorable Court's consideration. (Attached as Exhibit A.)

Respectfully submitted this the ___20___ day of April, 2000.

                                  Charles W. Blakeney, BLA068
                                  Attorney for Defendant
                                  Post Office Box 100
                                  Geneva, Alabama 36340
                                  (334) 684-2387

## *CERTIFICATE OF SERVICE*

I certify that a copy of the above and foregoing has been served upon Honorable David Emery, District Attorney for Geneva County, by hand delivery of this the 20 day of April, 2000.

                                  Charles W. Blakeney

*PETITIONER WINSTON DAVIS'S*
*      u EXHIBIT 5*

**EXHIBIT A**

69

# ITEMIZED ATTORNEY'S FEE DECLARATION
# TIME SHEET
## (January 25, 2000 to April 19, 2000)

For: **WINSTON DAVIS**                        Case: **CC-99-126**

## OUT OF COURT TIME

| Date | Activity | Hours |
|------|----------|-------|
| January 25, 2000 | Open of File | 0.3 |
| January 25, 2000 | Copied Court File | 0.5 |
| January 25, 2000 | Conference with Client in Geneva Co. Jail | 0.8 |
| January 31, 2000 | Letter to Richard Waldrop requesting copy of file | 0.5 |
| February 8, 2000 | Request to Compel Disclosure/Request for Production and Proposed Order | 1.5 |
| February 14, 2000 | Collect call from Client | 0.5 |
| February 16, 2000 | Conference with District Attorney's Office | 0.3 |
| February 17, 2000 | Letter to Client | 0.5 |
| March 1, 2000 | Letter to Client | 1.0 |
| March 10, 2000 | Motion for Speedy Trial | 1.0 |
| March 10, 2000 | Motion for Transfer of Defendant | 1.0 |
| March 10, 2000 | Letter to Client | 1.0 |
| March 27, 2000 | Subpoena Duces Tecum to Alice Kelly | 1.0 |
| March 27, 2000 | Subpoena Duces Tecum to Briarwood Inn | 1.0 |
| March 27, 2000 | Petition for Funds for a Private Investigator | 1.0 |
| March 27, 2000 | Petition for Funds for an Architectural Engineer | 1.0 |
| March 27, 2000 | Petition for Funds to fly to Arizona and depose Michael Casconi | 1.0 |
| March 27, 2000 | Letter to Client | 1.0 |
| March 29, 2000 | Letter to District Attorney | 0.5 |
| April 3, 2000 | Letter to Client | 1.0 |

| | | |
|---|---|---|
| April 11, 2000 | Petition for Funds for CPA | 1.0 |
| April 11, 2000 | Letter to Client | 1.0 |
| April 18, 2000 | Letter to District Attorney | 0.5 |
| April 18, 2000 | Letter to Client | 1.0 |
| April 19, 2000 | Motion for Change of Venue | 1.0 |
| April 19, 2000 | Motion to Compel Disclosure/Motion to Compel Production | 1.0 |
| April 19, 2000 | Motion for Transfer of Defendant and Proposed Order | 1.0 |
| April 19, 2000 | Motion for Funds to Subpoena Witnesses and Documents from Witnesses who reside out-of-state | 1.0 |
| April 19, 2000 | Request for Permission for Defendant to be Present at Deposition of Michael Casconi and Petition for Funds with which to Pay the Expense of Travel | 1.0 |
| April 19, 2000 | Subpoena Duces Tecum to Barbara Morris | 1.0 |
| April 19, 2000 | Subpoena Duces Tecum to Sheriff Greg Ward | 1.0 |
| April 20, 2000 | Subpoena Duces Tecum to Harry O. Adkison, Judge of Probate | 1.0 |
| April 20, 2000 | Subpoena Duces Tecum to Rachel Townsend | 1.0 |
| April 20, 2000 | Subpoena Duces Tecum to Geneva County Probation Officer | 1.0 |
| April 20, 2000 | Subpoena Duces Tecum to Madison County Probation Officer | 1.0 |
| April 20, 2000 | Petition for Extraordinary Expenses to Pay Attorney's Fees | 1.0 |
| April 20, 2000 | Letter to Client | 1.0 |
| Total time out of court: | | 32.9 |
| Times $30.00 per hour: | | $987.00 |

71

## IN COURT TIME

March 13, 2000            Circuit Court-Jury Trial (Trial Continued)                    0.4

Total time in court:                                                                   0.4

Times $50.00 per hour:                                                             $20.00


Total number of copies:                                                                290

Times $.25 per copy:                                                               $72.50


Number of collect phone calls:                                                           1

Times $2.85 per call                                                                $2.85


Total hours in and out of court:                                                      33.3

Times office overhead fee of $25.00 per hour:                                     $832.50


Total amount Due:                                                              $1,914.85


Charles W. Blakeney, BLA068
Attorney for Defendant
Post Office Box 100
Geneva, Alabama  36340
(334) 684-2387

CityBank
of Hartford
HARTFORD, ALABAMA

PLEASE ENTER CHECKS SEPARATELY

DEPOSITED IN

PLEASE ENDORSE ALL CHECKS

CityBank
of Hartford

APPROVED:                    TOTAL

PETITIONER WINSTON DAVIS'S
EXHIBIT 19 (A)

*PETITIONER WINSTON DAVIS'S*

*EXHIBIT 24*

85

## IN THE CIRCUIT COURT OF GENEVA COUNTY, ALABAMA

WINSTON DAVIS,                              *

    PLAINTIFF,                          *

VS.                                        *

GRADY C. TOLLEY AND                        *    CASE NO. CV-97-049(W)
MARSHA A. TOLLEY, ET.AL.,                  *

    DEFENDANTS.                         *

### RESPONSE TO SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Comes now the Defendants, Donald Mair and City Bank of Hartford, and for response to the Second Request for Production of Documents heretofore requested of them by the Plaintiff says as follows:

1.    City Bank of Hartford was not involved in the employment of any contractor by the Tolleys. Therefore, they have no records pertaining to this.

2.    Attached is a copy of the disbursement sheet as requested. City Bank has numerous invoices in their file which are available for you to copy.

**FILED IN OFFICE**

NOV - 4 1998

*(signature)*
**CLERK**

DONALD MAIR

CITY BANK OF HARTFORD,
A banking corporation.

BY: *(signature)*
DONALD MAIR
Vice Chairman

STATE OF ALABAMA

GENEVA COUNTY

Before me, the undersigned authority, personally appeared Donald Mair, who being first duly sworn deposes and says that he has read the foregoing Response to Request for Production of Documents and the same is true and correct to the best of his knowledge, information and belief.

Notary Public
My Commission Expires _____

'95
3  ST11

CONTRACTOR
Claude BARWICK

P2

```
                                                    4.09.272
JEMAND DEPOSIT INQUIRY
ACCT: 080M179-50  SSN: 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 B  STATUS: ACTIVE    STOP CHECKS: NO
   MONEY MARKET                BRANCH #: 00           PURGE STATUS: 0-01-03

MARSHA A TOLLEY              PREFERRED DEPOSIT NO         $0.00 OPN BAL
OR GRADY L TOLLEY CONSTRUCTION  LIFELINE ACCOUNT  NO   $33,426.69 CUR BAL
500 HILLCREST               INT TYPE 365/365 SMPL        $0.00 FLT AMT
HARTFORD AL 36344           INT RATE  3.6500 %           $0.00 HLD AMT
                                   APY  3.72 %       $33,426.69 HIG BAL
CREDIT ACCT          DATE OPN 10/20/95 LAST ACT 10/23/95  $9,475.56 R-DD AV
CYCLE FREQ MONTHLY   LAST DEP 10/23/95 LAST CYC 10/20/95 $24,426.69 LOW BAL
STMT TYPE COMBINED   # OF PIECES     3 LAST CHG  / /        $5.69 ACR INT
STMT DAY 31          DAYS IN CYC     6 DAYS OVRDR     0      $0.00 YTD INT
CLASS INDIVIDUAL     THS O/D CYC     0 FLOATS/PERIOD  2      $0.00 SVC CHG
SVC TYPE MONEY MARKET THS O/D LIF    0 CREDITS/PERIO  2      $0.00 TAX SVC
CLUB TYPE WAIVE CLUB THS NSF CYC     0 DEBITS/PERIOD  1      $0.00 FED TAX
INSURANCE NO INSURANC O/D PAY PAY ALL 0 FLOATS/CYCLE  2      $0.00 YTD TAX
ACTIVITY SVC APPLY   ATM ON PREM     0 CREDITS/CYCLE  2  $34,426.69 TOT CR
INTERNAL SVC APPLY   ATM OFF PREM    0 DEBITS/CYCLE   1   $1,000.00 TOT DR
PRINT OPTION NORMAL  REG DD ACCT YES   O/D LMT        0
OFFICER CODE         ATM IND NO ATM CARD
FLT/HLD APPLY/APPLY  DRAW TYPE MONEY MARKET
```

12·7·95

Deer + I went by
Gradeys house, Everything
was in good shape and
finished.   David

$ 3,917.88

| | | | |
|---|---|---|---|
| 10/23 | 1st DRAW | 1,000.00 | |
| 0/25 | 2nd DRAW | 4,000.00 | |
| 1/27 | 3rd Draw | 795.12 | |
| 1/3 ✓ | 4th Draw | 3,063.00 | |
| 18 ✓ | 5th Draw | 4,172.99 | |
| 10 ✓ | 6th DRAW | 1,937.00 | |
| 14 | 7th DRAW | 2,460.00 | A/c HARRISON |
| f ✓ | 8th Draw | 300.00 | Thomas Home repair Shed |
| 21 ✓ | 9th Draw | 300.00 | Joe Thomas repair shed |
| 24 ✓ | 10th Draw | 1500.00 | Claude Barwick Contractor |
| 28 ✓ | 11th DRAW | 1500.00 | SCREEN MFT INC. |
| 1 ✓ | 12th Draw | 2550.00 | Last payment to Claud Barwick --- |
| 1 ✓ | 13th Draw | 3805.70 | Dowling Lumber 11·1 to 11·30 |
| 4 ✓ | 14 Draw | 1600.00 | Prestige Carpets |
| 4 ✓ | 15 Draw | 352.85 | Dowling Lumber |
| 4 ✓ | 16 Draw | 1044.00 | Dowling Lumber (Shed) |

As of 12-4-95 talked to Wallace Dowling & told
him as of today anything Graddy gets is up to him to
6·95  17 Draw  200.00  final payment on Shed

```
DEMAND DEPOSIT HISTORY FILE INQUIRY                        4.09.272
ACCT: 080M179-50  SSN: 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 B  STATUS: ACTIVE    STOP CHECKS: NO
  MONEY MARKET                  13,480.50 OPEN BAL      10,930.50 HIG BAL
                                 3,917.88 CURR BAL       7,723.68 R-DD AV
MARSHA A TOLLEY                       .00 FLOT AMT       3,917.88 LOW BAL
OR GRADY L TOLLEY CONSTRUCTION A 3,917.88 COLL BAL           4.63 ACR INT
500 HILLCREST                        .00 HOLD AMT          81.92 YTD INT
HARTFORD AL 36344                3,917.88 AVAL BAL
  TRAN.    POST.   CHECK T/C DESCRIPTION      AMOUNT         BALANCE
12/01/95 12/01/95        166 CUSTOMER CHECK   2,550.00-     10,930.50
12/04/95 12/04/95        166 CUSTOMER CHECK   1,610.00-      9,320.50
12/04/95 12/04/95        166 CUSTOMER CHECK   3,805.70-      5,514.80
12/05/95 12/05/95        166 CUSTOMER CHECK     352.85-      5,161.95
12/05/95 12/05/95        166 CUSTOMER CHECK   1,044.07-      4,117.88
12/06/95 12/06/95        154 TELLER CASHED CHECK 200.00-     3,917.88
```

78

(P 3)

Closed out account 12.7.95
Transferred to → 00.566-50

SUPPLEMENT

Volume I

**Circuit Court No.** CV97-049 **Civil Appeals Court No.** 2000127

# APPEAL

## TO

# Court of Civil Appeals of Alabama

### FROM

**DEFENDANT'S EXHIBIT**

3

PETITIONER WINSTON DAVIS'S
EXHIBIT 25

GENEVA COUNTY CIRCUIT COURT

WINSTON DAVIS

| | |
|---|---|
| PRO-SE<br>#207010 C1-92<br>P.O. BOX 8<br>ELMORE, AL. 36025 | *Appellant* |

*vs.*

DONALD MATR AND CITY BANK OF HARTFORD

| | |
|---|---|
| W. PHIL ELDRIDGE<br>P.O. BOX 338<br>HARTFORD, AL. 36344<br>334/588-3882 | *Appellee* |

IN THE CIRCUIT COURT OF GENEVA COUNTY, ALABAMA

WINSTON DAVIS VS GRADY C. TOLLEY, ET ALS----CV-97-049(W)

### SUPPLEMENTAL INDEX

|    |                                                                                              |         |
|----|----------------------------------------------------------------------------------------------|---------|
|    |                                                                                              | 1-10    |
| 1. | CASE ACTION SUMMARY                                                                           | 11-13   |
| 2. | MOTION FOR CLERK TO SUPPLEMENT OF CORRECT RECORD BY APPELLATE                                 | 14-106  |
| 3. | DEPOSITION OF DONALD MAIR                                                                     | 107-155 |
| 4. | DEPOSITION OF GRADY C. TOLLEY                                                                 | 156-280 |
| 5. | DEPOSITION OF WINSTON DAVIS                                                                   | 281     |
| 6. | CERTIFICATE OF COMPLETION OF SUPPLEMENTAL RECORD ON APPEAL BY TRIAL CLERK                     |         |
| 7. | LETTER OF TRANSMITTAL OF SUPPLEMENTAL RECORD ON APPEAL TO APPELLATE COURT BY TRIAL CLERK      | 282     |

CV 97 00004

GE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY
CIRCUIT CIVIL    5/30/97 *Admin Doc fee*
*60 Days*

IN THE CIRCUIT COURT OF    GENEVA    COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED:   03/28/97   TYPE: CONTRACT    TYPE TRIAL: JURY    TRACK:

************************************************************
DATE1:          CA:              CA DATE: *Notify of Action*
DATE2:          AMT:      $.00   PAYMENT: *Robert C. Faircloth - Troy, AL 360*  *P.O. Box 489*
************************************************************
PLAINTIFF  001: DAVIS WINSTON         *Richard E Crum*  *12/2/98 attorney, subs Genu*
  1/29/99—   207010 CI-97            ATTORNEY: ~~Bruce B. Stone, 420 S. Lawrence St.~~
*See address* Elmore C.F., P.O. Box 8 *2 Hwys*     ~~P.O. Box 563, Montg. AL 36101—0563~~
*on case 2/9/00* Elmore, AL 36025   HL  00000—000  *12/7/97* *Richard E. Crum of Cobb & Shealy*
*attorney*      PHONE: 000—0000              P.O. Box 6346, Dothan, AL 36302   _____-7200
2/9/00 ENTERED: 03/28/97  ISSUED:          TYPE:            *222 Mcrca Blvd #229*
~~BTSE~~ ~~207010—POBox 158 Hamilton, AL~~  JUDGEMENT: *Pro Se*  *Madison, AL 35758*
           ANSWERED:         35570
DEFENDANT  001: TOLLEY GRADY C                        David F. Holmes
                500 HILLCREST DR         ATTORNEY:

                HARTFORD, AL  36344—0000
                PHONE: 000—0000
  ENTERED:  03/28/97  ISSUED: 04/02/97   TYPE: SHERIFF
  SERVED:   4/4/97   ANSWERED:           JUDGEMENT:
------------------------------------------------------------
DEFENDANT  002: TOLLEY MARSHA A                       David F. Holmes
                500 HILLCREST DR         ATTORNEY:

                HARTFORD, AL  36344—0000
                PHONE: 000—0000
  ENTERED:  03/28/97  ISSUED: 04/02/97   TYPE: SHERIFF
  SERVED:   4/4/97   ANSWERED:           JUDGEMENT:
------------------------------------------------------------
DEFENDANT  003: MAIR DONALD                ATTORNEY: W. Phil Eldridge
                C/O CITY BANK OF HARTFORD
                307 W MAIN
                HARTFORD, AL  36344—0000
                PHONE: 000—0000
  ENTERED:  03/28/97  ISSUED: 04/02/97   TYPE: SHERIFF
  SERVED:   4/4/97   ANSWERED:           JUDGEMENT:
------------------------------------------------------------
DEFENDANT  004: CITY BANK OF HARTFORD                 W. Phil Eldridge
                307 W MAIN               ATTORNEY:

                HARTFORD, AL  36344—0000
                PHONE: 000—0000
  ENTERED:  03/28/97  ISSUED: 04/02/97   TYPE: SHERIFF
  SERVED:   4/4/97   ANSWERED:           JUDGEMENT:
----WILLIAM PATTY IS ATTORNEY FOR STATE FARM ON OBJECTION TO SUBPOENA.-- *1/7/98*
DEFENDANT  005 — EQUIFAX. ATTN: ~~Carol Decosta, CSC, 80 State Street, 6th Floor, Albany, NY~~
                                    *Sumt 2/9/98*  *John Knowles*  *32207*
  04/02/1997   FILED THIS DATE: 03/28/97          *2/2/98 New addr*
  04/02/1997   ASSIGNED TO JUDGE: CHARLES L. WOODS   *5/19/98*
  04/02/1997   JURY TRIAL REQUESTED                   *Equifax*
  04/02/1997   DAVIS WINSTON ADDED AS C001
  04/02/1997   LISTED AS ATTORNEY FOR C001: FAIRCLOTH, ROBERT CU
  04/02/1997   TOLLEY GRADY C ADDED AS D001
  04/02/1997   SHERIFF ISSUED: 04/02/97 TO D001
  4/15/97    Motion to Dismiss filed by Holmes on as attorney for Grady C. Tolley and
MEL/040297   Marsh A. Tolley.

GE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY

GE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY
CIRCUIT CIVIL

IN THE CIRCUIT COURT OF    GENEVA    COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED:   03/28/97   TYPE: CONTRACT           TYPE TRIAL: JURY     TRACK:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DATE1:            CA:              CA DATE:
DATE2:            AMT:        $.00 PAYMENT:
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| 04/02/1997 | TOLLEY MARSHA A ADDED AS D002 |
| 04/02/1997 | SHERIFF ISSUED: 04/02/97 TO D002 |
| 04/02/1997 | MAIR DONALD ADDED AS D003 |
| 04/02/1997 | SHERIFF ISSUED: 04/02/97 TO D003 |
| 04/02/1997 | CITY BANK OF HARTFORD ADDED AS D004 |
| 04/02/1997 | SHERIFF ISSUED: 04/02/97 TO D004 |

| | |
|---|---|
| 4/18/97 | Motion to dismiss set for hearing May 30, 1997 at 10:00 A.M. Notify Clk |
| 4/18/97 | Motion to Dismiss set for hearing May 30, 1997, at 10:00 a.m. /s/ CLW |
| 4/21/97 | C.A.S. to Faircloth and Holmes. gl |
| 4/23/97 | Motion to dismiss filed by Eldridge on behalf of Mair, Indiv and as Agent and City Bank. |
| 4/29/97 | Hearing on Motion to Dismiss on behalf of Mair, Indiv + as Agent + City Bank set for May 30, 1997, at 10:00 A.M. Notify. - CLW. |
| 4/29/97 | Hearing on Motion to Dismiss on behalf of Mair, Indiv. and as Agent and City Bank set for May 30, 1997, at 10:00 a.m. /s/ CLW |
| 5/1/97 | C.A.S. to Faircloth, Holmes and Eldridge. |
| 5-30-97 | Case placed on Adm. Docket for 60 days |
| 6/2/22 | Copy to Faircloth, Holmes & Eldridge |
| 6/20/97 | Motion by Faircloth to deny defendants' motion to dismiss with Exhibit "A" attached. Included is motion to reset. |
| 6/24/97 | Case restored to active docket. Notify. Clw |
| 6/24/97 | Case set 9/23/97, at 11:00 A.M. Clw (Case will be reset) |
| 6/24/97 | Case restored to active docket. /s/ Charles L. Woods, Judge |
| 6/24/97 | Case set for hearing Sept. 23, 1997, at 11:00 a.m. /s/ CLW |
| 6/25/97 | C.A.S. to Faircloth, Holmes and Eldridge. |
| 8/4/97 | Motion by Faircloth to Amend Complaint. |

VEL/040297

000049.00

JUDGE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CE...
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL

IN THE CIRCUIT COURT OF GENEVA COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED:   03/28/97   TYPE: CONTRACT          TYPE TRIAL: JURY      TRACK:

**************************************************************************
DATE1:  09/23/97  CA:                    CA DATE:
DATE2:  05/30/97  AMT:        $.00 PAYMENT:
**************************************************************************

8/4/97  Notice of Service of Discovery Request filed by Faircloth gc

8/5/97  Motion to amend complaint granted. Notify Clw gc

8/5/99  copy to Faircloth, Holmes & Eldridge

8/20/97  Notice of Filing Request for Production by Faircloth. gc ✓

8/22/97  Notice of Serv. of Discov Doc by Faircloth (Notice of Dep.) gc

8/26/97  Objection to Notice of Deposition by Eldridge gc ✓

9-5-97  Hearing to be held on objection on the 16th day of Sept., 1997, at 1:15 p.m. Notify. Clw

9/8/97  C.A.S. to Faircloth, Holmes and Eldridge

9/16/97  Motion to dismiss denied. notify CLW ✓

9/16/97  Motion to dismiss denied. /s/ CLW ✓

9/18/97  C.A.S. to Faircloth, Holmes and Eldridge gc

9/19/97  Notice of Service of Discovery Documents by Faircloth gc ✓

10/17/97  Response to Req. for Admiss by Holmes gc

10/28/97  Res. for Order Compelling Discovery by Faircloth gc ✓

10/28/97  All motion to be heard on Nov. 21, 1997 at 10:00 A.M. Notify Clw 18

10/29/97  Copy to Faircloth, Holmes & Eldridge

11/7/97  Mot. by Faircloth to Continue from 11/21 gc ✓

11/12/97  Answer of Defendants, Donald Mair and City Bank of Hartford to the complaint filed by Eldridge. gc ✓

11-13-97  Hearing on all motions cont'd & reset for Dec. 19, 1997, at 10:00 A.M. Notify - Clw.

11/14/97  C.A.S. to Faircloth, Holmes & Eldridge gc

12/18/97  Response to Request for Production of Document of Donald Mair filed by Eldridge

12-19-97  Pf's Motion to Compel granted. Def; Tolley, given to Jan 10, 1998, to file response to interrogatories & request to produce. - Clw

VEL/080597  12/23/97 -C.A.S. to Faircloth, Holmes, Eldridge. gc

CV 97 000049.00
JUDGE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL

IN THE CIRCUIT COURT OF GENEVA COUNTY
WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED: 03/28/97  TYPE: CONTRACT              TYPE TRIAL: JURY     TRACK:

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
DATE1: 12/19/97  CA:            CA DATE:
DATE2: 11/21/97  AMT:          %.00  PAYMENT:
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

- 12/23/97.....Motion by Faircloth to add defendant.  Motion to Amend Complaint filed
         by Faircloth.

- 12/23/97  Motion to amend complaint and motion to add
      Def. granted. Notify. Clw.

.12/23/97..Motion to amend complaint and motion to add defendant granted. Notify. /s/ CLW

-12/23/97--- Faircloth to advise clerk as to method and content of service on Equifax.

- 12/23/97. C.A.S. to Faircloth, Holmes and Eldridge.

12/29/97  Answer to Amended Complaint by Holmes

1-13-98  S.D. - Clw.

1/23/98  New Service to amend filed by Faircloth - to serve
      Summons/Complaint + last Amend, etc - Need fee
      for cert. mail (5ºº) (Darlene to send Postage Stamp)

- 2/3/98  Cont'd, not ready. Clw

2/6/98  Service issued to Equifax (Cert Mail) Su Summons for Content

3/25/98  New Address for Equifax from Faircloth.

3/24/98  Serv. to Montgomery Co. S.D. for Serv. Equifax.

3/5/98  Notice of filing Reg. for Prob + Reg. for Assessor
      + Cert. by Faircloth

- 3/3/98  Notice of Appearance of Knowles for Equifax

3/3/98  Equifax's Mot. to Dismiss 2nd Amended Complaint w/ Memorandum
      of Law filed by Knowles

.4/3/98  Motion to Dismiss set for hearing on Motion Day, April 24, 1998, at 10:00 a.m.

-4/06/98  C.A.S. to Faircloth, Holmes, Eldridge and Knowles.  Charles L. Woods

4/22/98  Motion to Compel filed by Faircloth

4/23/98  Motion to Continue filed by Faircloth.

4/24/98  Motion to continue granted. All pending Motions will be heard on May 29, 1998 at 10:0 a.m
      Notify. Clw.

4/27/98  Copy to Faircloth, Holmes, Eldridge & Knowles.

VEL./122397

CVL0052

CV 97 000049.00

JUDGE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL

IN THE CIRCUIT COURT OF GENEVA COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED: 03/28/97 TYPE: CONTRACT        TYPE TRIAL: JURY     TRACK:

DATE1: 12/19/97 CA:                   CA DATE:
DATE2: 05/29/98 AMT:          $.00 PAYMENT:

| Date | Entry |
|------|-------|
| 5/19/98 | David Rousseau and Henry F. Lee, III appearance for Equifax Credit Info. |
| 5/29/98 | Answers to Interrogatories filed by Eldridge. |
| 5/29/98 | Response to Request for Production of Documents by Eldridge |
| 5/29/98 | Response to Request for Admissions by Eldridge |
| 5/29/98 | Motion to Withdraw by Knowles |
| 5/21/98 | Knowles is hereby allowed to withdraw. Buddy Lee enters appearance for Equifax. Motion to Dismiss filed by Equifax, as to Counts 6 and 7 are hereby granted. Notify. Clm |
| 6/2/98 | C.A.S. to Faircloth, Holmes, Eldridge, Rousseau/Lee and to Knowles. |
| 7/9/98 | Notice by Faircloth of filing Pltf's 2nd set of Interrogatories and Request for Production of Document. |
| 8/12/98 | Answer of Defendants James Mann and City Bank of Hartford to Pl's 2nd Set of Interrogatories and Request for Production filed by Eldridge. |
| 8/18/98 | Pass on 9/1. SZ |
| 8/25/98 | Letter from Eldridge - RE: 9/1 scheduling conf - Discovery no complete-please pass |
| 8/28/98 | Pass'd to Clm - No Entry Made. (X) |
| 8/31/98 | Faircloth called - Concurs w/ Eldridge. (X) |
| 9-1-98 | Cont'd - not ready. (Equifax no longer in case.) - Clm |
| 10/21/98 | Plaintiff's 2nd Request for Production of Docs of Donald Mair and City Bank of Hartford filed by Faircloth. |
| 10/21/98 | Notice of Intent to serve subpoena on Non Party by Faircloth (on Bob Jones of State Farm Insurance Co) (Copy of Sub attached) |
| 10/26/98 | Objection to Civil Subpoena for Production of Documents filed by Eldridge (as to subpoena to Bob Jones, State Farm Ins) |
| 10/27/98 | Objection to Civil Subpoena will be heard on Nov. 20, 1998 at 11:00 A.M. Notify. Clm |
| 10/28/98 | C.A.S. to Faircloth, Holmes, Eldridge |

AT/042998

152.

JUDGE: CHARLES L. WOODS    CV 97 000049.00

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL

12/29/98 Attorney's Lien

IN THE CIRCUIT COURT OF GENEVA COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED: 03/28/1997  TYPE: CONTRACT    TYPE TRIAL: JURY    TRACK:

DATE1: 11/20/1998  CA:           CA DATE:
DATE2: 05/29/1998  AMT:    $.00  PAYMENT:

| Date | Entry |
|------|-------|
| 11/4/98 | Response to 2nd Request for Production of Documents by Eldridge |
| 11/19/98 | Motion to Withdraw Objection to Civil Subpoena filed by Eldridge. (subpoena to issue when Faircloth sends certified mail fee). 11/20/98 Hearing will not be necessary and attorneys won't be here per Eldridge. |
| 11/26/98 | Motion to w/draw objection to Civil Subpoena granted. Notify. Clv |
| 11/23/98 | Copy to Faircloth, Eldridge & Gem |
| 12/2/98 | Subpoena issued to State Farm for Faircloth by Cert. Mail |
| 12/15/98 | Motion to Withdraw by Faircloth P |
| 12/21/98 | State Farm's Objection to Subpoena, Motion to Quash Subpoena and Motion for Protective Order filed by William Patty, Attorney for State Farm. |
| 12/22/98 | Motion to withdraw filed by atty. Robert C. Faircloth for Pl is hereby granted. (Notify). Clw |
| 12/22/98 | Objection to Subpoena, Motion to Quash Subpoena - Motion for Protective Order set for hearing January 29, 1999 at 10:05 A.M. Notify. Clw |
| 12/22/98 | Copy to Faircloth, Eldridge, Homer & Rousseau |
| 12/29/98 | Attorney's Lien filed by Faircloth |
| 1/5/98 | Counts notice Attorney Lien filed by Faircloth. Notify. Clw |
| 1/5/99 | C.A.S. to Faircloth, Holmes, Eldridge, Lee and Winston Davis. |
| 1/4/99 | Notice from Davis that he is in process of obtaining new counsel. Requests that any documents filed after 12/22 be sent to him at 222 Kyser Blvd. #229, Madison, AL 35758 |
| 1/4/99 | Answer to State Farm Objection to Subpoena filed by Davis, pro se. |
| 1/8/99 | Order on Objection to Subpoena. Clw |
| 1/9/99 | Pro Se Response to Atty. Faircloth's Lien by Davis |
| 1/22/99 | This matter is set for hearing on Jan 29, 1999 at 10:00 A.M. Notify. Clw |
| 1/25/99 | C.A.S. to Davis, Holmes, Eldridge, Rousseau Lee (bc) |
| 1/26/99 | Notice of appearance of Bruce Stone and Richard Crum for Davis. |
| 1/29/99 | Notice of Change of Attorney by W. Davis (Bruce Stone) (256-721-5591) |

11/05/1998

CV 97 000049.00

JUDGE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL          2/26/99 Admin

IN THE CIRCUIT   COURT OF   GENEVA   COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED:  03/28/1997  TYPE:  CONTRACT          TYPE TRIAL:  JURY     TRACK:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DATE1:  11/20/1998  CA:          CA DATE:
DATE2:  01/29/1999  AMT:          $.00  PAYMENT:
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| 1-29-99 | Atty Dan Talmadge appeared from the firm of Bustin & Cobb on behalf of the Plaintiff, Winston Davis. The particular matter concerning the atty's lien is cont'd from today's date & reset for Feb. 26, 1999, at 10:00 A.M. Clerk to give everyone notice of said hearing. Attorneys are to prepare brief and argument concerning the lien. Notify. -Clw- |
| 1/29/99 | C.A.S. to Stone/Crum/Holmes and Eldridge /  Copy mailed to Faircloth |
| 2/1/99 | FAX from Crum-Requests Court continue 2/2/ pre-trials- Crum only recently got into case and needs additional time to complete discovery.  Crum is also scheduled for docket call in Covington Co. 2/2-Other attys do not object to continuance. |
| 2-2-99 | Cont'd. Place on next pre-trial docket. Clw |
| 2/3/99 | Mot. to Cont from atty by Crum (already cont'd) |
| 2/26/99 | All motions and cases continued and placed on admin Docket for 90 days. Notify - Clw |
| 2/24/99 | Motion for More Definite Statement and Motion to Defer filed by Faircloth |
| 3/2/99 | Copy to Pla. Stone, Crum, Holmes & Eldridge |
| 3/17/99 | C.A.S. to Faircloth |
| 3/17/99 | Notice of Dep of Mary by Stone |
| 3/18/99 | Re-Notice of Taking Deposition of Mary by Stone |
| 3/25/99 | Notice of Dep of Winston Davis and Grady Tolley by Eldridge |
| 4/29/99 | 1st Amendment to Re-Notice of Dep of Mary by Stone |
| 5/17/99 | Notice Dep of Tolley & Davis by Eldridge |

JEL   01/29/1999

7/1/99  Copy of CAS to Faircloth
7/6/99  on 7/27/99 Pre-Trial Doc.

```
AVS0352                                          CV 97 000049.00
                                        JUDGE: CHARLES L. WOODS
```

```
                ALABAMA JUDICIAL DATA CENTER
                CASE ACTION SUMMARY CONTINUATION
                        CIRCUIT CIVIL

   IN THE CIRCUIT COURT OF    GENEVA    COUNTY

   WINSTON DAVIS VS GRADY C TOLLEY ET AL
   FILED:  03/28/1997 TYPE:  CONTRACT        TYPE TRIAL:  JURY    TRACK:

   DATE1:  11/20/1998  CA:              CA DATE:
   DATE2:  01/29/1999  AMT:      $.00  PAYMENT:
```

7-27-99 Cont'd for discovery. Place on SD.-Clw.

8/6/99 Mot. by Crum to Amend Complaint filed w/ Amended Complaint ✓

8/10/99 Pl.'s motion to amend complaint is hereby granted. Notify. Clw. Copy to _____ Stone, Crum, Eldridge & Holmes ✓

8/23/99 Mot. by Eldridge for Pl. to specify his Cause of Action ✓

8/27/99 Pl. given 15 days to specifically set forth the cause or causes of action relied upon. Notify. Clw.

8/27/99 CAS to Stone/Crum/Holmes/Eldridge ✓

9-3-99 Cont'd not ready. Clw.

9/18/99 The Delineation of Causes of Action Stated in Complaint filed by Crum ✓

1/24/00 Mot. by Eldridge to Continue from 2/7 Trial ✓

1/26/00 Mot. by Crum to Continue from 2/7 Trial ✓

1/26/00 Mot. to W/d by Crum ✓

1/27/00 Mot. to w/draw by Stone ✓

2/1/00 All motions to w/draw are hereby granted. Notify. Clw ✓

2/1/00 Case Continued Clw    (from 2/7/00 Jury Trial) ✓

2/1/00 Copy to Stone, Crum, Eldridge, Holmes & Clw ✓

2/9/00 Mot. to continue by Winston Davis (Already notified from 2/7/00) ✓ -

2/9/00 CAS to Winston Davis (gl)

3/22/00 Mot. by Pl. to Resume Pl. to _____ for 4/3/00 Trial ✓

3/21/00 Case continued from the April Trial Docket. Notify. Clw ✓

3/21/00 Copy to Pla + Holmes ✓

4/19/00 Pro Se Mot for Order Compelling Production by W. Davis ✓

4/11/00 Resubmit. Clw

4/18/00 Motion for order compelling discovery. Notify. Clw ✓

4/19/00 Copy to Davis, Holmes & Eldridge

WS0352

CV 1997 000049.00
JUDGE: CHARLES L. WOODS

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL

IN THE CIRCUIT COURT OF   GENEVA   COUNTY

WINSTON DAVIS VS GRADY C TOLLEY ET AL
FILED: 03/28/1997 TYPE: CONTRACT          TYPE TRIAL: JURY     TRACK:

DATE1: 09/03/1999  CA:          CA DATE:
DATE2: 01/29/1999  AMT:         PAYMENT:
                   $.00

5/24/00 Response to Request for Production of Documents filed by Eldredge

5/30/00 Lien on Grady C Tolley filed by Richard Crumm

7/13/00 Mot. for S/J filed Eldredge etc

        Motion for S/J needs to be set up

        (file is in Buckitt) etc

7/25/00 Mot for S/J set for hearing Aug 25 2000 at 10:00 A.M.

        Notify CLW

7/27/00 C.A.S. to Faulkett, ~~Crum~~ Davis, Holmes & Eldredge etc

8/10/00 Pro Se Mot of Winston Davis for Court to Deny

        Def'n Mot for S/J dated 8/13/00 etc

9-15-00 Mot of Plaintiff to Deny S/J read Notify CLW ✓

8/15/00 Motion of Plaintiff to Deny S/J read by CLW.

8/17/00 C.A.S. to Davis, Holmes and Eldredge ✓

8/23/00 Motion for Order to Issue Subpoena Duces Tecum etc ✓

8/25/00 Motion for Subpoena Duces Tecum Denied Notify

8/25/00 Motion for Summary Judgment filed by defendants

        City Bank of Hartford and Donald Maip is hereby

        granted as to all Counts there being no just cause for

        Delay this is a final judgment. Notify  Charles T Woods

                                                          Judge

8/25/00 Copy to Davis, Holmes & Eldredge

8/31/00 Notice of Appeal to Court of Civil Appeals filed by Defendant

        (Def with issue forms, money on S/J of Hartford)

9/8/00 Letter from Defendant

9/8/00 Notice of Appeal improper Notify CLW ✓

9/11/00 C.A.S. to Davis Holmes & Eldredge (#)

9/19/00 Pro Se Motion for Leave to Proceed in Forma Pauperis in above styled cause of action
        filed by Davis. ✓

9/19/00 Pro Se Motion for Appeal from Geneva Circuit Court of Geneva County filed by Davis ✓

     9/19/00 2nd Motion for a Direct Appeal from the Circuit Judge Woods Final Judgment of
     05/30/2000  8/25/00 to the ~~Circuit~~ Court of Civil Appeals. (filed by Davis)

AVS0352

ALABAMA JUDICIAL DATA CENTER
CASE ACTION SUMMARY CONTINUATION
CIRCUIT CIVIL

IN THE CIRCUIT COURT OF GENEVA COUNTY
FILED: 03/28/1997 TYPE: CONTRACT          TYPE TRIAL: JURY     TRACK:

DATE1: 09/03/1999 CA: SUMMARY JUDGMT CA DATE: 08/25/2000
DATE2: 08/25/2000 AMT:           $.00 PAYMENT:

| Date | Entry |
|---|---|
| 10/3/00 | Motion for Affirmation filed by Winston Davis. |
| 11/21/00 | Appeal Docketed with Appellate Court # 2000127 |
| 12/1/00 | Motion for leave to proceed in forma pauperis is hereby granted. Notify Clerk |
| 12/11/00 | copy to Appellate Court + Expedite + Davis |
| 12/5/00 | Motion for Clerk to Supplement Record on Appeal filed by Davis |
| 12/13/00 | Order transferring case from Supreme Court to Court of Civil Appeals. |
| 12/15/00 | CLERK TO TAKE NECESSARY STEPS TO INCLUDE DEPOSITIONS IN RECORD ON APPEAL. CLW |

VEL    09/20/2000

FILED IN OFFICE

DEC - 5 2000

CLERK

IN The Circuit Court of Geneva County, Alabama

Winston Davis;
          plaintiff

VS                                    CASE NO CV-97-019(h

Donald Mair and City Bank          Court of Civil Appea
of Hartford, A Corporation         CASE No 2000-127
          Defendants

## Motion For Circuit Clerk to Supplement or Correct the Record on Appeal Pursuant to A.R.A.P rule 10(F)

Comes now plaintiff, Winston Davis, Pro Se and Moves this Court to Order the Geneva County Circuit Clerk to Correct the Record on Appeal.

(1)   Plaintiff asserts the depositions of Plaintiff Winston Davis, Defendant Donald Mair and Grady Tolley With exhibits are Not Contained in the record.

(2)   Plaintiff asserts the defendants Motion For Summary Judgment, listed as Document 52, page C-116 in the record Forwarded to the Court of Civil Appea specifically states, "This motion is based upon the pleadings, 'depositions' of Plaintiff Winston Davis, Defendants Donald Mair and Grady Tolley

Copy to Johnnie H. Elledge

(3)   Plaintiff Futher asserts the Geneva County Circuit Clerk has failed to Comply with A.R.A.P rule 11 (a) (1) Clerk's record, specifically "an index of any document and exhibits omitted from the Clerks record with a full description of each item."

4)   Plaintiff asserts pages C-1, C-2, C-3 of the record (ie CASE Action Summary Sheets) are NOT IN Chronological Order, and numerous entrys on same, C-1 to C-10 are NOT IN the record ON Appeal.

5)   IN Conclusion plaintiff moves this Court to Order the Clerk to Correct the Record ON Appeal to Comply with the Alabama rules of Appellate Procedure; specifically rule 11 (a) (1)

Done on this 4ᵀᴴ day of Dec 2000

Respectfully Submitted
y Winston Davis

Winston Davis
AIS # 207010
E.C.F
P.O Box 8
Elmore, AL
36025

(2)

13

## Certificate of Service

I hereby certify that I have served a copy of " Motion for Circuit Clerk to Supplement or correct the record on Appeal, on the Persons who's address are below by placing in the U.S. mail postage pre-paid.

1) John Wilkerson, Jr Clerk
   Court of Civil Appeals
   300 Dexter Avenue
   Montgomery, AL
                36104-3741

2) Geneva County Circuit Clerk
   p.o Box 86
   Geneva, AL 36310

3) Attorney for Defendants
   W. Phil Eldridge
   p.o Drawer 338
   Hartford, al, 36344


Done on this 4 day of Dec. 2008    x Winston Davis

                                   Winston Davis
                                   E.CF
                                   p.o Box 8
                                   Elmore, AL
                                             36025

/14/

# FOSHEE & TURNER COURT REPORTERS

1  IN THE CIRCUIT COURT OF

2  GENEVA COUNTY, ALABAMA

3

4

**COPY**

5  CIVIL ACTION NUMBER:

6  CV-97-049(W)

7

8

9  WINSTON DAVIS,

10       Plaintiff,

11  vs.

12  GRADY C. TOLLEY and MARSHA A. TOLLEY,

13  Et al.,

14       Defendants.

15

16

17  DEPOSITION TESTIMONY OF:

18  DONALD MAIR

19  June 25, 1999

20  9:12 a.m.

21

22  COURT REPORTER:

23       STEPHANIE M. TILLEY

*Filed in Open Court 2/25/00 [initials]*

1              IN THE CIRCUIT COURT OF

2              GENEVA COUNTY, ALABAMA

3

4    CASE NUMBER:   CV-97-049(W)

5

6    WINSTON DAVIS,

7            Plaintiff,

8    vs.

9    GRADY C. TOLLEY and MARSHA TOLLEY, et al.,

10           Defendants.

11

12              DEPOSITION OF DONALD MAIR

13

14           In accordance with Rule 5(d) of The

15   Alabama Rules of Civil Procedure, as

16   Amended, effective May 15, 1988, I,

17   STEPHANIE M. TILLEY, am hereby delivering

18   to Richard Crum, the original transcript of

19   the oral testimony taken on the 25th day of

20   June, 1999, along with exhibits.

21           Please be advised that this is the

22   same and not retained by the Court

23   Reporter, nor filed with the Court.

## FOSHEE & TURNER COURT REPORTERS

1     S T I P U L A T I O N

2     IT IS STIPULATED AND AGREED by and

3     between the parties through their respec-

4     tive counsel that the deposition of DONALD

5     MAIR, may be taken before Stephanie M.

6     Tilley, Court Reporter and Notary Public,

7     State at Large, at the City Bank in

8     Hartford, Alabama, on June 25, 1999,

9     commencing at approximately 9:12 a.m.

10    IT IS FURTHER STIPULATED AND AGREED

11    that the signature to and the reading of

12    the deposition by the witness is waived,

13    the deposition to have the same force and

14    effect as if full compliance had been had

15    with all laws and rules of Court relating

16    to the taking of depositions.

17    IT IS FURTHER STIPULATED AND AGREED

18    that it shall not be necessary for any

19    objections to be made by counsel to any

20    questions, except as to form or leading

21    questions and that counsel for the parties

22    may make objections and assign grounds at

23    the time of trial or at the time said

## FOSHEE & TURNER COURT REPORTERS

1    deposition is offered in evidence, or

2    prior thereto.

3         IT IS FURTHER STIPULATED AND AGREED

4    that notice of filing of the deposition by

5    the Commissioner is waived.


7         * * * * * * * * * *


9              I N D E X

10   EXAMINATION BY:                    PAGE NO:

11   Mr. Crum                           6

12   Certificate                        87

13

14

15   EXHIBITS:                          PAGE NO:

16   Plaintiff's Exhibit 1              11

17   Plaintiff's Exhibit 2              40

18   Plaintiff's Exhibit 3              70

19

20

21

22

23

# FOSHEE & TURNER COURT REPORTERS

(8

```
 1              A P P E A R A N C E S
 2     FOR THE PLAINTIFF:
 3            Richard E. Crum
 4            Cobb & Shealy
 5            Post Office Box 6346
 6            Dothan, Alabama   36302
 7
 8            Bruce B. Stone
 9            Attorney at Law
10            Post Office Box 1963
11            Montgomery, Alabama   36104
12     FOR CITY BANK:
13            W. Phil Eldridge
14            Attorney at Law
15            Post Office Drawer 338
16            Hartford, Alabama   36344
17     FOR THE TOLLEYS:
18            David Holmes
19            Attorney at Law
20            Post Office Box 721
21            Slocomb, Alabama   36375
22     ALSO PRESENT:
23            Winston Davis and Grady Tolley
```

19

## FOSHEE & TURNER COURT REPORTERS

1        I, Stephanie M. Tilley, Court

2    Reporter and a Notary Public for the State

3    of Alabama at Large, acting as Commission-

4    er, certify that on this date, pursuant to

5    the Alabama Rules of Civil Procedure, and

6    the foregoing stipulation of counsel, there

7    came before me at the City Bank in

8    Hartford, Alabama, commencing at approxi-

9    mately 9:12 a.m., on June 25, 1999, DONALD

10    MAIR, witness in the above cause, for oral

11    examination, whereupon the following

12    proceedings were had:

13

14                DONALD MAIR

15    being first duly sworn, was examined and

16    testified as follows:

17

18            MR. CRUM:  We just have the

19    usual stipulations?

20            MR. ELDRIDGE:  Yeah.

21

22    EXAMINATION BY MR. CRUM:

23            Q.    Could you tell me your name,



# FOSHEE & TURNER COURT REPORTERS

1  please, sir?

2     A.    Donald R. Mair.

3     Q.    Mr. Mair, my name's Richard

4  Crum, and I met you just before this

5  deposition.  And I represent Mr. Winston

6  Davis.  And what I would like to do is ask

7  you some questions about some dealings in

8  the past that you might have had with Mr.

9  Davis and some other things regarding your

10  background.

11        If I ask you a question you don't

12  understand or anything that's confusing,

13  please tell me and I'll be glad to rephrase

14  the question.  But please do tell me if you

15  don't understand because I won't have any

16  way of knowing otherwise.

17     A.    Uh-huh.

18     Q.    Okay?

19     A.    Correct.

20     Q.    And when you answer, we've got

21  to say yes or no or out loud because she's

22  got to type everything down.  All right?

23     A.    Yes.



# FOSHEE & TURNER COURT REPORTERS

```
 1          Q.      Tell me how old you are,

 2   please, sir.

 3          A.      75.

 4          Q.      And where do you live right

 5   now?

 6          A.      Here in Hartford.

 7          Q.      Could you tell me your address,

 8   please, sir?

 9          A.      Route 2, Box 585, Hartford,

10   Alabama.

11          Q.      How long have you lived there?

12          A.      Let's see.  Since '85.

13          Q.      Are you married?

14          A.      I was.  My wife passed away in

15   January this year.

16          Q.      Do you have any children?

17          A.      Yes.

18          Q.      Could you tell me how many and

19   what their names are?

20          A.      Four daughters.

21          Q.      Any of them live here?

22          A.      None.

23          Q.      Any of them live in Geneva
```



## FOSHEE & TURNER COURT REPORTERS

```
1   County?

2        A.    No.

3        Q.    What other relatives do you

4   have in Geneva County?

5        A.    None.

6        Q.    Can you tell me your Social

7   Security number?

8        A.    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.

9        Q.    And you have an Alabama

10  driver's license?

11       A.    Yes.

12       Q.    Can you tell me that number,

13  please, sir?

14       A.    4989719.

15            MR. CRUM:  Before I go any

16  further, I think in our deposition notice

17  we tried to get some documents brought to

18  the deposition.  Did y'all receive that?

19            MR. ELDRIDGE:  Yeah.  I think

20  he has the file there.

21       Q.    Would it be all right if I

22  looked at those documents you've brought in

23  response to your notice of deposition,
```


23

## FOSHEE & TURNER COURT REPORTERS

1   please, sir?  I know we requested -- it

2   says, Any and all documentation regarding

3   the lending policies and obtaining of

4   credit reports of the bank.

5       A.    You have it there.

6       Q.    Including loan policy manuals,

7   credit manuals, and all loan guideline

8   manuals.  That's right here?

9       A.    Yeah.

10      Q.    And then secondly, we've got a

11  copy of the real estate loan file of the

12  Defendants Grady Tolley and Marsha Tolley

13  and all the documents in that file, and

14  that's right there?

15      A.    Uh-huh.

16          MR. ELDRIDGE:  Is this the

17  real estate loan file?

18          THE WITNESS:  Well, it's in

19  both of them.

20          MR. ELDRIDGE:  Both of these?

21          THE WITNESS:  Uh-huh.

22          MR. ELDRIDGE:  But nothing in

23  here has to do with the lawsuit; right?



## FOSHEE & TURNER COURT REPORTERS

1              THE WITNESS:  No.  The

2    lawsuit's right here.

3              (Plaintiff's Exhibit No. 1 was

4              marked for identification.)

5              MR. CRUM:  Just the notice of

6    deposition, attach that as Plaintiff's

7    Exhibit No. 1.

8         Q.   Mr. Mair, are you retired now?

9         A.   No.

10        Q.   You're still working here at

11   the bank?

12        A.   Every day.

13        Q.   What's your job here at the

14   bank?

15        A.   I'm CEO of the holding company

16   and loan officer at the bank.

17        Q.   Well, if you would, please,

18   sir, tell me a little bit about yourself,

19   where you're from, where you went to

20   school.

21        A.   I was born in Rhode Island,

22   grew up in Rhode Island, Massachusetts.

23   Graduated from high school which was 1942,



## FOSHEE & TURNER COURT REPORTERS

1    went into the Navy.  Went in the flight

2    program.  Was a pilot, carrier pilot out in

3    the Pacific.  Served 5 years on active

4    duty, 29 years in the reserves, retired as

5    a captain.

6         When I came back from overseas, I

7    went to Pensacola and was an instructor

8    guide with the Navy there.  Worked civil

9    service nine years, then went into bank-

10   ing.  Been in banking since 1947.  Started

11   four banks.

12        Q.    You were in the military, got

13   out of that, and did civil service work for

14   nine years?

15        A.    Correct.

16        Q.    And then it was after that that

17   you got into banking?

18        A.    Correct.

19        Q.    Did you go to -- what

20   education do you have if you could, please,

21   sir?

22        A.    High school and two and a half

23   years of college.



## FOSHEE & TURNER COURT REPORTERS

```
 1        Q.    Was the college something you
 2   got in the military or did you go --
 3        A.    No.  After I got out, I went to
 4   Pensacola Junior College, and Tulane had a
 5   campus aboard the air station.  I went
 6   there at night.
 7        Q.    When you said you got into
 8   banking, and I think you said 1947; is that
 9   right?
10        A.    Right.
11        Q.    Tell me, if you would, how you
12   came to get into banking generally.  That's
13   been a while ago.
14        A.    While I was in the reserves
15   there flying out of Corey Field, I met
16   Charles Woodberry and Foster and Ed Parker
17   who had an insurance company, and I started
18   to sell insurance on the side while I was
19   working civil service for them.  And Chuck
20   Woodberry started the Warrington Bank in
21   Warrington, Florida, which is just outside
22   Pensacola, and he needed a loan officer
23   that understood the military.  So he asked
```

## FOSHEE & TURNER COURT REPORTERS

27

1    me about going into the bank.   That's how I

2    got into banking.

3         Q.     And you started as a loan

4    officer there at the Warrington Bank?

5         A.     Right.

6         Q.     Is it W-A-R-R-E-N-T-O-N?

7         A.     W-A-R-R-I-N-G-T-O-N.

8         Q.     It's outside Pensacola?

9         A.     Right.

10        Q.     And how long did you work with

11   them as a loan officer?

12        A.     I was with Warrington Bank

13   until '80 -- no, excuse me, '79.  The bank

14   I was in, Chuck sold it to Jim Brockoe

15   (phonetic), and he had the Bank of West

16   Florida.  And I combined the two banks.  I

17   became president of the bank for Jim and

18   combined Bank of West Florida and the Bank

19   of Pensacola, excuse me, the Bank of West

20   Pensacola into the West Florida Bank.

21        Then in '81, I had the chance to come

22   up here to City Bank of Hartford, and I

23   moved up here and been here since.

## FOSHEE & TURNER COURT REPORTERS

1    Q.    When you started with the

2  Warrington Bank, how did you come to learn

3  the duties of a loan officer?  How did you

4  learn that job, please, sir?

5    A.    On the job.

6    Q.    Was that something that your

7  supervisor or the guy that owned the bank

8  or something taught you how to do?

9    A.    No.  The senior loan officer,

10  I was under his direction.

11    Q.    Who was that?

12    A.    Robert Blake.

13    Q.    Is Robert Blake still with

14  that bank?

15    A.    No.  He passed away.  Some of

16  the people that I was with are still at the

17  bank.  And taking courses and going to

18  seminars and so forth, banking seminars.

19    Q.    Did you work as a loan officer

20  specifically with that bank, the Warrington

21  Bank, during that entire time you were with

22  them?

23    A.    I've always been a loan officer



1    ever since I've been in banking.

2    Q.    You said you were a loan

3    officer with Warrington and then you helped

4    consolidate the Bank of West Florida and

5    the Bank of Western Pensacola?  Is that

6    what you said?

7    A.    West Pensacola.  Bank of West

8    Pensacola and Bank of West Florida into the

9    West Florida Bank.

10    Q.    And did you work as a loan

11    officer for them as well or did you --

12    A.    Yes.

13    Q.    -- just help with the

14    consolidation?

15    A.    No.

16    Q.    And you were with them I guess

17    approximately two years or so?

18    A.    Little over two years, right.

19    Q.    Then how did you come to have

20    an opportunity to come to the City Bank of

21    Hartford?

22    A.    Well, it's kind of funny.  I

23    got a call from Mrs. Sneed who was the

## FOSHEE & TURNER COURT REPORTERS

1    president of the bank about one of my

2    officers that used to work for me.  He'd

3    applied for the job here, and she called me

4    about him.  And in talking to her, she was

5    telling me about the job and all, and I

6    told her that it sounded pretty good to me

7    and I would be interested in it.

8         So I came up and had an interview

9    with the board of directors and Mrs. Sneed

10   who was the president and was hired by the

11   bank.

12        Q.    What job were you specifically

13   hired to do by the bank at that time?

14        A.    Loan officer.  Then in '83,

15   yeah '83 -- no.  Beginning of '84, I took

16   over as president, been president and later

17   on became CEO of the bank.

18        Q.    Do you still to this day work

19   doing any loans as a loan officer for the

20   bank?

21        A.    Yes.

22        Q.    Tell me what the job require-

23   ments and responsibilities of a loan



**FOSHEE & TURNER COURT REPORTERS**

1    officer for this bank would be.  Just

2    generally, what would you do I guess I'm

3    asking?

4         A.    Meet with prospective

5    customers, decide what they want, what they

6    need, whether the bank can do it or not,

7    whether it falls within policy, and if it

8    does, see about making the loan.

9         Q.    You said in 1983 you became

10   president of the bank?

11        A.    It was either '83, '85.  I

12   think it was January of '84.

13        Q.    That's right.  Just around that

14   time?

15        A.    Yes.

16        Q.    What does the bank president do

17   as far as job responsibilities?

18        A.    Responsible for the running of

19   the bank, all departments.

20        Q.    All of the bank?

21        A.    Uh-huh.

22        Q.    And then you said later you

23   became the CEO of the bank; is that right?



**FOSHEE & TURNER COURT REPORTERS**

1      A.      Right.

2      Q.      Tell me how that structure

3   works as far as the CEO or the president or

4   how that might relate.

5      A.      Well, the CEO, of course, is

6   the chief executive officer.  He's

7   responsible for everything.  And then when

8   Mr. Kennedy, Bill Kennedy became president,

9   he was president and I was CEO of the bank.

10  And in other words, the ultimate responsi-

11  bility for running the bank was the CEO.

12  The president works under him.  And, of

13  course, the CEO usually delegates most of

14  it to the president of the bank.

15     Q.      Who was the CEO when you

16  started acting as president of the bank or

17  working as president of the bank?

18     A.      Paul Kennedy who was chairman

19  of the board and still chairman of the

20  board.

21     Q.      How many folks generally work

22  at the bank here?

23     A.      Let's see.  I believe now

33

1   there's ten.

2        Q.    Can you give me an idea as to

3   what jobs there are here at the bank?  I

4   know that you've got obviously tellers and

5   you've told me about some others.

6        A.    Well, you would have bookkeep-

7   ing department.  You've got the loan

8   department.  You've got the teller

9   department.

10       Q.    And you said Paul Kennedy is

11  the chairman of the board now or --

12       A.    He was then and has been.  He

13  still is, yes.

14       Q.    As chairman of the board, what

15  responsibilities would he have generally?

16       A.    He chairs the board of

17  directors meeting and he is the senior

18  officer as chairman of the board.

19       Q.    And at this time you are still

20  the CEO of the bank?

21       A.    No.  I am CEO of the holding

22  company and vice chairman.

23       Q.    Tell me how that would work

## FOSHEE & TURNER COURT REPORTERS

1    then.  What is a holding company in

2    relation to the bank?

3         A.    Back some years ago, we formed

4    a holding company, one bank holding company

5    which wholly owns the bank.  The holding

6    company has stockholders.

7         Q.    What's the name of that holding

8    company?

9         A.    Hartford Financial Corporation.

10        Q.    And who is the, I guess who is

11   the CEO of the bank now or does it have

12   one?

13        A.    President and CEO is William

14   Kennedy, Mr. Kennedy's son.

15        Q.    And the fellow I met outside

16   who was in the wheelchair, who is that?

17        A.    That's Bill.  That's Bill

18   Kennedy.  He's president and CEO.

19        Q.    As the CEO of the holding

20   company, what generally are your duties?

21        A.    More or less overseeing the

22   bank.

23        Q.    Is there anything in

## FOSHEE & TURNER COURT REPORTERS

35

1   particular, though, or is it just --

2          A.      No.

3          Q.      -- kind of a general deal?

4          A.      Just general overall.

5          Q.      But the president and the CEO

6   of the bank would handle the day-to-day

7   activities I would assume?

8          A.      Correct.

9          Q.      Would you generally monitor the

10  president and CEO to make sure everything's

11  running smoothly?

12         A.      If there's a problem, they can

13  come to me and all. But being here every

14  day, I pretty well know what's going on.

15         Q.      That was going to be my next

16  question. Are you still -- you come to the

17  bank every day?

18         A.      Uh-huh.

19         Q.      What generally, what kind of

20  schedule are you working now? Eight to

21  five every day?

22         A.      No. I usually get here about

23  quarter of seven, seven o'clock. The bank



# FOSHEE & TURNER COURT REPORTERS

1  closes at three.  I usually leave, oh,

2  3:30, four, 4:30.

3       Q.    But you still maintain an

4  office here at the bank?

5       A.    Yes.  Sometimes I'll take off,

6  you know, go home at one and not come back.

7  When I have the nice position, I can come

8  and go as I want.

9       Q.    Sounds good to me.

10       A.    It only takes fifty years to

11  earn that position.

12       Q.    I understand.  You certainly

13  are entitled to it.  Tell me this:  Who

14  else is involved in running the bank now?

15  Besides the president and CEO of the bank,

16  who you've already told me about and

17  obviously yourself, who else is involved in

18  the running of this bank at this time?

19       A.    Well, I'm not quite sure I

20  understand what you mean, if you understand

21  the setup of a bank.

22       Q.    Tell me about the setup of a

23  bank then.  Let me try to understand that.



# FOSHEE & TURNER COURT REPORTERS

1    A.    I'm taking it day-to-day.

2  Well, not day-to-day.  But probably next

3  year when we have our annual stockholders

4  meeting and they elect the officers of the

5  bank and so forth, I'll decide then whether

6  I want to go another year or not.

7         Q.    Now, seated here with me is a

8  guy named Winston Davis.  Do you know Mr.

9  Davis?

10         A.    Unfortunately I do, yes.

11         Q.    Can you tell me how you first

12  came to know Mr. Davis?

13         A.    Yes.  Back in October of '95,

14  Grady and Marsha Tolley, who we had a real

15  estate loan with, their house burned.

16         Q.    Let me ask you this before we

17  even get that far.  Did you know Mr. Davis

18  personally before October of '95?

19         A.    No.  I never laid eyes on him.

20         Q.    Had you heard any conversations

21  or talk about Mr. Davis or did you know

22  anything about Mr. Davis before October of

23  '95?

39

## FOSHEE & TURNER COURT REPORTERS

1         A.      I never had set eyes or heard

2    the name until he walked in the bank with

3    the Tolleys that day.

4         Q.      Tell me about the Tolleys.

5    How long had you known them before that

6    day?

7         A.      I had probably known them I'd

8    say probably three to four years."

9         Q.      And prior to October '95, what

10    generally -- how had you known them?  Had

11    they been working with the bank?

12        A.      Strictly through the bank here,

13    through loans.

14        Q.      Just loans and that type thing?

15        A.      Checking account and so forth,

16    yes.

17        Q.      And just a moment ago you said

18    that the Tolleys had had their house burn

19    down or something like that.

20        A.      No, not burn down.  They had a

21    fire in the house.

22        Q.      Tell me generally what you know

23    of that fire or what had happened.

## FOSHEE & TURNER COURT REPORTERS

1      A.    All I know is they had a fire

2  and, of course, going on from there.

3      Q.    Well, just go on from there.

4  That would be fine.

5      A.    In October, one day they came

6  in.  Well, they had called and told me they

7  had the fire before then.  I told them

8  okay.  The insurance company will probably

9  come out and check it.  And since we're a

10  lien holder, the check will probably have

11  our name on it.  You get someone to, you

12  know, whatever you're going to do, repair

13  the house or tear it down, build a new one,

14  whatever you're going to do, once you

15  decide, come and see me.

16      Q.    Is that normal for the

17  insurance company to put I guess the bank's

18  name on the check as the lien holder?

19      A.    Not a bank name.  The lien

20  holder.  The lien holder name would always

21  be on the check.  In my experience, it's

22  always been that.

23      Q.    Tell me what was the nature of

1    the lien that the bank had on the Tolleys'

2    property at that time.

3         A.    First mortgage.  Real estate

4    mortgage.

5         Q. ─ And documents that reflect all

6    that, are they in your files --

7         A.    Yes.

8         Q.    -- as far as what mortgage was

9    held?  Do you have a general recollection

10   of the amount of that mortgage?

11        A.    Not without looking up in the

12   file.  As I remember, it was up in the late

13   twenties.

14        Q.    And the first thing you

15   remember with respect to this fire and

16   anything which occurred was that the

17   Tolleys, Mr. Tolley called you?

18        A.    One of the Tolleys.  I don't

19   remember who it was, but they contacted me,

20   told me they'd had a fire.

21        Q.    And then what -- what were they

22   doing?  Asking you advice or what to do?

23        A.    No.  They were notifying me

1    they'd had a fire.

2        Q.    Was it normal for you to be

3    notified when something like that happens

4    on a piece of property?

5        A.    Well, normally we hear about

6    it, you know, through the grapevine.  You

7    know, it's a small town here.  So and so

8    had a fire, something of that nature.  I

9    can't say for sure, but I believe I knew

10   that, you know, the Tolleys had a fire.

11   But they did call and tell me they'd had

12   one.  They notified me.

13       Q.    And what generally did you

14   tell them when they notified you?

15       A.    What I tell any customer under

16   those circumstances.  Decide what you're

17   going to do and come to see me and we'll

18   work it out.

19       Q.    What happened next as far as

20   your contact with either the Tolleys or Mr.

21   Davis?

22       A.    Was one day when the Tolleys

23   walked into the bank, Marsha and Grady with

43

## FOSHEE & TURNER COURT REPORTERS

1    Mr. Davis.

2         Q.    Do you recall how long it was

3    after that telephone conversation that they

4    came in your bank as far as how many days

5    later?

6         A.    No, I can't tell you.

7         Q.    Do you remember if it was more

8    than a day or so or do you have any idea?

9         A.    I kind of feel like it was more

10   than a couple of days, but I mean I

11   honestly, I mean, I don't know.  It was

12   after the phone call that they came in.

13   Now, I don't know how many days later.

14        Q.    In that interval, the days

15   that passed, did you have any conversations

16   with anyone else, either with the bank or

17   otherwise, regarding Mr. Davis or the

18   Tolleys?

19        A.    I didn't know Mr. Davis at that

20   time, so I couldn't even mention his name.

21   I didn't know him.  Till the day he walked

22   in the bank, I didn't know Mr. Davis.

23        Q.    And the bank we're talking

## FOSHEE & TURNER COURT REPORTERS

1   about is this bank here; is that right?

2       A.    Yeah.

3       Q.    And what was your job duty?  I

4   mean, what job did you hold specifically at

5   the time they came walking in the bank?

6       A.    Let's see.  That was 8/95.  I

7   was loan officer, and Bill was the

8   president and CEO at that time.

9       Q.    Tell me then what happened as

10  you recall from the moment that Davis and

11  the Tolleys came in the bank that day,

12  October '95.

13      A.    Well, they walked in and sat

14  down up in the lobby in the waiting area.

15  When I went over to them, they introduced

16  me to Mr. Davis and something.  I'm not

17  saying these exact words.

18      Q.    I understand.

19      A.    But someone said, well, they're

20  here to see about what they're going to do

21  on the house.  So I took them into the

22  office.

23      Q.    When you were introduced to Mr.

45

## FOSHEE & TURNER COURT REPORTERS

1    Davis, did the Tolleys say, give you any

2    other explanation as to who Mr. Davis was

3    other than just his name?  Meaning did they

4    say this is our contractor or this is the

5    contractor?

6         A.    I honestly don't remember

7    that.  I know they introduced Mr. Davis to

8    me, but I don't remember exact words they

9    used or anything.

10         Q.    Was anything else said other

11    than just introduction there in the lobby?

12         A.    That was all.

13         Q.    At that point, you then let

14    them into your office.  Is that what you

15    said?

16         A.    Yes.  Well, I asked Grady and

17    Marsha to come into the office.  I did not

18    ask him.  I asked them in.  They're our

19    customer.  Okay.  They get up and came into

20    the office and Mr. Davis followed them in.

21    So I said, well, you know, if the Tolleys

22    want him in here while we're discussing

23    their business, that's up to them.

# FOSHEE & TURNER COURT REPORTERS

1    So he came in and sat down, and then

2    we started to discuss the fire and what we

3    could do.  And they said they had a check

4    from the insurance company, so I told them

5    the procedure we'd go through.  They said

6    they wanted to fix the house up.

7        Q.    Tell me the procedure you told

8    them you'd go through.

9        A.    That we would open up a

10   checking account, deposit the money in

11   there, and it would take an officer of the

12   bank and the Tolleys to sign.  It would

13   take two signatures on the check to draw

14   money out of that account.  They would get

15   it on drawers as they bring in the material

16   invoices for material and labor, and we'd

17   make up a check.  And didn't want it every

18   day probably.  They'd come in once a week,

19   as normally you pay your contractor every

20   week.

21       And with the invoices, we would draw

22   that much out of the checking account, and

23   it would make the checks payable to the

## FOSHEE & TURNER COURT REPORTERS

1   contractor, whoever's doing the work, or to

2   the supply houses.

3       Q.    You explained all that to the

4   Tolleys at that initial part of the

5   conversation?

6       A.    Well, I tried to. Mr. Davis

7   kept breaking in.

8       Q.    In what way was he breaking in

9   during the time you were explaining?

10      A.    No. That's not the way it's

11  done. That's not the way you do it.

12  That's not the way I do it. That's not the

13  way I'm going to do it.

14      Q.    When you say he was breaking

15  in, was he saying anything else other than

16  what you've just told me which is that's

17  not the way he's going to do it or has done

18  it?

19      A.    More or less, that was the

20  tone. That was the subject. That's what

21  he was saying, yes.

22      Q.    How long did it take for you to

23  explain that procedure you told me about to

# FOSHEE & TURNER COURT REPORTERS

1    the Tolleys?

2        A.    Oh, gosh, I don't know.  Ten

3    minutes, fifteen minutes.  I mean, I can't

4    tell you exactly how long.

5        Q.    Was anyone else in your office

6    when this was going on?

7        A.    No.  Just the four of us.

8        Q.    What then happened after you

9    explained this to the Tolleys and you said

10   that Mr. Davis was breaking in?  Was

11   anything else said in that interval?

12       A.    Not that I can remember

13   anything that stands out in my mind except

14   he was very disruptive and I thought rude.

15   I mean, as far as I was concerned, he was

16   not part of this deal.  This was the

17   Tolleys and the bank.

18       Q.    Tell me what happened then

19   after that point.

20       A.    Well, then Tolley said he had a

21   check from State Farm, and he showed it to

22   me.  I held it in my hands.  And I told him

23   fine.  We can go ahead and open up your

49

## FOSHEE & TURNER COURT REPORTERS

1   account and deposit it, and that's when Mr.

2   Davis got real belligerent and said, 'No

3   way.' His name was on the check and he was

4   not endorsing it.

5        Q.    So the Tolleys said they had a

6   check, and they showed it to you. And as I

7   understand it, you said, Fine. We'll open

8   up the account. And at that point, 'Mr.

9   Davis said, 'No way.'

10       A.    No.  He was not signing that.

11  I told him okay. We can open up an

12  account. You sign it, Davis sign it, and

13  we can deposit and get going on this. And

14  with a few choice words, he said 'no way' is

15  he endorsing that check.

16       Q.    When you say a few choice

17  words, I need to know what you're saying.

18  What did he tell you?

19       A.    He used swear words.

20       Q.    So, he said, no, I'm not signing

21  the check and some swear words were said.

22       A.    (Witness indicated yes.)

23       Q.    What happened after that?



# FOSHEE & TURNER COURT REPORTERS

1      A.      Then they finally left.  I

2   said, well, that's the only way we're going

3   to do it.  I had some words with Davis

4   there.  I said, well, that's the way we do

5   it.  And he said no, that's not the way he

6   does it.  And he and Davis, Tolleys talked

7   back and forth, and then they left in a

8   huff.  I mean, they went out and he left

9   with them and took the check with them.

10      Q.      You said that Davis and the

11   Tolleys then talked back and forth.  What

12   did they say back and forth at that point?

13      A.      Now, I can't remember exactly.

14   But it was more the tone was, you know, he

15   was telling them that's not the way it's

16   done.  This is the way it works.  I'll take

17   the money.  I'll buy the supplies.  I'll

18   pay the help and so forth.

19      Q.      And what were the Tolleys

20   saying?

21      A.      They did not agree to it.  I

22   don't remember exactly what they said, but

23   they did not agree to it.  That's when they

## FOSHEE & TURNER COURT REPORTERS

1   said we'll leave and discuss it, and they

2   left.

3        Q.    They said, We'll leave and

4   discuss it?

5        A.    I don't say they said that.

6   But after discussing it and, you know, and

7   I'd already told them the bank was not

8   endorsing that check.  It was going into an

9   account, a joint account with the Tolleys.

10  And after talking with Davis, he was trying

11  to tell them that's the way it was done,

12  they finally left.

13       Q.    And the joint account procedure

14  you told me about, is your testimony that

15  that's the way the bank normally handles a

16  situation such as --

17       A.    Construction loan of that type

18  where damage has been done, yes, that's the

19  way it's done.  That's the way all banks do

20  it.

21       Q.    That the check is written to

22  the owner and to the bank, and then there's

23  a signature required from each of them to



## FOSHEE & TURNER COURT REPORTERS

1    make a withdrawal?

2         A.     Let me put it this way.  The

3    insurance company in my experience always

4    makes a check payable to their customer and

5    to a lien holder.  A bank will open up an

6    account.  And to be sure that the material

7    is paid -- in other words, the bank's

8    ultimate end is to protect the customer to

9    make sure that when that work is done, it's

10   paid for.  There's no material, no labor to

11   go against the mortgage because they come

12   first.

13        So if you've got a mortgage, you want

14   to make sure that there's no material or

15   labor liens put against your property.  And

16   the only way I know of to do that is the

17   way I'm talking about.  And in my

18   experience in banking, that's the way all

19   banks do it.  Go talk to your banker and

20   ask him how he would handle it.  I'm pretty

21   sure he would tell you the same thing.

22        Q.     And when the Tolleys and Mr.

23   Davis got up and left at that point, did

## FOSHEE & TURNER COURT REPORTERS

1      you say that they had the check with them?

2          A.     Yes.

3          Q.     Let me show you what I'll

4      mark, and tell me if you can identify

5      that.

6          A.     Yeah, that looks like the

7      check.  Except when I had it, it was not

8      crossed out.  No name was crossed out.

9                 (Plaintiff's Exhibit No. 2 was

10                marked for identification.)

11                MR. CRUM:  We'll mark this as

12     Plaintiff's Exhibit 2 so we'll know what

13     we're talking about.

14         Q.     And I've showed you what's been

15     marked as Plaintiff's Exhibit 2 which

16     appears to be a copy of the check.  My

17     question, first of all, is I understand

18     there's some writing on the check.  I want

19     to ask you about that in a minute.  Does

20     that appear to be otherwise, besides the

21     writing on the check, a copy of the check?

22         A.     To me, that looks like a copy

23     of the check that they had at that time,

## FOSHEE & TURNER COURT REPORTERS

1  yes, sir.

2      Q.    Now, also on the check is some

3  writing.  First of all, it says "spoil" on

4  the right side of it.  Did you write that

5  on the check?

6      A.    No.

7      Q.    Do you have any knowledge as to

8  how that got on the check?

9      A.    No.

10      Q.    And then on the left side where

11  it says Pay to the Order of Grady L. Tolley

12  and Marsha A. Tolley and City Bank of

13  Hartford and Winston Davis, the name

14  Winston Davis has some lines through it

15  basically.  Did you put those lines there

16  through his name?

17      A.    No.  Those lines were not on it

18  when I saw the check.

19      Q.    Do you have any knowledge as to

20  how those lines over Mr. Davis's name came

21  to be on that check?

22      A.    No, I do not.

23      Q.    And your testimony is at the

## FOSHEE & TURNER COURT REPORTERS

1   time the Tolleys and Davis left your office

2   with the check that day, this check didn't

3   have either one of those writings on it?

4        A.     That's correct.

5        Q.     When Davis and the Tolleys got

6   up to leave at that time, and I'm talking

7   about after this initial conversation with

8   them, what was your understanding as to

9   what was going to happen after that in

10  relation to this check and the work to be

11  done?

12       A.     I didn't know what was going to

13  happen at that time.  It was up to the

14  Tolleys to decide what they wanted to do.

15       Q.     And when you say what they

16  wanted to do, my understanding is that you

17  had told them the way the bank would do it

18  is what?  Tell me specifically what your --

19       A.     Exactly what I told you before,

20  the same way.

21       Q.     Did you have any understanding

22  at that point that that's what the Tolleys

23  were going to do or did you know?



## FOSHEE & TURNER COURT REPORTERS

1      A.    I did not know at that time.

2      Q.    Before they got up and left,

3  did you have any conversations with Mr.

4  Davis other than what we've already

5  discussed?

6      A.    Not except, you know, him

7  talking and breaking in and all, you know,

8  the fact that this is the way the bank does

9  it. This is the way a bank does it.  And

10  we're not, the bank is not signing,

11  endorsing the check over to Tolleys, Davis,

12  or anybody else.

13      Q.    Did you tell Mr. Davis at that

14  time that he wasn't going to be the

15  contractor?

16      A.    No. "No way." That's not my

17  decision.

18      Q.    Did Mr. Davis at that time talk

19  to you about references?

20      A.    Yes. In talking, he kept

21  saying about he's had good credit, good

22  upstanding, particularly said he's a

23  Christian, pays his bills, those sort of



## FOSHEE & TURNER COURT REPORTERS

1    things I imagine trying to tell me how good

2    he is, that he can handle this job and do

3    it his way.

4         Q.    Did he give you any specific

5    references that you recall other than those

6    general type things you just mentioned?

7         A.    Not at that time.  Well, no,

8    not at any time.

9         Q.    Was anything else said that

10   you can recall at that initial conversation

11   between any of y'all?

12        A.    Well, there was a lot of small

13   talk back and forth, but nothing that

14   would, you know, change the tone of the

15   meeting that I know of.

16        Q.    And when Davis and the Tolleys

17   left your office that day, when was the

18   next contact that you had with either of

19   them?

20        A.    It was either two or three

21   days later, Davis came in all upset, and I

22   would say in a very belligerent manner,

23   stormed into the office, used some swear



## FOSHEE & TURNER COURT REPORTERS

1   words, and said that because of me, more or

2   less because of me, he did not get the job

3   for the Tolleys. By gosh, I'd be sorry for

4   it and I'd be hearing from his lawyer.

5         Q.    Well, during that interval, let

6   me go back a little bit. The two or three

7   days, did you have any conversations with

8   anyone regarding either the Tolleys or Mr.

9   Davis?

10        A.    Negative.

11        Q.    During that interval, did you

12  attempt to check on Mr. Davis's references?

13        A.    Yes, I did.

14        Q.    Tell me what you did in that

15  regard.

16        A.    I got a credit report on him.

17  Since it looked like I might be having to

18  do business with him, I got a credit

19  report.

20        Q.    Other than getting the credit

21  report, did you talk to any other folks he

22  may have done work with or gotten materials

23  from?

# FOSHEE & TURNER COURT REPORTERS

1    A.    Not at that time, no.  I got

2  some feedback later on, but not at that

3  time.

4    Q.    That's what I wanted to ask

5  you, though.  At that time, did you get any

6  feedback from anybody else regarding Mr.

7  Davis?

8    A.    No.

9    Q.    And you said you did get a

10  credit report on Mr. Davis.  When did you

11  get that in relation to the day the Tolleys

12  and Davis left your office?  Was it a day

13  later, two days?

14    A.    It was probably -- I know it

15  wasn't that day.  It was probably the next

16  day or probably the next day.

17    Q.    Tell me generally how you would

18  go about getting a credit report on Mr.

19  Davis or how you did go about getting a

20  credit report on him at that time.

21    A.    We have a link in with the

22  Credit Bureau and we can call in and get

23  it.



## FOSHEE & TURNER COURT REPORTERS

1    Q.    You're talking about Equifax?

2    A.    Yes.

3    Q.    Is it anything more than

4  calling and saying this is Mr. Davis and

5  I'd like a credit --

6    A.    Give them the name, address,

7  and Social Security number.  I did not have

8  his Social Security number, so I used name

9  and address.  No.  In fact, I didn't have

10  the name, so I used the -- I mean, I didn't

11  have his address, so I used name.

12              (Let the record reflect that

13              Mr. Holmes was present for the

14              remainder of the deposition.)

15    Q.    When you got the credit report,

16  was that something that you yourself

17  handled or did you have somebody help you

18  do it?

19    A.    No, I got it.

20    Q.    And you know what I mean by

21  that.  I mean, did you have a secretary or

22  somebody say go do this?

23    A.    I got it.

61

## FOSHEE & TURNER COURT REPORTERS

1    Q.    It was you did it. Had you in

2    the past obtained a credit report on

3    contractors that had come in with a

4    relationship like we've been discussing

5    where you said the bank had to have a joint

6    signature?

7    A.    ~~No.~~  ~~The reason I think~~ this one

8    is because of his belligerent attitude.

9    And I've learned from experience when

10    people tell you what good Christians they

11    are, how honest they are, how they pay

12    their bills, that is a red flag. It's not

13    always so. But that's a red flag, believe

14    me.

15    Q.    Had you ever yourself gotten a

16    credit report on anyone?

17    A.    Sure.

18    Q.    In what capacity I guess would

19    you do that? As a loan officer?

20    A.    As an officer of the bank.

21    Q.    How many times approximately

22    would you do that? Something that happens

23    all the time?

**FOSHEE & TURNER COURT REPORTERS**

1    A.    Hundreds.  All the time.  I

2    mean, you get a new loan customer and they

3    give you a loan application, you get a

4    credit report if you're going to do

5    business with somebody, particularly in

6    loans.  Now, checking and all you don't.

7    But if it's a loan, you run a credit report

8    on them.

9    Q.    But you had not obtained

10   credit reports on any other contractors

11   that had come in with --

12   A.    Not that I know of or remember,

13   no.

14   Q.    Had you spoken to Mr. Davis

15   again before you got that credit report?

16   A.    No.  It was strictly on his,

17   what do you say, the way he acted in the

18   office that I decided to get the credit

19   report because I felt like there was a good

20   chance the Tolleys may use him.  Since his

21   name was on the check and so forth, I

22   figured the Tolleys were going to use him

23   as their contractor.

## FOSHEE & TURNER COURT REPORTERS

1    Q.    Do you have any knowledge or

2    understanding as to how his name came to be

3    on that check?

4    A.    Only afterwards.  After he'd

5    been in to see me and they said they

6    weren't going to use him, I was talking to

7    the Tolleys asking them, well, how did

8    Davis get in this in the first place.  They

9    said after the fire, he came to their house

10   and told them he was going to give them an

11   estimate on what it would cost to fix it

12   up, and he gave them an estimate.  When

13   they went down to the State Farm office, he

14   went with them.  Now, this is what they're

15   telling me.

16   Q.    I understand.

17   A.    And he got his name on the

18   check down there.  Now, that was after when

19   they told me they weren't using him.

20   Q.    So we -- this was after what

21   we're talking about now.  I want to stay

22   with the credit report now.  You're telling

23   me after that is when you learned of how

## FOSHEE & TURNER COURT REPORTERS

1      name came to be on the check?

2          A.     Right.  You asked me how I know

3    that, and that's how I knew.

4          Q.     Had you obtained Mr. Davis's

5    permission to get the credit report on him?

6          A.     No.

7          Q.     What generally do you recall

8    the credit report saying?

9          A.     It had some collections on it

10   and it was not a good report.

11         Q.     Is a copy of that report in

12   your --

13         A.     No.  It's been destroyed.

14         Q.     And when you said it's been

15   destroyed, is that something the bank

16   generally does as a routine practice?

17         A.     If we make a loan and get a

18   credit report and we make the loan, the

19   credit report, there's a place in the loan

20   file for it.  If we don't make the loan and

21   they're turned down, after they're

22   notified, then they're destroyed.

23              MR. STONE:  May I interrupt a



## FOSHEE & TURNER COURT REPORTERS

1    minute?  Is this document entitled

2    Financial Policy and Credit Report, is this

3    a copy for us or is this y'alls original?

4              MR. ELDRIDGE:  I think it's

5    his.  We'll copy it if you want a copy of

6    it.

7              Q.    Was the next thing that

8    happened in the chain of events, after you

9    met with Davis and the Tolleys, they left.

10   The next thing that happened was that you

11   got the credit report.  Is that fair?

12             A.    Yes.

13             Q.    And you got that, and to your

14   remembrance, it was not a favorable credit

15   report?

16             A.    Right.

17             Q.    Tell me what happened next then

18   as far as your contact with either Davis or

19   the Tolleys or any action --

20             A.    Davis came in to the bank by

21   himself.

22             Q.    How long was that after the

23   time that you'd gotten the report that Mr.

## FOSHEE & TURNER COURT REPORTERS

```
1    Davis came in?

2          A.     It had to be two or three days

3    after that.  One, two, or three days after

4    that.

5          Q.     Had you had any contact with

6    either Davis or the Tolleys before he came

7    in then at that point?

8          A.     No.

9          Q.     Did you talk with anyone else

10   about these circumstances --

11         A.     No.

12         Q.     -- during that period?

13         A.     Had no reason to.

14         Q.     And when Davis came in then at

15   that time, was anybody with him?

16         A.     No.

17         Q.     Tell me what happened from that

18   point when Mr. Davis came in.

19         A.     Well, I told you.  He came in

20   very belligerent, few swear words, and told

21   me that I'd lost that for him and he wasn't

22   going to get it and I'd be sorry for it and

23   I would hear from his lawyer.  That's
```

67

## FOSHEE & TURNER COURT REPORTERS

1  exactly what he said.  I asked him to

2  leave.

3        Q.    Where did this conversation

4  take place when Mr. Davis came to the bank

5  that day?

6        A.    In my office and in the lobby

7  as he was coming in.

8        Q.    Up until that point when Mr.

9  Davis came in the bank that day, had you

10  discussed his credit report with anyone

11  else?

12        A.    Negative.

13        Q.    Had you shown the credit report

14  to anyone else?

15        A.    Negative.

16        Q.    When he came in that day, did

17  you show the credit report to him?

18        A.    Negative.

19        Q.    How did -- I mean, you've told

20  me Mr. Davis came in very belligerent.  Are

21  you telling me he came in and started off

22  belligerent without you saying anything?

23        A.    He was belligerent when he

**FOSHEE & TURNER COURT REPORTERS**

1    walked in the bank.

2        Q.    Did you say anything to him at

3    all before he was belligerent?

4        A.    No.  I asked him to come into

5    the office.  You get someone like that, you

6    want to get them out of the lobby.  You

7    have other customers in there.

8        Q.    How long did y'all have any

9    type of conversation in the lobby?  How

10   long did that take place?

11       A.    As he was walking.  You've seen

12   the lobby.  Walk in the lobby into the

13   office there.

14       Q.    Was there anyone else in the

15   lobby that saw or heard any of this that

16   you can recall?

17       A.    Yeah, the employees.

18       Q.    Employees here at the bank?

19       A.    Yes.  I'm sure there was some

20   customers, but I can't tell you who they

21   are.

22       Q.    What employees are you aware of

23   that heard or saw this when he came in that

# FOSHEE & TURNER COURT REPORTERS

1     day?

2          A.     I can't tell you.  I'd have to

3     go ask them.  That hasn't come up and I

4     haven't checked into it.

5          Q.     My next question was:  You're

6     telling me generally you feel like

7     employees of the bank saw or heard Mr.

8     Davis come in that day?

9          A.     Yes.

10         Q.     But you've not talked to the

11    employees of the bank specifically to say

12    did you see what was said or anything like

13    that; is that right?

14         A.     That's correct.

15         Q.     Mr. Davis then went into your

16    office, and you say that he told you

17    something about losing it for him I think

18    you said; is that right?

19         A.     Uh-huh.

20         Q.     Tell me what he said

21    specifically as best you can recall.

22         A.     Now, this is the best that I

23    recall.

70

# FOSHEE & TURNER COURT REPORTERS

1    Q.    I understand that.

2    A.    He came in, a few swear words,

3  said I had caused him to lose the Tolley

4  job.

5    Q.    What did you say?

6    A.    That I would be sorry for it

7  and that I would hear from his attorney.

8    Q.    What was your response?

9    A.    I said, That's up to you.  I

10  can give you the name of our attorney, and

11  I want you to leave.

12    Q.    What happened after that?

13    A.    He went out.

14    Q.    Did you ask him at that point

15  why he was saying you caused him to lose

16  the Tolleys' job?

17    A.    No.  No.

18    Q.    Did you have any understanding

19  as to what he was talking about when he

20  said that to you there in the bank?

21    A.    I had an idea what he was

22  talking about, the Tolleys weren't going to

23  use him as their contractor.  Yeah, that's

## FOSHEE & TURNER COURT REPORTERS

1    what I took it to mean.

2         Q.    Well, at that time did you feel

3    like you had had any part in him losing the

4    Tolleys' job?

5         A.    No.

6         Q.    Did he have that check with him

7    at that time or anything of that sort?

8         A.    No.  I don't remember him

9    having anything in his hands.

10        Q.    And there weren't any witnesses

11   or anybody in your office there, were

12   there?

13        A.    No.

14        Q.    And did he leave at that point?

15        A.    Yes.

16        Q.    When was the next time you had

17   any conversation with him?

18        A.    I didn't, not until all these

19   lawsuits started to show up.

20        Q.    What happened as far as your

21   contact with either the Tolleys or Davis

22   after you had this conversation in the

23   bank, what was the next thing that happened

1    to you with respect to any of the dealings

2    we've discussed?

3        A.    Well, the Tolleys came in and

4    said they had a contractor and they had a

5    check and wanted to -- wait. I'm not

6    sure. I'm not sure at that time when the

7    next time they came in the bank whether

8    they had a check with them or not. But

9    they came in and I know they said they had

10   a contractor, and it was not Mr. Davis,

11   and they were ready to start fixing up the

12   house.

13       Q.    How long was this after that

14   conversation?

15       A.    I can't tell you exactly.

16       Q.    Just generally. I mean, are we

17   talking about --

18       A.    Generally, I'd say probably a

19   week or ten days.

20       Q.    And the Tolleys then came in by

21   themselves?

22       A.    Right.

23       Q.    And told you that they had a

## FOSHEE & TURNER COURT REPORTERS

1   contractor to fix the house; is that right?

2       A.    That's correct.

3       Q.    And who was that contractor?

4   Barwick (phonetic)?

5       A.    Yes.  Yes.

6       Q.    And did they have another check

7   with them at that time?

8       A.    I'm not sure whether they had

9   it at that time or not.  But they came in,

10   you know, with a check and we opened up an

11   account with just the bank name and their

12   name on it.

13       Q.    When you did that to open up

14   the account, would it be your testimony

15   that that was the usual way that the bank

16   handled such situations?

17       A.    That's correct.

18       Q.    Did you question them, when the

19   Tolleys came in at that time, did you

20   question them about their new contractor or

21   about Barwick as to what kind of background

22   he had?

23       A.    No.  It's their decision.  No,

# FOSHEE & TURNER COURT REPORTERS

1  I did not.

2      Q.    Did you get a credit report on

3  Barwick to see what kind of credit he had?

4      A.    No, I did not.  I didn't even

5  know Mr. Barwick.  I hadn't even met him at

6  that time.

7      Q.    Did you discuss with Tolleys

8  the credit report that you had gotten on

9  Mr. Davis?  Did you discuss that credit

10  report with them?

11      A.    No, I did not discuss it with

12  them.

13      Q.    I was gone say at any time.

14      A.    No.

15      Q.    And then when the Tolleys came

16  and told you about Barwick, y'all opened

17  the account.  What contact or dealings did

18  you have with anyone with respect to the

19  fixing up the Tolleys' home?

20      A.    When I would go out and check

21  the work, I'd see Mr. Barwick there.  And

22  sometimes he would bring in the invoices

23  and so forth, like on a Friday.  Usually

1   one of the Tolleys brought him in.  But I

2   think, as I remember, I think one time he

3   did bring them in, left them with us, and

4   then the Tolleys came in later and we'd

5   write a check and the bank officer would

6   sign it and the Tolleys would sign it and

7   that was it.

8        Q.    After your meeting with Mr.

9   Davis, the last one, after that point did

10  you make any inquiry with anyone with

11  respect to his references or his background

12  or anything of that sort?

13       A.    No, I did not do anything else

14  after that.  I was just glad to be rid of

15  him.

16       Q.    And then we previously

17  discussed I guess some conversation you had

18  with the Tolleys later about how Mr. Davis

19  had become involved in their proceedings.

20  Tell me about that.  I want to go to that

21  specifically now.  What conversation did

22  you have with the Tolleys about Mr. Davis?

23       A.    Sometime after that, his name

76

## FOSHEE & TURNER COURT REPORTERS

1   came up and I don't remember how.  And I

2   asked them, you know, how did Mr. Davis get

3   into this in the first place.  That's when

4   they told me that he came to their house

5   after the fire.  I don't know if it was the

6   next day or when.  But it was shortly after

7   the fire he showed up at their house, said

8   he wanted to give them an estimate for

9   fixing the house up.

10          Now, I don't know what they said.

11  Evidently, they must have said okay or

12  something because I understand he worked up

13  an estimate and gave them an estimate,

14  which I did not see.

15          Q.     What other conversations did

16  you have about Mr. Davis with the Tolleys?

17          A.     They said when they went to the

18  State Farm office, he went with them, which

19  I thought was surprising.  But that's it.

20  Because as far as I'm concerned, all my

21  past dealings, a deal like this is between

22  whoever the insurance company has their

23  with, their customer and the insurance

## FOSHEE & TURNER COURT REPORTERS

1  they had this check, did you tell them they

2  needed to get a new check issued that

3  didn't have Mr. Davis's name on it?

4       A.    No.  Negative.

5       Q.    Did you yourself play any part

6  on Mr. Davis's name not being on this

7  check?

8       A.    Did I what now?

9       Q.    Did you play any part in Mr.

10  Davis's name not being on the check that

11  was issued by State Farm?

12       A.    No.  That would be up to State

13  Farm.  No.  I never talked to State Farm

14  about who should be on the check or

15  anything.

16       Q.    Have you ever spoken to Bob

17  Jones about any of this?

18       A.    Back when I got subpoenaed, I

19  talked to Nick Holly, the man here, and he

20  got me a copy of that check.

21       Q.    Nick Holly got you a copy of

22  the check that had originally been issued

23  by State Farm with Davis's name on it?

# FOSHEE & TURNER COURT REPORTERS

79

1        A.      Yes.

2        Q.      Is the copy that you got, does

3   it look like that?

4        A.      Yes.

5        Q.      Did Nick Holly tell you

6   anything as to how Mr. Davis's name got

7   marked off?

8        A.      No.  I don't think he knows,

9   but no, he never said anything about it.

10       Q.      Do you yourself have any

11  knowledge as to how Mr. Davis's name got

12  marked off?

13       A.      Negative.  I do not.

14       Q.      And did Mr. Holly give you any

15  other information about any of these trans-

16  actions which we've discussed?

17       A.      Negative.

18       Q.      Did he give you any other

19  documents other than a copy of this check?

20       A.      No.

21       Q.      Let's take a quick break if you

22  don't mind.

23            (A break was taken.)

## FOSHEE & TURNER COURT REPORTERS

1      A.    Most of the contractors I know

2  of, people come to them.  You know, they're

3  busy.  To my mind, that's something like a

4  lawyer being an ambulance chaser, chasing

5  after business.

6      Q.    So the impression I'm getting

7  is that you feel like Mr. Davis should have

8  had the Tolleys come to him or had a

9  customer come to him rather than him go out

10  to their site.

11      A.    I would say to my mind that's

12  the normal, under normal business relation-

13  ship.  I mean, he may advertise on the

14  radio, advertise TV or whatever.  But

15  usually the customer will, I mean, contact

16  somebody for business.  Now, this is --

17  you're asking me this.  You know, this is

18  all after the fact you might say.

19      Q.    I understand that.  But I

20  couldn't help but get that impression, and

21  I'm just curious to know why you feel that

22  way.

23      A.    Just a little different than



## FOSHEE & TURNER COURT REPORTERS

1    what my past experience has been.

2         Q.    During the time that you've

3    been associated with this bank, has the

4    bank solicited customers in any way?

5         A.    Oh, yes, naturally.

6         Q.    But do you feel that's somehow

7    different than what Mr. Davis did?

8         A.    We don't go knock on the door.

9    We advertise for customers, but we don't go

10   knock on their door.

11        Q.    This was in your file and I

12   want to show it to you if I can and ask you

13   if you can identify that, please, sir.

14   Some of that's been underlined, and that

15   wasn't something that was already done on

16   your copy.

17        A.    This is when people ask us for

18   credit information, yes.

19        Q.    Is that something that's

20   generally prepared by the bank?  And I say

21   the bank, this bank.

22        A.    Yes.    That's when people ask us

23   for credit.



## FOSHEE & TURNER COURT REPORTERS

1      Q.     And the bank drafts this policy

2   as far as how that's to be handled?

3      A.     How it's given out, yes, sir.

4            MR. CRUM:  Mark that as

5   Plaintiff's Exhibit 3.

6            (Plaintiff's Exhibit No. 3 was

7            marked for identification.)

8      Q.     Is Equifax the credit report-

9   ing agency who you or the bank normally

10  deal with?

11     A.     Yes, sir.

12     Q.     And there are others.

13     A.     Yes.  We have a different one

14  now.  We're not with them now.  We just

15  changed I think it was the first of the

16  year.

17     Q.     When you are dealing with them,

18  you have some kind of agreement with them

19  that they'll do all your credit reporting?

20     A.     No.

21     Q.     How does that work?

22     A.     We get credit from them.  If we

23  want a credit report, we request it from



**FOSHEE & TURNER COURT REPORTERS**

1    them.

2        Q.    And you say you're not using

3    them now.  Is that y'all just decided to

4    use somebody else or have some agreement

5    with them I guess is what I'm asking?

6        A.    No.  We've got another credit

7    reporting service.

8        Q.    Is there a formal agreement

9    that the bank has with the credit reporting

10   service, though?

11       A.    I'm sure there is.  I have not

12   seen it, but I'm sure there is.

13       Q.    Do you know if the bank used to

14   have one with Equifax?

15       A.    I'm sure we did.

16       Q.    But you're not aware of the ins

17   and outs of that agreement?

18       A.    No.

19       Q.    Do you know if that agreement

20   is in writing anywhere?

21       A.    I don't know.  I can find out.

22   I've kind of got a feeling that it is, but

23   I can't give you a yes or no at this time.

## FOSHEE & TURNER COURT REPORTERS

1    Q.    Who is the folks that y'all use

2 now, the credit reporting people?

3    A.    I'll have to go ask because I

4 really don't remember.

5    Q.    Did Equifax ever train either

6 you or your employees on the proper ways to

7 get credit reports?

8    A.    Well, they came in and showed

9 when it went on the computer and showed how

10 to do it.  But strictly, I mean, how to use

11 the computer to get the credit report, it's

12 done on the computer.

13    Q.    Let me ask you this because I

14 don't understand how that works.  If you

15 wanted to get -- let's go back to that time

16 period.  If you wanted to get a credit

17 report on somebody and you were going to

18 use Equifax, how would you normally go

19 about doing it?  You have a computer here

20 that you can get that information from or

21 do you call them or write them?  How does

22 that work?

23    A.    We pull it up on our computer.

# FOSHEE & TURNER COURT REPORTERS



1      Q.      The bank has its own in-house

2   computer that can contact Equifax?

3      A.      One of the programs in the

4   computer is Equifax or Credit Bureau.

5      Q.      So you don't have to actually

6   get anybody from Equifax on the phone in

7   order to get that information?

8      A.      No.

9      Q.      Is there a charge associated

10  with each credit report you get?

11     A.      Yes.

12     Q.      What is your understanding of

13  what information is necessary or that the

14  bank would need in order to get a credit

15  report on someone through Equifax with the

16  computer?

17     A.      The name.

18     Q.      Just a name?

19     A.      It helps if you have Social

20  Security number.  You can get it by putting

21  in a Social Security number or you can get

22  it by putting in a name.

23     Q.      Are you familiar with the Fair



87

# FOSHEE & TURNER COURT REPORTERS

1    Credit Reporting Act?

2         A.    Yes.

3         Q.    Are you aware of what

4    provisions there are in that act which

5    relate to getting credit reports on folks?

6         A.    I believe I am.  Now, you know,

7    you get right down to nitty-gritty and a

8    section and all, no.

9         Q.    I understand that.  I under-

10   stand that.  But what was your understand-

11   ing generally as to when an entity or

12   individual can get a credit report on

13   somebody according to that act?

14              MR. ELDRIDGE:  I'm going to

15   object to this.  That would require a legal

16   opinion, and I don't think he's trained in

17   that area.

18              MR. CRUM:  Well, I understand

19   that objection.  I don't want to -- I don't

20   want to get a legal opinion.  Really, I

21   would like for him to give me an explana-

22   tion as best he can as to --

23              THE WITNESS:  You want me to



# FOSHEE & TURNER COURT REPORTERS

1  answer that?

2           MR. CRUM:   -- as what is

3  necessary for a bank employee to get that

4  credit report.

5           MR. ELDRIDGE:  Do you under-

6  stand the law itself?

7       A.    I believe I do, yes.

8       Q.    The law will speak for itself I

9  think, and I don't want you to give me

10 really a dissertation on the law.  I just

11 want to know what your understanding is as

12 to when it's okay for somebody to get a

13 credit report on somebody.

14      A.    If you're going to have a loan

15 and do business with somebody and you have

16 an application, you either vocal or in

17 writing you get a credit, you can get a

18 credit report.

19      Q.    And in your understanding of

20 Mr. Davis, I guess, did you feel like the

21 bank was going to be doing business with

22 Mr. Davis?

23      A.    Uh-huh.



## FOSHEE & TURNER COURT REPORTERS

1    Q.    You've got to say yes or no

2  just for her.

3    A.    Yes.

4    Q.    Have you ever been in a

5  situation where somebody had some repairs

6  to be done and the contractor was going to

7  do those repairs and they came in with a

8  check kind of like with Mr. Davis in which

9  the procedure that the bank used was

10  different from that?  That's not a good

11  question.  Let me strike all that and start

12  over.

13    As I understand it, Mr. Davis

14  explained to you that the way he normally

15  did it was everybody signed the check that

16  was deposited and the money was given to

17  the Tolleys or to --

18    A.    No.  To the contractor.

19  Contractor gets the money up front.

20    Q.    Have you ever had that

21  situation --

22    A.    Negative.

23    Q.    -- before that?

## FOSHEE & TURNER COURT REPORTERS

1        A.      Negative.

2        Q.      Have you ever had that

3   situation arise after that?

4        A.      No.  I've not in my whole

5   banking career have I had it.

6        Q.      So you have never allowed a

7   contractor to receive the proceeds up front

8   to do work such as that?

9        A.      I have never done a real estate

10  loan the way that you mentioned, no.

11       Q.      Have you ever made a recommen-

12  dation to a customer of the bank to use a

13  certain contractor?

14       A.      No.

15       Q.      How many loan officers does

16  the bank have now that are under your

17  supervision?

18       A.      Three.  They're not under my

19  supervision.

20       Q.      There are three loan officers.

21  Tell me who they are, please.

22       A.      Bill Kennedy, David Bailey, and

23  myself, and of course Paul Kennedy is a

## FOSHEE & TURNER COURT REPORTERS

1    loan officer.  And Bobby Tindal can make a

2    loan.  Although, Bobby and Bill, I mean

3    Paul Kennedy do not as a general rule make

4    loans.

5         Q.    Has Mr. Davis ever had a

6    banking relationship with your bank?

7         A.    Not to my knowledge, thank the

8    Lord.

9         Q.    And as I understand it, you

10   didn't have any knowledge as to Mr. Davis's

11   reputation as a contractor or a person

12   prior to this October '95?

13        A.    As I said before, I knew

14   nothing about Mr. Davis till the day he

15   walked in here with the Tolleys.

16        Q.    And at any point in time did

17   you discuss Mr. Davis's credit report or

18   what was found in that report with the

19   Tolleys?

20        A.    No.

21        Q.    At any point in time did you

22   show them the credit report?

23        A.    No.

## FOSHEE & TURNER COURT REPORTERS

1    Q.    Has Mr. Barwick ever done any
2  construction work for you or the bank?
3    A.    No.
4    Q.    Do you recall how Mr.
5  Barwick's estimate differed from that of
6  Mr. Davis's?
7    A.    No.
8    Q.    And as I understand it, you
9  did not obtain a credit report on Mr.
10  Barwick; is that correct?
11    A.    That's right.
12    Q.    Can you tell me why you did not
13  obtain a credit report on him?
14    A.    I had no reason to.  I was not
15  doing business with him.
16    Q.    And do you have any knowledge
17  firsthand as to Mr. Barwick's financial
18  status?
19    A.    Negative.
20    Q.    Do you know if Mr. Barwick has
21  ever been arrested or convicted of a crime?
22    A.    I know nothing about him except
23  that he repaired Grady's house.



## FOSHEE & TURNER COURT REPORTERS

1    Q.    Do you know Richard Louellen

2  (phonetic)?

3    A.    No.  I know who he is.  I don't

4  know him personally.

5    Q.    Is he a customer of the bank?

6    A.    Yes.

7    Q.    You said you know who he is.

8  How do you know who he is?  Is it because

9  he's a customer of the bank?

10    A.    He's a customer of the bank.

11  Also, later he heard that we had problems

12  with Davis, and he said if we need a

13  witness, he'd be glad to come and appear as

14  a witness for us against Mr. Davis, that he

15  did a job for him and took off with the

16  money and did not do the job he was

17  supposed to.

18    Q.    Mr. Louellen told you that?

19    A.    No.

20    Q.    Who did he tell you that?

21    A.    Mr. Kennedy.

22    Q.    And you weren't at that

23  conversation?

## FOSHEE & TURNER COURT REPORTERS

1        A.      Negative.

2        Q.      It was later that Mr. Kennedy

3    told you?

4        A.      He just told me, he says, I

5    heard --

6                MR. HOLMES:  For the record,

7    can we have which Mr. Kennedy, Paul or

8    Bill?

9        A.      Bill.  He deals with Bill.

10   That's Bill's customer.  And he told Bill

11   that.

12       Q.      Do you know as to whether

13   other than what you heard from Bill --

14       A.      Now, that was months

15   afterwards, months afterwards."

16       Q.      Other than what you heard from

17   Bill Kennedy in that conversation, do you

18   know anything of the work Mr. Davis did for

19   the Louellens?

20       A.      No, I do not.

21       Q.      Did you ever speak to the

22   Louellens about Mr. Davis?

23       A.      Negative.  No.  Never spoke to

## FOSHEE & TURNER COURT REPORTERS

1     them period.

2          Q.     You have never spoken to them?

3          A.     I might have said hello if he

4     came in the bank or something, but that's

5     it.  I wouldn't know, recognize him if he

6     walked in that door.

7          Q.     You never had any conversation

8     with Louellen regarding Mr. Davis?

9          A.     Negative.

10          Q.     Do you have any knowledge as

11     to how Mr. Davis's work for the Louellens

12     ended?

13          A.     No.  All I know is what I just

14     told you.

15          Q.     Have you had any other conver-

16     sations with Bill Kennedy regarding Mr.

17     Davis other than what we've discussed?

18          A.     Well, now, he's president of

19     the bank.  Yeah, lot of discussions.

20     Discussing all these lawsuits and

21     everything, yes.

22          Q.     And I want to clarify my

23     point.  As I understand it, there is a

# FOSHEE & TURNER COURT REPORTERS

1  lawsuit pending.

2      A.    Sure.  The third set of lawyers

3  that have had this lawsuit.

4      Q.    I understand.  But you keep

5  saying -- you've said more than once

6  "lawsuits."  There's one lawsuit.

7      A.    This lawsuit.

8      Q.    And I guess I'm asking that

9  because if there's another lawsuit, I'd

10 like to know about it.

11     A.    No.  No.  This is the only one

12 I know of with us.

13     Q.    Have you discussed with Bill

14 Kennedy the credit report that was pulled

15 on Mr. Davis?

16     A.    No.  I wouldn't say I discussed

17 it with him.  I feel like he probably knows

18 I got one, but I don't ever remember

19 discussing it with him.

20     Q.    What about the Wards?  Do you

21 know who they are?

22     A.    Who?

23     Q.    The Wards, W-A-R-D-S.



## FOSHEE & TURNER COURT REPORTERS

1    A.    I know a lot of Wards.

2    Q.    Charles Ward, do you know him?

3    A.    What does he do?

4    Q.    I have no idea.

5         MR. DAVIS:  He works at the

6    electric company.  He lives on East Street.

7    A.    I don't recognize the name, no.

8    Q.    Do you know if the Wards,

9    Charles Ward is a customer of the bank?

10   A.    No, I don't know.  I'd have to

11   go look it up.

12   Q.    Do you have any knowledge as to

13   whether Mr. Davis did work for the Wards?

14   A.    No.

15   Q.    Do you know a Mr. Vickers, an

16   inspector for Avco Financial?

17   A.    No, not to my knowledge.

18   Q.    I guess then the question is

19   -- the answer to my question is have you

20   had any conversation with Mr. Vickers about

21   Mr. Davis?  I guess the answer would be no

22   then; is that right?

23   A.    No.

## FOSHEE & TURNER COURT REPORTERS

1      Q.     H.G. Hayes, do you know him?

2      A.     No.  The name's not familiar.

3      Q.     And, again, have you had any

4 conversation with Mr. Hayes about Mr.

5 Davis?

6      A.     Negative.

7      Q.     Just a few general questions

8 and then we'll be done.  Have you ever been

9 arrested?

10     A.     No.

11     Q.     Have you ever filed a lawsuit

12 against anyone?

13     A.     No.

14     Q.     Have you ever been sued other

15 than this lawsuit?

16     A.     No.

17     Q.     I don't even know if you're

18 party to this lawsuit.  Have you ever

19 testified in a case for any reason?

20     A.     Yes.

21     Q.     Other than having to do with

22 the bank, have you ever testified in any

23 case for any reason?



## FOSHEE & TURNER COURT REPORTERS

1    A.    Yes.  There was a case of

2  Dowling Lumber Company against Mr. Davis

3  down at the court, and I was called as a

4  witness.  I think that's when he was guilty

5  and got a jail sentence.

6    Q.    You testified in court in that

7  case?

8    A.    I testified as to bank records

9  at that time for Dowling Lumber Company.

10    Q.    Your role in that was basically

11  to identify records, authenticate records,

12  that type thing?

13    A.    As a bank officer.

14    Q.    Any other proceedings in which

15  you've testified?

16    A.    Not that I can remember, no.

17    Q.    I don't think I have anything

18  else.

19

20    FURTHER DEPONENT SAITH NOT

21

22

23



# FOSHEE & TURNER COURT REPORTERS

1            C E R T I F I C A T E

2

3

4    STATE OF ALABAMA)

5    HOUSTON COUNTY)

6

7            I hereby certify that the above

8    and foregoing deposition was taken down by

9    me in stenotype, and the questions and

10   answers thereto were transcribed by means

11   of computer-aided transcription, and that

12   the foregoing represents a true and correct

13   transcript of the deposition given by said

14   witness upon said hearing.

15           I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action, nor am I in anywise

18   interested in the result of said cause.

19

20   _____

21           STEPHANIE M. TILLEY

22

23

## IN THE CIRCUIT COURT OF GENEVA COUNTY, ALABAMA

WINSTON DAVIS,          )

    *Plaintiff,*        )

                   )    CIVIL ACTION NO.: CV-97-049(W)

VS.              )

GRADY C. TOLLEY, et. al.,    )

    *Defendants.*      )

### NOTICE OF TAKING DEPOSITION

TO:   Mr. Phil Eldridge, Esq.        Foshee & Turner, Inc
       P.O. Drawer 338           2001 Park Place Tower
       Hartford, Alabama 35344    Suite 220
                          Birmingham, AL 35203

       David Holmes, Esquire
       P.O. Box 1180
       Slocomb, Alabama 36375

       Bruce Stone, Esquire
       420 South Lawrence Street
       P.O. Box 563
       Montgomery, AL 36301-0563

     Please take notice that at the time, date and place indicated below, the Defendant, will take the testimony by deposition, upon oral examination, of the party listed. Such deposition shall be taken for the purpose of discovery or for use as evidence in the action pursuant to <u>Alabama Rules of Civil Procedure</u>, and shall be taken before a court reporter and notary public who is authorized to administer oaths under the laws of the State of Alabama. Deponent is requested to **bring with him the following documents for inspection and copying**:



**PLAINTIFF'S EXHIBIT**

*1 mair*

1. *Any and all documentation regarding the lending policies and obtaining of credit reports of Defendant Bank including, but not limited to, loan policy manuals, credit manuals, and/or loan officer guideline manuals.*

2. *A copy of the real estate loan file of the Defendants Grady C. Tolley and Marsha A. Tolley, to include, but not limited to, letters, correspondence, notes and memorandum, and phone communication logs.*

| | |
|---|---|
| **DEPOSITION OF:** | **MR. DONALD MAIR** |
| **DATE:** | **Friday, June 25, 1999** |
| **TIME:** | **9:00 am** |
| **PLACE:** | **City Bank of Hartford**<br>**Conference Room**<br>**307 West Main Street**<br>**Hartford, Alabama** |

Richard E. Crum
Attorney for Plaintiff

OF COUNSEL:
COBB & SHEALY, P.A.
P. O. Box 6346
Dothan, AL 36302-6346
(334) 794-8526



## CERTIFICATE OF SERVICE

I hereby certify I have this day mailed a copy of the foregoing Notice of Deposition, properly addressed and postage prepaid, to:

Mr. Phil Eldridge, Esq.
P.O. Drawer 338
Hartford, Alabama 35344

David Holmes, Esquire
P.O. Box 1180
Slocomb, Alabama 36375

Bruce Stone, Esquire
420 South Lawrence Street
P.O. Box 563
Montgomery, AL 36301-0563

Foshee & Turner, Inc
2001 Park Place Tower
Suite 220
Birmingham, AL 35203

This the 23rd day of June, 1999.

Of Counsel

Law Offices
# COBB & SHEALY, P. A.
206 North Lena St.
P.O. Box 6346
Dothan, Alabama 36302-6346
Phone (334) 794-8526
Fax (334) 677-0030

104

*Also Admitted in Florida
and Georgia
**Also Admitted in Florida
***Also Admitted in New York
and Massachusetts

Herman Cobb
Steadman S. Shealy, Jr.
Todd Derrick
Richard E. Crum*
James H. Pike
Joseph A. Morris**
Brian T. Mosholder***
Joseph D. Talmadge

## TELECOPY TRANSMISSION SHEET/COVER

THIS FACSIMILE TRANSMISSION IS CONFIDENTIAL AND MAY BE PRIVILEGED AND IS INTENDED FOR THE USE OF THE ADDRESSEE ONLY. IF YOU ARE NOT THE ADDRESSEE (OR A PERSON RESPONSIBLE FOR DELIVERING THIS TRANSMISSION TO THE ADDRESSEE), DO NOT USE THIS TRANSMISSION IN ANY WAY, BUT PROMPTLY CONTACT THE SENDER BY TELEPHONE.

DATE: 23 June 99     TIME: 11:00am

TELECOPY SENT TO: Phil Eldridge 334-588-3477

David Holmes 334-886-2331

Bruce Stone 334-269-3239

Foshee & Turner 205-252-5644

AREA CODE NUMBER: _____

FILE/CLIENT: Davis vs. Tolley

NUMBER OF PAGES BEING SENT (Including this page): 4

PERSON SENDING TELECOPY: Richard E. Crum

SPECIAL MESSAGE: Depo Notice of Ronald Main for this Friday. Should you have any questions please call. Thanks

IF YOU HAVE ANY DIFFICULTY RECEIVING THIS TRANSMISSION:

PLEASE CONTACT Jennifer IMMEDIATELY AT 334-794-8526.

PLAINTIFF'S
EXHIBIT

STATE FARM FIRE AND CASUALTY COMPANY
ALABAMA-MISSISSIPPI OFFICE
SOUTHTRUST BANK OF ALABAMA,    61-8/620
N.A.
BIRMINGHAM, AL
BIRMINGHAM, AL
Dothan 509-108

1 09 390344 J
DATE 10/13/95

COVERAGE
D-33        $10,000.00 2-01

CLAIM UNIT B86
COMMENT CD FA

CLAIM NO 01-D011-910    POLICY NO 01-BX1483-0
LOSS DATE 09/16/95

INSURED TOLLEY, GRADY

EXACTLY TEN THOUSAND AND .00/100 DOLLARS

$****10,000.00

Pay to the
Order of:
GRADY L TOLLEY &
& MARSHA TOLLEY
500 HILLCREST AVE.
HARTFORD AL 36344

MARSHA A TOLLEY & CITY BANK OF HARTFORD

TIN 01-417561375
MUTH WRETH

-AUTHORIZED REPRESENTATIVE

"09 1 73 90 344" 1:06 2000080 1: 70 "00 2 "135"

PETETEQNER WINSTON DAVESS
EXHIBIT 25 (A)

| CITY BANK OF HARTFORD<br>307 W. MAIN ST. PO BOX 340<br>HARTFORD, AL  36344<br><br>**LENDER'S NAME AND ADDRESS** | WILEY HOWARD<br>MARSHA A CASE<br>500 HILLCREST<br>HARTFORD, AL  36344<br><br>**BORROWER'S NAME AND ADDRESS** | Loan Number 6696 2<br>Date JULY 28, 1994<br>Mat. Date JULY 26, 1997<br>Loan Amount $ 24,000.00 |
|---|---|---|

**TRUTH-IN-LENDING DISCLOSURES**
**"I" MEANS THE BORROWER AND "YOU" MEANS THE LENDER**

| ANNUAL PERCENTAGE RATE<br>The cost of my credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost me. | AMOUNT FINANCED<br>The amount of credit provided to me or on my behalf. | TOTAL OF PAYMENTS<br>The amount I will have paid when I have made all scheduled payments. | I have the right to receive at this time an itemization of the Amount Financed<br><br>____ do    ____ do not want an itemization. |
|---|---|---|---|---|
| 10.251 % | $ 6,628.86 | $ 24,000.00 | $ 30,628.86 | |

My Payment Schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 35 | $ 330.00 | MONTHLY BEGINNING AUGUST 26, 1994 |
| 1 | $ 19,078.86 | JULY 26, 1997 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

☐ **Demand:** ☐ This loan has a demand feature. ☐ This loan is payable on demand and all disclosures are based on an assumed maturity of one year.

☐ **Variable Rate:** (check one below)
  ☐ My loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to me earlier.
  ☐ The annual percentage rate may increase during the term of this transaction if _____
  _____
  Any increase will take the form of _____
  If the rate increases by _____ % in _____ , the _____
  will increase to _____ . The rate may not increase more often than once _____
  and may not increase more than _____ % each _____ . The rate will not go above _____ %.

☒ **Security:** I am giving a security interest in: ☐ (brief description of other property)   Filing/Recording Fees: $ _____
  ☒ the goods or property being purchased.
  ☐ collateral securing other loans with you may also secure this loan.
  ☒ my deposit accounts and other rights I may have to the payment of money from you.

☒ **Late Charge:** If a payment is late I will be charged 5.000% OF THE PAYMENT WITH A MIN. OF $0.50 AND A MAX. OF $100.00 AFTER 10 DAYS OF THE SCHEDULED PAYMENT.

☐ **Required Deposit:** The annual percentage rate does not take into account my required deposit.

**Prepayment:** If I pay off this loan early, I ☐ may ☒ will not have to pay a penalty.
  ☐ may ☐ will not be entitled to a refund of part of the finance charge.

☒ **Assumption:** Someone buying my house ☐ may, subject to conditions, be allowed to ☒ cannot assume the remainder of the mortgage on the original terms.

I can see my contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.       "e" means an estimate.

**CREDIT INSURANCE** - Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless I sign and agree to pay the additional costs.

| Type | Premium | Term |
|---|---|---|
| Credit Life | | |
| Credit Disability | | |
| Joint Credit Life | | |

I ☐ do ☐ do not want credit life insurance.
X _____ DOB _____

I ☐ do ☐ do not want credit disability insurance.
X _____ DOB _____

I ☐ do ☐ do not want joint credit life insurance.
X _____ DOB _____

X _____ DOB _____

I ☐ do ☐ do not want _____ insurance.
X _____

**PROPERTY INSURANCE** - I may obtain property insurance from anyone I want that is acceptable to you. If I get the insurance from or through you

I will pay $ _____ for _____ of coverage.

**FLOOD INSURANCE** - Flood insurance ☐ is ☒ is not required. I may obtain flood insurance from anyone I want that is acceptable to you. If I get the insurance from or through you I will pay

$ _____ for _____ of coverage.

**ITEMIZATION OF AMOUNT FINANCED**

| | |
|---|---|
| Amount given to me directly | $ _____ |
| Amount paid on my (loan) account | $ _____ |

AMOUNTS PAID TO OTHERS ON MY BEHALF:

| | |
|---|---|
| Insurance Companies | $ _____ |
| Public Officials | $ _____ |
| HOWARD, CASE AND | $ _____ |
| PHIL ELDRIDGE, ATTY | $ 24,000.00 |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |

| (less) PREPAID FINANCE CHARGE(S) | $ _____ |
|---|---|
| Amount Financed | $ 24,000.00 |

(Add all items financed and subtract prepaid finance charges.)

**BY SIGNING BELOW - I ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE ON THE DATE INDICATED ABOVE.**

X _Wiley Howard_      X _Marsha A. Case_      X _____
WILEY HOWARD                MARSHA A CASE

© 1982 Bankers Systems, Inc., St. Cloud, MN (1-800-397-2341) Form TI-DRV-S 11/18/92

# NOTE

..JULY. 28,. 1994...................    .....HARTFORD.........................  ,    ......ALABAMA........................... ,
       **[Date]**                       **[City]**                     **[State]**

..500. HILLCREST,. HARTFORD,. AL. 36344.....................................................................................................
                                             **[Property Address]**

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $.24,000.00...................... (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is ..CITY. BANK. OF. HARTFORD................
.......................................................................................................................................................
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of .......10,250... %. Interest will be charged beginning on ..........JULY. 28,. 1994..........................

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Scheduled Payments**

I will pay principal and interest by making payments when scheduled:

☒ I will make ...35........................... payments of $.330,00...................................... each on the
................26TH............................... of each .............MONTH................................................
....................................................... beginning on AUGUST. 26,. 1994..............................

☐ I will make payments as follows:

☒ In addition to the payments described above, I will pay a "balloon payment" of $.19,078.86..................
on .JULY. 26,. 1997................. . The Note Holder will deliver or mail to me notice prior to maturity that the balloon payment is due. This notice will state the balloon payment amount and the date that it is due.

**(B) Maturity Date and Place of Payments**

I will make these payments as scheduled until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My scheduled payments will be applied to interest before principal. If, on ...........JULY. 26,. 1997......................................, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my scheduled payments at 307. W. MAIN. ST.,. PO. BOX. 340,. HARTFORD,. AL.. 36344........
....................................................................................................................... or at a different place if required by the Note Holder.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any scheduled payment by the end of .10...............
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be ...5,000... % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment. THE MINIMUM LATE CHARGE IS $0.50. AND THE MAXIMUM IS $100.00

**(B) Default**

If I do not pay the full amount of each scheduled payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**MULTIPURPOSE FIXED RATE NOTE (MULTISTATE)**                     *(page 1 of 2)*

# HOUSE APPRAISAL REPORT

Borrower: _Willie Hazel_      Loan Amt. $_____    No. of Months _____

Address of Property: _500 Hillcrest_    Sect. ____    Borrower's Est. MV $_____

Lot Size: _145_ ' X _135_ ' Sq. Ft. in Htd. Area _1280_   Rented: ( ) Mo. Rental $_____

GENERAL DESCRIPTION IMPROVEMENTS PLANNED:  (Use reverse side if necessary)   COST:

_Business Loan_      $_____

Contractor: _____      $_____

## NEIGHBORHOOD AND LOT

Primary Age of Neighborhood: Within 10 years ( ) 10 to 20 Years ( ) Over 20 Years (X)
Appearance of Neighborhood: Good (X) Fair ( ) Poor ( ) Deteriorating: Yes ( ) No ( )
Predominatly Home Owners: Yes (X) No ( ) Good rental area: Yes ( ) No ( )
Would Be Classified: Residential (X) Rural ( ) Residential and Commercial ( )
    If transitional ( ), explain :
Street Is: Paved (X) Unpaved ( ) Curb & Gutter: Yes (X) No ( ) Condition: Good (X) Fair ( ) Poor ( )
Lot Is: Level (X) Sloping ( ) Steep ( ) Condition of yard: Good (X) Fair ( ) Poor ( )
Utilities: Sewer (X) Septic Tank ( ) City Water (X) Deep Well ( ) Lights (X) Gas (X)
Appears To Be Near:  Busline ( ) Shopping Facilities ( ) Schools ( ) Access Routes ( )
Comments: _____

## HOUSE

Exterior Construction:  Brick Veneer (X) Frame ( ) Shingles ( ) Other ( )
     No. Stories (1) Split Level ( ) Finished Basement ( )
Condition of Exterior:  Good (X) Fair ( ) Poor ( ) Comments ( )
Roof: Composition Shingles (X) Other ( ) Condition: Age ( ), Good ( ) Fair ( ) Poor ( )
Rooms: No. Bedrooms – Main Floor (3) Upstairs ( ) Basement ( )
     No. Baths – Main Floor (1) Upstairs ( ) Basement ( )
     Living Room (X), Dining Room ( ) Kitchen ( ) Basement ( )
     Living & Dining Comb. ( ) Kitchen-Breakfast Comb. ( ) Kitchen-Dining Comb. (X)
     Family Room , (Dining, Den & Kitchen Comb.) ( )
     Foyer ( ) Office ( ) Utility ( )
     Garage ( ) Carport ( ) Attached ( ) Detached ( ) Single ( ) Double ( )
     Porches _____

OUT BUILDINGS:  Barns ( ) Open Shed ( )
     Construction _____

     Direction from house _____

TYPE OF HEAT:  Central ( ) Floor Furnace ( ) Gas ( ) Oil ( ) Electric Wall Panel (X)
     Space Heater:  Gas ( ) Electric ( ) Oil ( )
     Wood:  Stove ( ) Fireplace ( )
     Solar ( )

AIRCONDITON:  Central Unit ( ) Window Units (1) None ( ) Attic Fan ( ) Window Fan ( )

FLOORS – (Predominantly): Hardwood ( ) Pine ( ) Concrete Slab (X) Carpeting ( )
BUILT IN APPLIANCES:  Oven ( ) Range ( ) Dishwasher ( ) Disposal ( ) None ( )
Walls: Sheetrock (X) Panel: (X) Plaster ( ) Lumber ( ) Type Lumber ( ) Wallpaper ( )
     Bathroom Walls:  Wallpaper ( ) Cermic Tile ( ) Other ( ) _Tile Board_
     Bathroom Floor: Ceramic Tile ( ) Plastic Tile ( ) Other ( ) _Vinyl Tile_
CONDITION OF INTERIOR:  Good (X) Fair ( ) Poor ( ) Comment: _____
House value as compared to average in neighborhood:  Higher ( ) About Average (X) Lower ( )
In event of foreclosure, would this house readily:  Rent – Yes (Y) No ( ) Sell – Yes (X) No ( )

Date of Appraisal: _12-6-94_      APPRAISED VALUE
(%) Loan to Value Ratio: _75_ % =    Lot Value.................$ _3000.00_
SIGNATURE (S) OF APPRAISER (S):      House Value..............._32,800.00_
     Other...._Chain Link_...._1,500.00_
     TOTAL....................._37,300.00_

75% of    37,300.00 = 28,000.00

(over)

| CITY BANK OF HARTFORD | WILEY D HOWARD | |
|---|---|---|
| 307 W. MAIN ST. PO BOX 340 | MARSHA CASE | Loan Number 050 6893 0 |
| HARTFORD, AL 36344 | 500 HILLCREST | Date DECEMBER 9, 1994 |
| | HARTFORD, AL 36344 | Mat. Date DEC. 26, 2009 |
| | | Loan Amount $ 28,000.00 |
| **LENDER'S NAME AND ADDRESS** | **BORROWER'S NAME AND ADDRESS** | SSN/EIN: 262 79 3951 |

## TRUTH-IN-LENDING DISCLOSURES
### "I" MEANS THE BORROWER AND "YOU" MEANS THE LENDER

| ANNUAL PERCENTAGE RATE The cost of my credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost me. | AMOUNT FINANCED The amount of credit provided to me or on my behalf. | TOTAL OF PAYMENTS The amount I will have paid when I have made all scheduled payments. | I have the right to receive at this time an itemization of the Amount Financed |
|---|---|---|---|---|
| 13.506 % | $ 37,872.80 | $ 28,000.00 | $ 65,872.80 | I _____ do _____ do not want an itemization. |

My Payment Schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 180 | $ 365.96 | MONTHLY BEGINNING JANUARY 26, 1995 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

☐ **Demand:** ☐ This loan has a demand feature. ☐ This loan is payable on demand and all disclosures are based on an assumed maturity of one
☐ **Variable Rate:** (check one below) year.
  ☐ My loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to me earlier.
  ☐ The annual percentage rate may increase during the term of this transaction if _____

_____
Any increase will take the form of _____
If the rate increases by _____ % in _____ , the _____
will increase to _____ . The rate may not increase more often than once _____
and may not increase more than _____ % each _____ . The rate will not go above _____ %.

☒ **Security:** I am giving a security interest in: ☒☒ (brief description of other property) **Filing/Recording Fees:** $ 51.00
  ☐ the goods or property being purchased. REAL ESTATE AT 500 HILLCREST AVE, HARTFORD,
  ☐ collateral securing other loans with you may also secure this loan. ALABAMA
☒ ____ deposit accounts and other rights I may have to the payment of money from you.
☒ **Late Charge:** If a payment is late I will be charged 5.000% OF THE PAYMENT WITH A MIN. OF $0.50 AND A MAX. OF
☐ **Required Deposit:** The annual percentage rate does not take into account my required deposit. $100.00 AFTER 10 DAYS OF THE
**Prepayment:** If I pay off this loan early, I ☐ may ☒ will not have to pay a penalty. SCHEDULED PAYMENT.
  ☐ may ☐ will not be entitled to a refund of part of the finance charge.
☒ **Assumption:** Someone buying my house ☐ may, subject to conditions, be allowed to ☒ cannot assume the remainder of the mortgage on
  the original terms.
I can see my contract documents for any additional information about nonpayment, default,
any required repayment in full before the scheduled date, and prepayment refunds and penalties. "e" means an estimate.

**CREDIT INSURANCE** - Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless I sign and agree to pay the additional costs.

| Type | Premium | Term |
|---|---|---|
| Credit Life | | |
| Credit Disability | | |
| Joint Credit Life | | |

I ☐ do ☐ do not want credit life insurance.
X _____ DOB _____
I ☐ do ☐ do not want credit disability insurance.
X _____ DOB _____
I ☐ do ☐ do not want joint credit life insurance.

X _____ DOB _____

X _____ DOB _____
I ☐ do ☐ do not want _____ insurance.
X _____

**PROPERTY INSURANCE** - I may obtain property insurance from anyone I want that is acceptable to you. If I get the insurance from or through you

I will pay $ _____ for _____ of coverage.
**FLOOD INSURANCE** - Flood insurance ☐ is ☒ is not required. I may obtain flood insurance from anyone I want that is acceptable to you. If I get the insurance from or through you I will pay

$ _____ for _____ of coverage.

### ITEMIZATION OF AMOUNT FINANCED

| | |
|---|---|
| Amount given to me directly | $ 4,446.51 |
| Amount paid on my (loan) account | $ 23,553.49 |
| | $ _____ |

AMOUNTS PAID TO OTHERS ON MY BEHALF:

| | |
|---|---|
| Insurance Companies | $ _____ |
| Public Officials | $ _____ |
| | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| (less) PREPAID FINANCE CHARGE(S) | $ _____ |
| Amount Financed | $ 28,000.00 |

(Add all items financed and subtract prepaid finance charges.)

BY SIGNING BELOW - I ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE ON THE DATE INDICATED ABOVE.

(X) _____ (X) _____ X _____
**WILEY D HOWARD**      **MARSHA CASE**

© 1982 Bankers Systems, Inc., St. Cloud, MN (1-800-397-2341) Form TL-DRV-S 11/18/82

(page 1 of 1)

# NOTE

DECEMBER 9, 1994         HARTFORD    ,    ALABAMA
                                                     [City]           [State]

500 HILLCREST, HARTFORD, AL 36344

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 28,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is CITY BANK OF HARTFORD

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 13.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 26TH. day of each month beginning on JANUARY 26, 1995 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on DECEMBER 26, 2009 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at 307 W. MAIN ST., PO BOX 340, HARTFORD, AL 36344 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 365.96

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**MULTISTATE FIXED-RATE NOTE**-Single Family-FNMA/FHLMC UNIFORM INSTRUMENT  Form 3200 12/83      *(page 1 of 2)*

BANKERS SYSTEMS, INC., ST. CLOUD, MN 56302 (1-800-397-2341) FORM MN-1

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(B) on page 1 of this Note or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. BALLOON PAYMENT DISCLOSURE**

[Complete the balloon payment notice below if this Note provides for a balloon payment at Section 3(A) on page 1 of this Note.]

THIS LOAN IS PAYABLE IN FULL ............ON .JULY. 26,. 1997.......................................................................
..............................................................................................................AT. MATURITY..   I MUST REPAY THE
ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE, WHICH MAY BE A
LARGE PAYMENT. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT
TIME. I WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT I MAY
OWN, OR I WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER I HAVE THIS LOAN WITH,
WILLING TO LEND ME THE MONEY. IF I REFINANCE THIS LOAN AT MATURITY, I MAY HAVE TO PAY
SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF I
OBTAIN REFINANCING FROM THE SAME LENDER.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _____(Seal)
WILEY HOWARD                                                        -Borrower

X _____(Seal)
MARSHA A CASE                                                       -Borrower

_____(Seal)
                                                                   -Borrower

[Sign Original Only]

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

(X)............................................................................(Seal)
WILEY D HOWARD                                                      -Borrower

(X)............................................................................(Seal)
MARSHA CASE                                                          -Borrower

............................................................................(Seal)
                                                                    -Borrower

*[Sign Original Only]*

# CONTRACTORS INVOICE

**FROM:** Claude Barwick
405 N. Morris
Geneva, Ala, Lic # 418.

**TO:** Grady Tolley
500 Hillcrest
Haetford, Ala 588-0911

NO. _____

**WORK PERFORMED AT:**
500 Hillcrest
Haetford Al 36344

**DATE** Oct 18 95

**YOUR WORK ORDER NO.** 02983

**OUR BID NO.**

Remove all Sheet Rock & Insul from House -
Remove Smoked Insul - Remove Burut Trusss & Decking -
Remove everything from Bathroom - Remove all Doors -
Windows - Will Replace New Trusss Decking Roof - Replace
New Sheet Rock & Insul - Wiring - Wiring - Windows & Doors
Will Replace New Shower Tub + Commode - Sink - Replace New
Light Fixtures - Plugs - Switches - Replace 3 Ceiling Fans - Will
Texture Ceiling - Paint Inside - Cut Laundry Room to 5x8 -
Move 1 Bedroom Wall over - Cut & Replace Sliding Glass Door - Paint
Inside - Replace Vinyl & Carpet - Replace Kitchen Cabnets -
Replace Switch Box - Remove all Old Materials -
House is 29x49 Consisting of 3 Bedrooms - 1 Bath - Kitchen
1 Hallway - 1 Living Room - Dining Room Combo
Will spray Alumin. Paint
4 Draws = 3 Draws Consisting of 5,000.00 EA
1 Draws Consisting of 6,000.00

All Work Will be Completed Within 30-45 days from Starting Date

All Material is guaranteed to be as specified, and the above work was performed in accordance with the drawings and specifications provided for the above work and was completed in a substantial workmanlike manner for the agreed sum of $21,000.00 Doll

21,000.00

This is a ☐ Partial  ☐ Full invoice due and payable by: _____ Month _____ Day _____ Year

accordance with our ☑ Agreement  ☐ Proposal  No. _____ Dated _____ Month _____ Day

_____ 10-19-95 _Claude Barwick_

*PETITIONER WILSON LAVOSS*
*EXHIBIT 26*

**SOUTHTRUST BANK**
DRAWER A
OPP, ALABAMA  36467-0400
TELEPHONE: (334) 493-3581
FACSIMILE:  (334) 493-3752



**SouthTrust Bank**

May 22, 2000

Jimmy Hand·
District Attorney's Office
P O Box 247
Geneva, Al. 36340

Mr. Hand:

Per our conversation of this date, please find enclosed copies of records from the file of Richard Lewellyn
requested in the subpoena dated 5-17-00. Should you have further questions, please let me know.

Sincerely,

*Robin Pierce*

Robin Pierce,

Assistant Vice President

*SUPPRESSED BY THE*
*GENEVA COUNTY DISTRICT*
*ATTORNEY DAVID EMERY*
*FOR CASES CC-96-219,220 ₸221*

**DEFENDANT'S
EXHIBIT**

*5*                          *1*

**ACORD. INSURANCE**

BE SURE — INSURE WITH
**WEEKS INSURANCE AGENCY, INC.**
106 4th Ave., So. - P.O. Box 99
Hartford, AL 36344-0099
Telephone 205-588-2285

THIS BINDER IS A TEMPORARY II
SIDE OF THIS FORM.

SHOW

PRODUCER

M. L. WEEKS INSURANCE AGENC
P.O. BOX 99
Hartford, AL 36344

DATE

554

AM
PM  10/1/95

COVERAGE IN THE ABOVE NAMED

CODE    17880    SUB-CODE

DESCRIPTION OF OPERATIONS/VEHICLES/PROPERTY (Including Location)
Dwelling/Builders Risk
Property located at Co. Rd. 9, Between Slocom!
Wicksburg, Geneva County, AL
2700 Sq. Ft. Heated
Brick Veneer
Fireplace/Metal Insert

INSURED

Winston Davis
501 E. Palmetto St.
Geneva, AL 36340

| COVERAGES TYPE OF INSURANCE | COVERAGE/FORMS | AMOUNT | LIMITS DEDUCTIBLE | COINSUR. |
|---|---|---|---|---|
| PROPERTY CAUSES OF LOSS | Dwelling | $125,000. | $250. | |
| BASIC    BROAD x    SPEC. | | | | |
| Builders Risk. | | | | |

| GENERAL LIABILITY | | |
|---|---|---|
| COMMERCIAL GENERAL LIABILITY | GENERAL AGGREGATE | $ |
| | PRODUCTS — COMP/OP AGG. | $ |
| CLAIMS MADE    OCCUR | PERSONAL & ADV. INJURY | $ |
| OWNER'S & CONTRACTOR'S PROT. | EACH OCCURRENCE | $ |
| | FIRE DAMAGE (Any one fire) | $ |
| | MED. EXPENSE (Any one person) | $ |
| RETRO DATE FOR CLAIMS MADE: | COMBINED SINGLE LIMIT | $ |
| AUTOMOBILE LIABILITY | BODILY INJURY (Per person) | $ |
| ANY AUTO | BODILY INJURY (Per accident) | $ |
| ALL OWNED AUTOS | PROPERTY DAMAGE | $ |
| SCHEDULED AUTOS | MEDICAL PAYMENTS | $ |
| HIRED AUTOS | PERSONAL INJURY PROT. | $ |
| NON-OWNED AUTOS | UNINSURED MOTORIST | $ |
| GARAGE LIABILITY | | $ |

| AUTO PHYSICAL DAMAGE DEDUCTIBLE    ALL VEHICLES    SCHEDULED VEHICLES | | |
|---|---|---|
| | ACTUAL CASH VALUE | |
| COLLISION: | STATED AMOUNT | $ |
| OTHER THAN COL: | OTHER | |

| EXCESS LIABILITY | | |
|---|---|---|
| UMBRELLA FORM | EACH OCCURRENCE | $ |
| | AGGREGATE | $ |
| OTHER THAN UMBRELLA FORM    RETRO DATE FOR CLAIMS MADE: | SELF-INSURED RETENTION | $ |

| | STATUTORY LIMITS | |
|---|---|---|
| WORKER'S COMPENSATION AND | EACH ACCIDENT | $ |
| EMPLOYER'S LIABILITY | DISEASE-POLICY LIMIT | $ |
| | DISEASE-EACH EMPLOYEE | $ |

SPECIAL CONDITIONS/OTHER COVERAGES
Rick Lewellyn, Co. Rd #9, Between Slocomb and Wicksburg, AL (Geneva County)

NAME & ADDRESS:
SouthTrust Bank
Opp, AL 36467

X  MORTGAGEE
LOAN #  LOSS PAYEE

ADDITIONAL INSURED

AUTHORIZED REPRESENTATIVE
_Royce J Martin_

ACORD 75-S (7/90)

© ACORD CORPORATION 1990

J.

FIRST MORTGAGE

### NOTICE OF MORTGAGE
### REQUEST FOR LOSS PAYABLE CLAUSE

Date: _09/01/95_ _____   Branch: OPP _____

_Weeks Ins. Agency_   SouthTrust Bank of _Alabama, National Association_
Insurance Company

_P.O. Box 99_ _____   110 Main Street
Address

_Hartford, Al 36344_   Opp, AL 36467
City, State, Zip

Dear Sirs:

We have, as of this date, made a loan to our customer whose property is insured by your company. This letter will serve as a notice to you of our mortgage.

We would appreciate your sending to SouthTrust Bank of _Alabama, National Association_ _____ at the address above, a loss payable clause to insure our protection in the event of a loss under the policy.

Your prompt attention to this matter will be appreciated.

Policy Number: _____

Insured/Borrower: _Richard Lewellyn_

Address of Insured: _____

Property Located At: ROUTE 5, BOX 222-A

City, State, Zip: DOTHAN, Alabama 36303

SOUTHTRUST BANK OF _Alabama, National Association_

Mortgage Loan Department
334-+493-358

_3._

SA42287 4/81

November 13, 1995


Winston Davis Contractor
501 East Palmetto Street
Geneva, Al.  36340


Rick Lewellyn
Rt. 5 Box 222
Dothan, Al.  36301


RE:  Construction on new home


Dear Mr. Lewellyn:

According to **CONTRACTORS CONTRACT SECTION 7- OTHER PROVISIONS,**
Hurricane Opal dated October 4, 1995 caused damage to your property
and this has created a delay in labor and material, as of today
November 13, 1995 I am waiting on an engineers report to find out
the extent of damage, if any.  There will be a short delay on the
construction of you home.

Sorry for any inconvenience this may have caused you, if any questions
please call me at (334) 684-6927.



Sincerely,

Winston Davis

Winston Davis



md
cc:     SOUTHTRUST BANK OF COVINGTON COUNTY
        P. O. BOX A
        OPP, AL.  36467-0400                    4.

RE: RICK LEWELLYN

INSPECTION # 1

ITEMS IN PLACE

FOOTINGS
SLAB
ROUGH PLUMBING IN SLAB
FRAMING - (95%)
SHEATHING
ROOF DECKING & FELT
WINDOWS
EXT DOORS (ON SITE)

ITEMS SCHEDULED TO BEGIN WK OF 10/2/95

HVAC
BRICK
ELECTRICAL
PLUMBING
ROOFING

5.

OFFICER _TWJ/Blo_____

PROJECT NAME

_Lewellyn_____

BORROWER

_Richard + Genevieve_

LOT NUMBER_____     BLOCK_____     AREA_____

LOAN AMOUNT _86,744.70_____     LOAN DATE _9/1/95_____     APPRAISED VALUE _130,000_

ADDRESS

DIRECTIONS TO PROPERTY

| ***AMOUNT ***DRAWN | PERCENT DRAWN | PERCENT COMPLETE | INSPECTION DATE | REMARKS | INSPECTED *** BY *** |
|---|---|---|---|---|---|
| 1) 86,744.70<br>1,744.70 | Loan Amount<br>Fees + | Amount<br>see HUD | | | |
| 2) 85,000.00<br>8,000.00<br>13,000.00 | posted<br>w rith | payment on<br>Davis | other loan | ⎰at loan closing | |
| 3) 64,000.00<br>24,000.00 | Winston | Davis | | | |
| 4) 35,000.00<br>11,000.00 | ck # 074254025<br>ck # 074254026 | 12/01/95<br> | Rick Lewellyn<br> | | |
| 5) 24,000.00<br>2,200.00<br>81,780.00 | | 12/01/95 | Rick Lewellyn + EE Smith | | |
| 6) 12,251.05<br>9,529.00 | 12/29/95<br>1 | Richard Lewellyn Jr CHT | | | |
| 7) | | | | | |
| 8) | | | | | |
| 9) | | | | | |

6.

**SouthTrust Bank**
SouthTrust Bank of Covington
County, National Association
P.O. Drawer A
Opp. AL 36467

OFFICIAL CHECK

074254026

010466

12/01     95

Two Thousand Two Hundred Twenty and 00/100————— $ 2,220.00

Rick Lewellyn and E. E. Bentley Insulation Co. of Dothan, Inc.

Loan Proceeds - Lewellyn

Acct. #6916531-21652

NON NEGOTIABLE
Vice President

REMITTER COPY

TO THE REMITTER
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

---

FOR YOUR PROTECTION SAVE THIS COPY

**SouthTrust Bank**
SouthTrust Bank of Covington
County, National Association
P.O. Drawer A
Opp. AL 36467

OFFICIAL CHECK

074254025

010466

12/01     95

Eleven Thousand and 00/100————— $ 11,000.00

Rick Lewellyn

Loan Advance #6916531-21652

NON NEGOTIABLE
Vice President

REMITTER COPY

TO THE REMITTER
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

---

FOR YOUR PROTECTION SAVE THIS COPY

**SouthTrust Bank**
SouthTrust Bank of Covington
County, National Association
P.O. Drawer A
Opp. AL 36467

OFFICIAL CHECK

074253086

010466

September 29     95

$ 29,000.00**

Twenty-Nine Thousand and No/100—————

Richard Lewellyn and Winston Davis

advance on construction

6916531 - 21652

NON NEGOTIABLE
Teresa V. Ward, Vice President

REMITTER COPY

TO THE REMITTER
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

7.

074254094

**SouthTrust Bank** 🅂
SouthTrust Bank of Covington
County, National Association
P.O. Drawer A
Opp, AL 36467

OFFICIAL CHECK

December 29    95

010466

Twelve Thousand Two hundred Fifty One Dollars and NO/100———    $ 12,251.00

Richard Lewellyn
Advance on construction

6916531-21652

NON NEGOTIABLE
Teresa V. Ward, Vice President

TO THE REMITTER
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

---

FOR YOUR PROTECTION SAVE THIS COPY

074254414

**SouthTrust Bank** 🅂
SouthTrust Bank of Covington
County, National Association
P.O. Drawer A
Opp, AL 36467

OFFICIAL CHECK

1-8    96

010466

Nine Thousand five hundred twenty-nine and no/100————————    $9,529.00

Richard Lewellyn
SouthTrust Bank -Construction Advance

6916531-21652

NON NEGOTIABLE
Teresa V. Ward,
Senior Vice-President

TO THE REMITTER
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

8.

| Post-it® Fax Note | 7671 | Date 12.26.96 | # of pages ▶ 1 |
|---|---|---|---|
| To MELINDA HALL | | From Citicorp | |
| Co./Dept. SOUTHTRUST BK. | | Co. Retrieval Servias | |
| Phone # | | Phone # 716 694-3150 | |
| Fax # 334 493 3752 | | Fax # | |





9.

| Post-It® Fax Note | 7671 | Date 12·26·96 | # of pages ▶ 1 |
|---|---|---|---|
| To MELINDA HALL | | From Citicorp | |
| Co./Dept. SOUTHTRUST BK. | | Co. Retrieval Servias | |
| Phone # | | Phone # 716 694·3150 | |
| Fax # 334 493 3752 | | Fax # | |





10.



12

FOR YOUR PROTECTION SAVE THIS COPY

074254461

010466

**SouthTrust Bank**

OFFICIAL CHECK

SouthTrust Bank of Covington
County, National Association
P.O. Drawer A
Opp, AL 36467

2/5/96

$ 13,000.00**

Thirteen Thousand and No/100————————————

Richard L. Lewellyn and Genevieve P. Lewellyn

loan proceeds

NON NEGOTIABLE

Carla Baham   Loan Coordinator

TO THE REMITTER
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THIS INSTRUMENT

- REMITTER COPY

REMITTER COPY

13.

LAW OFFICE OF

# HENRY F. LEE, III

710 WEST MAPLE AVENUE
POST OFFICE BOX 129
GENEVA, ALABAMA 36340

LICENSED IN
ALABAMA
FLORIDA

November 17, 1995

TELEPHONE
(334) 684-6406
684-6260
TELECOPIER
(334) 684-2602

Mr. Winston Davis
501 E. Palmetto St.
Geneva, AL   36340

　　　　　Re:  Rick Lewellyn
　　　　　　　Construction Contract

Dear Mr. Davis:

1　　　This office is representing Mr. Rick Lewellyn with regards to his rights under a contract whereby you agreed to construct a home for him on his property at Route 5, Box 222, Dothan, Alabama 36301.

2　　　Mr. Lewellyn advises me that you have ceased work on his home and have advised him that you will not be able to perform any additional work until you receive some additional funds.

3　　　According to your contract, you are entitled to remaining draws based upon SouthTrust Bank rules and inspections to be conducted by the Bank.

4　　　SouthTrust Bank has inspected the premises and have advised Mr. Lewellyn that you are not entitled to additional draws at this time.

5　　　Mr. Lewellyn has been contacted by numerous persons who claim they have not been paid for the materials which you had shipped to the job site and which you have incorporated in Mr. Lewellyn's house.

6　　　At least one subcontractor has contacted Mr. Lewellyn and requested he be allowed to remove his tools from the job since he had not been paid for his work.

7　　　One supplier came to recover the materials which had been delivered to the site and Mr. Lewellyn was caused to pay the supplier for the materials in order to retain them.

8　　　The engineer who inspected the property on behalf of the insurance company advised Mr. Lewellyn that there was no structural damage to the premises and that work should and could be continued on the project.

9　　　Mr. Lewellyn has proceeded to complete the roof in order to protect the materials that have been incorporated into the construction project.

10　　　This is, therefore, to advise that if you desire to complete the contract, you should proceed immediately to complete construction.  Mr. Lewellyn will offset your next entitled draw by the amount he has been caused to pay for materials already delivered.  Also, all future draws will be made payable to you

*141*

Mr. Winston Davis
Re:  Rick Lewellyn
November 17, 1995
Page Two

and all suppliers who have put Mr. Lewellyn on proper legal written notice that
they are supplying materials to the project.

In the event you fail to resume construction of the project within five (5)
days of the date of this letter, we shall assume that you have abandoned the
project and the contract signed by each of you is terminated by reason of your
breach.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Very Truly Yours,

Henry F. Lee, III

HFL/mmb

cc:  Richard Lewellyn
     Route 5, Box 222
     Dothan, AL  36301

     SouthTrust Bank of Alabama
     ATTN:  Max Metcalf
     P. O. Drawer A
     Opp, AL  36467

15.



**2374**

Please write the above invoice number on your check.
Thank you.

Alabama Court of Criminal Appeals
300 Dexter Avenue
P.O. Box 301555
Montgomery, Alabama 36130-1555

INVOICE, PAYABLE TO: STATE C
INVOICE, REMIT TO:

Oct. 11 2000

**DEFENDANT'S EXHIBIT**

Winston Davis
AIS 207010 C 192
P.O. Box 8
Elmore AL 36025

97-367

For Copying:

Various Copies

Paid M.O. 50627113

PETITIONER WINSTON DAVIS'S
EXHIBIT 27.

TRIAL COURT TRANSCRIPT
ON APPEAL FOR CASES
CC96-219, 220 AND 221.

16

the District Attorney and
by Defense Counsel, during
which no objections were
made, following which the
following occurred:


THE COURT: Call your first witness.


## WALLACE DOWLING

having been first duly sworn, was examined and
testified as follows, to-wit:


## DIRECT EXAMINATION

BY MR. EMERY:

Q    Would you introduce yourself to these ladies and
gentlemen, please.

A    I'm Wallace Dowling.    I'm the owner of Dowling
Lumber Company in Hartford.

Q    How long have you been in that business?

A    It's a family business and it has been operating
since back in the early 40's.

Q    What kind of business is it?

A    Building materials, lumber for construction work
of homes, and stuff like that.

17

| | | |
|---|---|---|
| 1 | Q | Do you know the Defendant over here, Winston Davis? |
| 2 | A | Yes sir. |
| 3 | Q | How did you meet him? |
| 4 | A | He was buying materials from us. |
| 5 | Q | When did that start? |
| 6 | A | Back in September or October of '95. |
| 7 | Q | Did you know him before then? |
| 8 | A | No sir. |
| 9 | Q | What was your arrangement with Mr. Davis? |
| 10 | A | He would give us a check and sign it, we would put |
| 11 | | it under the drawer and at the end of the month we |
| 12 | | would fill it out for the amount of his monthly |
| 13 | | bill and send him a receipt. |
| 14 | Q | Would he come in and charge materials? |
| 15 | A | Yes sir. |
| 16 | Q | And then at the end of the month you were supposed |
| 17 | | to be paid. |
| 18 | A | We would fill out the check for the amount of his |
| 19 | | monthly bill. |
| 20 | Q | Is that what he told you to do? |
| 21 | A | Yes sir. |
| 22 | | MR. EMERY:  Mark this. |
| 23 | | (Whereupon, the same was |
| 24 | | marked as State's Exhibit |
| 25 | | 1 for identification, |

18

following     which     the

following occurred:

Q     Let me show you State's Exhibit 1. Can you identify that?

A     Yes sir. This is one of the checks that he gave us.

Q     Is that endorsed by him?

A     Yes sir, endorsed, and made out to us by him.

Q     When was that done?

A     On the 10th, 9th, of '95.

Q     So, on October 9th, 1995.

A     Yes sir.

Q     Was the amount of the check filled in?

A     No sir.

Q     What did he tell you concerning what to do with that check?

A     At the end of the month to fill the amount out for the amount of his monthly statement and deposit it.

Q     At that time, October 9th, did he owe you any money?

A     This amount here.

Q     No, on October 9th when he gave you the check?

A     Yes sir, this amount here is what we made the check out for on that date.

Q     Okay, when he was there?

A     No sir. I don't know if I'm following your

19

questions.

Q    He gave you that check on what date?

A    October 9th.

Q    And that was to secure some credit was it not?

A    Yes sir.

Q    At your store there.

A    Yes sir.

Q    And then after that did he charge certain items?

A    Yes sir.

Q    And did you bring those tickets with you?

A    Yes sir.  You have them in your presence.

MR. EMERY: We'll call this State's Exhibit 2.

(Whereupon, the same was marked as State's Exhibit 2 for identification, following which the following occurred:

Q    Now these are tickets that he charged after October 9th at your store?

A    Yes sir.

Q    And what do they total?

A    One Thousand six hundred and seven dollars and twenty cents, the same amount the check is made out for.

Q    And he charged these on different days during the

20

1    month of October, after October 9th?

2  A    The first charge ticket is on 10/9 which is the

3    same day of the check and it goes froward to 10/20.

4  Q    So on the day he gave you that check, he picked up

5    -- I don't know what this is.

6  A    It's probably my writing.

7  Q    Some kind of supplies there. He swapped something

8    out or something.

9  A    Yes, it was the difference between narrow eve metal

10    and wide eve metal, the metal that goes around the

11    roofing on a house.

12  Q    So that was only $6.42.

13  A    The difference between the two items.

14  Q    I guess this is the same day he picked up these

15    materials?

16  A    Picked up sixteen rolls of 30 weight felt, 400 feet

17    of narrow eve metal, which is what he returned over

18    here, a box of simplex nails, that's the big headed

19    nails you nail felt on with, a knife, would have

20    been a felt knife, and two saw blades.

21  Q    So the next ticket is the next day, October 10th?

22  A    Uh huh.

23  Q    So on October 9th what happened was, he gave you

24    this check, endorsed by him, made out to your

25    business, but without the amount in it?

21

1    A    Correct.

2    Q    And picked up some items and charged them.

3    A    Yes sir.

4    Q    And if I understand what you're saying, he promised

5    to pay you for those items and other items he

6    charged during the month of October?

7    A    Yes.

8    Q    With this check?

9    A    True.

10   Q    To be done at the end of the month.

11   A    The end of the month.

12   Q    So the rest of these tickets is when he purchased

13   things in your store on credit during the month of

14   October?

15   A    Yes sir.

16        MR. EMERY:    We would offer State's Exhibit 1

17   and 2.

18        THE COURT: You're offering State's 1 and 2?

19        MR. EMERY:    Yes sir, I can.

20        THE COURT:    State's 2, let it be admitted.

21   Q    Back to the -- so October 31st rolls around and he

22   owes you, according to your records there

23   $1,607.20?

24   A    Yes sir.

25   Q    Is that when the amount of the check is filled in?

22

1  A   That's what the amount of the ticket is.

2  Q   Is that what he told you to do?

3  A   Yes sir.

4  Q   Had you done that before?

5  A   Several times

6  Q   And they were good before?

7  A   Yes sir, all the checks he ever gave us except

8      this one was good.

9  Q   So this one bounced?  Did you deposit it?

10 A   Yes sir.

11 Q   And it was returned not paid for insufficient

12     funds?

13 A   Yes sir.

14 Q   What did you do then?

15 A   I called him on the phone and told him about the

16     check and he didn't come in,  and then later on I

17     sent him a registered letter that is required by

18     law on a bad check.

19 Q   Did you ever hear from him personally about paying?

20 A   Just the signature on the certified mail letter we

21     had to send him.  No sir.

22 Q   And you've never been paid?

23 A   Never.

24 Q   And those materials were never returned?

25 A   No sir.

23

1    MR. EMERY:  That's all I have to ask.

2    THE COURT:  Cross examine?

3    MR. FAIRCLOTH:  Yes sir.

4

5

6                    CROSS EXAMINATION

7    BY MR. FAIRCLOTH:

8    Q    Mr. Dowling, you're on the Board  for City  Bank of

9         Hartford, aren't you?

10   A    Yes sir.

11   Q    Do you serve on any committees?

12   A    I'm on the Board of Directors.

13   Q    Any special committees or anything other than that?

14   A    No sir.

15   Q    Were you on the Board in 1995?

16   A    Yes sir.

17   Q    Mr.  Emery  showed  you  some receipts and I've got

18        some others as well I want to show you.  This first

19        set  I've  marked  Defendant's  Exhibit 1.  If you

20        would just identify that those are receipts of your

21        company.

22   A    Yes.

23   Q    Okay, now  notice up  here at the top where it says

24        order number, and sold to, and somebody has written

25        in cash up there?

24

1   A   That was a cash ticket. He paid cash money for it.

2   Q   Somebody comes into the store and picks up

3   materials and either will write a check right then

4   or pay cash for it?

5   A   Yes sir.

6   Q   It's not a charge account, is that right?

7   A   No sir.

8   Q   I show you what I have marked Defendant's Exhibit

9   2. I just want to make sure those are the same

10   receipts from your company?

11   A   Yes sir.

12   Q   Same thing with Defendant's Exhibit 3.

13   A   Yes, they are carbons of one of the originals.

14   Q   Okay, and the same with Defendant's Exhibit 4.

15   A   Yes, our machines make three copies, white, yellow

16   and pink.

17   Q   That was my next question. What I've got is

18   different colors. Who got the white copy?

19   A   On the cash purchase the customer does. On the

20   charge ticket we keep the white and yellow and give

21   them the pink. At the end of the month we mail the

22   customer the yellow copy with the statement. We

23   keep the original.

24   Q   Now, you testified that in Mr. Davis's case you

25   would -- he would get materials throughout the

25

month or a certain period of time, give you a check
that he signed and made out to you, and then all
you had to do at the end of the month or the end of
some time period, you would fill out the amount,
having totaled up the receipts for that time
period, is that right?

A    Right.

Q    So at the time the amount was filled in on those
checks, he had already received those materials, is
that right?

A    Yes.

Q    And then you would send him, you said the yellow
copy, showing the amounts of the bills?

A    Yes, now some of these like Mr. Emery had was the
same date I got the check?

A    Right. When Mr. Davis first started doing business
with Dowling did he talk with you to set up this
arrangement or someone else?

A    No sir, he would have had to talk to me.

Q    Do you remember talking to him?

A    That was in '95.

Q    Right. And if you don't that's fine.

A    Bits and pieces.

Q    But in order to set it up he would have--

A    He would have had to come to me.

26

Q   And you said the agreement was he would give you
the check and get the materials, and at the end of
the month you would total it up and the check would
be your payment for those materials, is that
right?

A   Yes.

Q   That was your agreement with him?

A   Yes sir.

Q   At least on this last check, or this last time, he
breached that agreement, didn't he?

A   The check was returned, yes sir.

Q   And you didn't attempt to collect this debt through
civil means, did you?

A   I sent him a registered letter.

Q   Right. I'm talking about did you file a civil law
suit against him for the amount of the money?

A   No sir.

Q   And he still owes you that debt, doesn't he?

A   Correct. You want me to elaborate on that, or --

Q   I might get to it later on. I might come back to
that. You said these other checks he had paid with
were all good up until this $1607.00 one?

A   Yes.

Q   Do you have any idea about how many checks he wrote
to you?

27

1   A   Mr. Emery has the deposit slips.

2   Q   Can you guess one or two, or five or ten?

3   A   Ten or fifteen.

4   Q   Okay.

5   A   Now all of them weren't large amounts like this

6       one where he came in and bought and paid for a

7       skill saw or hand saw, but several of them is large

8       ones.

9   Q   Let me back up. When did you find out that the

10      check was no good?

11  A   When the bank returned it to me. Mr. Emery has the

12      copy where the bank returned it to me. The date is

13      on there.

14  Q   Now you said the ordinary practice with Mr. Davis

15      was at the end of the month or the end of some

16      period to total up the receipts and make the check

17      for that amount?

18  A   Yes sir.

19  Q   You said on this particular check, it didn't happen

20      that way?

21  A   No sir, the check was returned, insufficient funds.

22  Q   What I mean is, the check was given and Mr.

23      Davis got supplies after that, that went on

24      this check?

25  A   No sir.

28

1    Q    That's not how it happened?

2    A    This check is the last business he did with us.

3    Q    Okay, had he received all the materials at the time

4         this check was made out, the amount was filled in?

5    A    Yes sir.

6    Q    Do you have any idea why that was filled out on

7         October 9th?

8    A    The 9th.

9    Q    Right.

10   A    It takes a few days to send out statements and when

11        the secretary gets to his she hands it to me and I

12        fill it out and send it in.  She has to total all

13        the tickets and send out the statements.

14   Q    This was dated --

15   A    Oh, I see what you're saying.  He dated it when he

16        gave it to me.

17   Q    Was that ordinary?

18   A    Yes sir.

19   Q    So all the other checks that worked that way would

20        have been dated when he brought it first?

21   A    I don't remember on the others.  I know on that one

22        it is because on this it's his handwriting.

23   Q    So he dated, filled in the name, and signed it but

24        left the amount blank?

25   A    Left the amount blank.

29

1 Q  I think Mr. Emery asked you about some receipts
2    that showed that there were some pickups made after
3    the 9th. Are all the receipts that amount to the
4    $1607.00 and some change either on or after the
5    9th?

6 A  Uh huh.

7 Q  After you totaled up those receipts and filled out
8    this check was there any more business conducted
9    between you and Mr. Davis?

10 A  None that I remember.

11 Q  Didn't Mr. Davis come to you when he gave you this
12    check and tell you that you would need to hold that
13    one because he was waiting on another draft from
14    the Richard Lewellyn Job?

15 A  Now that I don't remember. If he had I wouldn't
16    have ever sent that certified letter to him that
17    was required.

18 Q  Do you remember when you sent the certified letter?

19 A  He has it.

20 Q  Isn't it true that Mr. Davis in fact sent you a
21    certified letter telling you that the check would
22    not be good?

23 A  I don't remember if I got one.

24 Q  Isn't it true that you talked on several occasions
25    with Mr. Davis's wife, Maria?

30

1    A    Myself?

2    Q    Yes.

3    A    Not that I know of.  I made one telephone call

4         which is listed on the sheet that the  bank puts on

5         the return  check, as  the only call listed we made

6         to his residence.

7    Q    You're saying after this  check was  filled out and

8         returned to you from the bank you didn't talk to or

9         hear from or see Winston Davis or his wife at all?

10   A    Not that I remember, no  sir.   Now  we're talking

11        about back in '95.

12   Q    But it could have happened?

13   A    It could have happened, yes sir.

14   Q    You don't  remember telling Mrs. Davis not to worry

15        about the check, just to pay it when they could.

16   A    No sir, I don't think I would make a statement like

17        that being  in  business,  or  you  wouldn't be in

18        business very long.

19   Q    Isn't it true, if you know, on a  construction loan

20        does a  contractor get  paid all  that money at one

21        time?

22   A    On draws.

23   Q    He gets it in installments sort of?

24   A    Yes.

25   Q    So he will get -- well, does he  get an installment

31

when he starts off a job?

A    No sir. The first stage is what they call the foundation. You put in your cement slab and then there's a draw.

Q    Right. So at certain stages of completion he will get an amount of money from the bank until it is all used up and by that time the house should be built.

A    It should be completed.

Q    Do contractors pay their sub-contractors out of their own pocket?

A    I don't know.

Q    Have you ever been a contractor?

A    No sir.

Q    Did Mr. Davis ever indicate to you what jobs he was working on that the materials he was getting from you would go on?

A    If he did it would be listed on the tickets. They tell us which job, like this Exhibit No. 2 is charged out to Winston Davis Construction 201, East Circle Drive. Deliver Friday morning.

Q    Okay. You don't recall him telling you anything?

A    The contractor has to tell us which job to put on there. We don't know where he's working.

      MR. FAIRCLOTH: Your Honor, I've marked these

32

1   originals with my exhibit numbers but I would ask

2   if we can submit copies of these.

3       MR. EMERY:   Your Honor, there has been no

4   testimony that those Defense exhibits have anything

5   to do with this case.

6       MR. FAIRCLOTH:  I'll be glad to go through it.

7       MR. EMERY:  I don't know if they are.

8       THE COURT:  They will have to be identified in

9   some fashion.

10      MR. EMERY:  They have just been identified as

11  receipts from his business.

12      MR. FAIRCLOTH:   If the Court wants me to go

13  through each receipt.

14      THE COURT:  I think it would be wise.   Do

15  ya'll want to look at them together and tell me.

16      MR. FAIRCLOTH:  I'm sorry?

17      THE COURT:   Ya'll want  to look at them

18  together and tell me if they are related.   Those

19  are the  ones marked  Defendant's Exhibits 1, 2, 3,

20  and 4?

21      MR. FAIRCLOTH: That's right.

22                      (Whereupon,    the    District

23                      Attorney and Defense Counsel

24                      reviewed the invoices.

25

33

1    MR. FAIRCLOTH: Your Honor, I'll have to have

2    other corroboration on this Defense No. 1, but 2

3    and 3 are self identifying I believe. If Mr. Emery

4    wants me to go through and identify each one I'll

5    be glad to.

6        MR. EMERY: You're saying it has something to

7    do with WInston Davis?

8        MR. FAIRCLOTH: Right

9        MR. EMERY: That's fine.

10       THE COURT: If you have no objection then go

11   ahead. Let them be admitted or -- maybe you better    .

12   let the witness see them if you're going to

13   introduce them.

14 Q  Just to be sure. If you would Mr. Dowling, look at

15   those. There appears to be a name written in on

16   those top parts as opposed to the cash receipts you

17   indicated, where it just says cash at the top.

18   Those have a name on them and if you would tell us

19   what those names are?

20 A  In Exhibit No. 2 you have just one with a name. The

21   rest of them are no name or cash. And it's

22   Winston Davis.

23 Q  Okay.

24 A  Now the yellow tickets --

25       MR. EMERY: Mr. Dowling are you saying you

34

1    don't know where those others came from?

2  A  It could be any job.  That's what he's asking me or

3     it could be anybody.

4  Q  The top one is Winston Davis?

5  A  The top one.

6        MR. EMERY:   The rest of them you just don't

7     know?

8  A  I don't know.  And the yellows may be carbon copies

9     of those because the yellows are carbon copies.

10  Q  If you would just look through there and see what

11     those say.

12  A  Okay.  Now these are all carbon copies made out to

13     Winston Davis.

14        MR. FAIRCLOTH:   Okay.  If you don't have an

15     objection I'll submit 3 which are all identified as

16     Mr. Davis's and I'll wait on the others.

17        THE COURT:   Exhibit 3 is what you're now

18     offering?

19        MR. FAIRCLOTH: Yes sir.

20        THE COURT:  Let it be admitted.

21        MR. FAIRCLOTH:  I believe that's all I have of

22     the witness.

23

24

25

35

<u>REDIRECT EXAMINATION</u>

<u>BY MR. EMERY:</u>

Q   Did you bring with you today the deposit tickets showing all the checks that you received from Mr. Davis that you deposited?

A   As far as we could tell digging back through our records, that's the beginning of the checks and the end of the checks we got from Mr. Davis.

Q   So this is sort of the history of your check business with Mr. Davis?

A   Yes sir.

Q   I tried to put them in chronological order. Would it appear that the first one is September 22nd?

A   Yes sir, that's the date of that deposit.

Q   And that was for $24.12?

A   Twenty-four dollars and twelve cents.

Q   I would assume you don't have any recollection of what he bought on that date?

A   No sir.

Q   And then September the 28th is for $48.08?

A   Yes sir.

Q   You don't know what that was for do you?

A   No sir, the only way you could do that would be to find the ticket for a total of $48.08 and find out

36

1      what he bought.

2    Q   And then on October 2nd there was two checks, one

3        for $676.79 and one for $245.26.   And three more,

4        $523.69, $321.68.

5    A   Yes sir.

6    Q   So on one day he gave you five checks.

7    A   Yes.

8    Q   Why would there be five checks on one date?

9    A   Just come in and buying material and paying for it

10       as he gets it.

11   Q   Would any one of those checks have been for charges

12       or is it just paying as he went at that time?

13   A   Being on the 10th and 2nd it could have been one of

14       those checks we was holding for the prior month

15       because it's the beginning of the next month.

16   Q   Then October 10th which was the day after he gave

17       you the blank check here --

18   A   Yes sir.

19   Q   -- there was a check for $5.02 I guess?

20   A   Yes sir.

21   Q   And then October 11th, $313.89?

22   A   Yes sir.

23   Q   Do you know what that was for?

24   A   No sir.  These checks I may have had them in my

25       pocket for two or three days before they was

37

1     deposited.  It doesn't  necessarily mean  that this

2     check was given to me on that particular date.

3  Q  You don't make a deposit every day?

4  A  No sir.

5  Q  And then  the last  check was  the one we have here

6     today for $1,607.20?

7  A  Right.

8  Q  And that's all  the  check  dealings  you  had with

9     him?

10  A  That's all I could find.

11  Q  And  you  only  started  dealing  with  him  then  in

12     September?

13  A  Yes sir.

14  Q  So this  wasn't a  long term  relationship where he

15     was giving you checks to hold?

16  A  No sir.

17  Q  Now, if I understand, on October 9th he gave you in

18     effect a blank check --

19  A  Yes sir.

20  Q  -- that he had endorsed?

21  A  Right.

22  Q  With the idea it was to pay at the end of the month

23     for what he charged during the month?

24  A  Yeah.

25  Q  And that was your understanding?

38

1   A   Yes sir.

2   Q   And that's why you gave him the credit?

3   A   Yes sir.

4   Q   And after that check bounced you had no further

5       business dealings with him?

6   A   That was it.

7   Q   Now, the $1,607.00 is the result of adding up the

8       charge tickets that we have called State's Exhibit

9       2?

10  A   Right. Yes sir.

11  Q   And on some of these tickets there's a place where

12      it says delivered to and there's a blank.

13  A   Uh huh.

14  Q   Does this mean like the second ticket, it says

15      "Delivered to," and then written in Ward.

16  A   Ward would be when he told us what job to charge it

17      against.

18  Q   So that Ward would tell you where to deliver

19      it?

20  A   Yes sir.

21  Q   Did ya'll deliver this stuff?

22  A   That small stuff he could have carried with him.

23  Q   But you were told to put it on the account or

24      referenced to a Ward job?

25  A   The Ward job.

39

1    Q    And like  the next  ticket thre's no reference

2         to a  job so  you would  have no  idea what he

3         did with that stuff?

4    A    No idea.

5    Q    The next  one that has an address on it seems to be

6         --

7    A    Hammer, it looks like.

8    Q    Hammer?  Is there a street --

9    A    That would be a job, the person he's doing the

10        work for.

11   Q    This one is Hammer again?

12   A    Yes.

13   Q    Do you know who Hammer is?

14   A    No.

15   Q    Do you know anybody he was working for?

16   A    Just  the  cement  man  there  in town where he was

17        going to start a job.

18   Q    Can you read that?  What does that say?

19   A    Wicksburg.

20   Q    Something was delivered to Wicksburg?

21   A    A lots of time  a job  name instead  of saying

22        Smith or  Jones he  lists the job as Wicksburg

23        and we'll know which  job  it  is.   Providing

24        that  would  be  the  only job he has going in

25        Wicksburg.

40

1   Q   And the rest of them don't have reference to a job?

2   A   No. He didn't give us a job name to put on them.

3   Q   So you didn't keep up with where he was working?

4   A   No sir.

5   Q   The only thing that you relied on is his word

6       that he would pay?

7   A   Yes sir, that and the check.

8   Q   That and the check he gave you on October 9th that

9       he signed on October 9th?

10  A   Yes sir.

11          MR. EMERY:   That's all. Thank you.

12

13

14                    CROSS EXAMINATION

15  BY MR. FAIRCLOTH:

16  Q   Mr. Dowling, when Mr. Davis gave you this check

17      dated October 9th and signed it, he didn't know how

18      much that was going to be, did he?

19  A   No.

20  Q   In fact he wouldn't know until the end of the month

21      when you totaled it up and filled that out and sent

22      him a receipt for it.

23  A   Yes sir.

24  Q   Now, you said that he would give you these blank

25      signed checks to secure credit.

41

1   A   Yes sir.

2   Q   Isn't it true that he would give you those checks

3       like that and set up that arrangement for

4       convenience?

5   A   I don't know what was on his mind. We hadn't

6       extended him any credit.

7   Q   If you're working on a job and you're having to

8       come in like Mr. Emery pointed out maybe five times

9       in a day, is that unusual on a job?

10   A   No sir.

11   Q   If you're having to write five checks a day, that

12       gets to be cumbersome doesn't it?

13   A   Yes.

14   Q   So it might be possible for somebody, instead of

15       wanting to write five checks a day for 30 days in a

16       month, to say, why can't you just hold a check and

17       fill it out one time at the end of the month.

18       Isn't that possible?

19   A   Possible. Most of them ask for a credit

20       application where they can charge it until the end

21       of the month.

22   Q   Mr. Davis didn't do that, did he?

23   A   No sir.

24   Q   So you didn't turn him down for credit, did you?

25   A   No.

42

Q    He just wanted it this way and you obliged him?

A    Yes sir.

        MR. FAIRCLOTH:  That's all I have, Judge.

        THE COURT:  Anything further?

        MR. EMERY:  That's all.

        THE COURT:  The witness may come down and be

    excused.

        MR. EMERY: Tell Mr. Kirkland to come in.


                    LAMAR KIRKLAND

    having been first duly sworn, was examined and

    testified as follows, to-wit:



                    DIRECT EXAMINATION

BY MR. EMERY:

Q    Would you introduce yourself to the ladies and

    gentlemen.

A    I'm Lamar Kirkland owner of Kirkland Plumbing and

    Electric in Slocomb.

Q    How long have you been in this business?

A    This will be twelve years.

Q    What do you do?

A    I contract plumbing and electric from builders and

43

1          from homeowners who are doing their own building.

2   Q     You've been doing that twelve years you say?

3   A     Yes sir.

4   Q     Do you know the Defendant over her?

5   A     Yes sir.

6   Q     How did you meet Winston Davis?

7   A     I was contacted by him to sub-contract the plumbing

8          and electric job for Rick Lewellyn.

9   Q     Where was that at?

10  A     Right off 103 north of Slocomb.  I don't have an

11         exact address.  It's kind of out in a field.

12  Q     On 103?

13  A     On a dirt road that goes right off 103.  They

14         aren't named or numbered so I don't know.

15  Q     When did Mr. Davis contact you?

16  A     Let me see here just a minute.  It was probably

17         around 10/10/95.  I have a check here made out on

18         10/20/95.  So it was probably five or six days

19         before that.

20  Q     What did he tell you when he contacted you?

21  A     That he wanted me to give him a price on

22         doing this job.

23  Q     Did you do that?

24  A     Yes sir, I gave him a price.

25  Q     What was the price?

44

1   A   The total price I think was $6700.00 if I'm

2       not mistaken. I don't have that figure right

3       with me, but in that neighborhood.

4   Q   That included materials as well as labor?

5   A   I had to furnish materials and labor to complete

6       the job.

7   Q   How much did the materials costs?

8   A   Probably in the neighborhood of probably $1200.00.

9       I had about $280.00 worth of labor. I have two

10      canceled checks her where I paid two electrician

11      to work $140.00 apiece.

12  Q   And the rest of it was your work?

13  A   Yes, I did all the plumbing work myself and used

14      some materials out of the shop and off my truck. I

15      didn't make a purchase for that particular job.

16  Q   How long did it take you to do the job?

17  A   Approximately five or six working days.

18  Q   So, did you go to him to get paid?

19  A   I was on the job within a half day of being

20      finished and he come up and wanted to know if I was

21      ready to get a check and I told him I was.

22  Q   Did he give you a check?

23  A   Yes, he did.

24  Q   State's Exhibit 3, is this what he gave you?

25  A   This is what he gave me, yes sir, it is.

45

| | | |
|---|---|---|
| 1 | Q | Did he give it to you on the date that's on the |
| 2 | | check? |
| 3 | A | Yes, October 20th, '95. |
| 4 | Q | Four thousand nine hundred dollars? |
| 5 | A | Right. |
| 6 | Q | What was that supposed to be for? |
| 7 | A | It was what we refer to in the building trade as a |
| 8 | | draw. When I was to that stage of the building of |
| 9 | | the plumbing and electrical work, I would make a |
| 10 | | draw. |
| 11 | Q | He paid you $4,900.00? |
| 12 | A | Right. |
| 13 | Q | Did you finish the job? |
| 14 | A | No, I did not. |
| 15 | Q | Why not? |
| 16 | A | Because I didn't get any money for what I had done. |
| 17 | Q | This check was no good? |
| 18 | A | Right. |
| 19 | Q | When did you find that out? |
| 20 | A | Probably one day the next week when it came back |
| 21 | | through the mail. I'm not sure of the date on |
| 22 | | that. |
| 23 | Q | Did he tell you to hold the check? |
| 24 | A | No he did not. |
| 25 | Q | Did he tell you the check was worthless? |

46

| 1 | A | No. |
| 2 | Q | He told you this was $4,900.00? |
| 3 | A | Right. |
| 4 | Q | So did you ever get paid? |
| 5 | A | No. |
| 6 | Q | Had you ever done business with him before? |
| 7 | A | No sir. |
| 8 | Q | Did you give him credit or loan him money? |
| 9 | A | No. |
| 10 | Q | You expected to get paid for what you did? |
| 11 | A | Yes sir, I did. |
| 12 | Q | Did he promise to pay you? |
| 13 | A | He promised to pay me. |
| 14 | Q | Did the house get finished? |
| 15 | A | It didn't get finished by me. The man that owned |
| 16 | | the house is currently living in it. |
| 17 | Q | Somebody finished it? |
| 18 | A | Yes, somebody finished it. |
| 19 | Q | But you're out at least $4,900.00? |
| 20 | A | Yes sir. |
| 21 | Q | You had never had dealings with Mr. Davis before |
| 22 | | then? |
| 23 | A | None whatsoever.  The first time I saw him was |
| 24 | | when we looked at the job and I gave him a price on |
| 25 | | it. |

47

MR. EMERY:   That's all I have to ask. Thank you.


CROSS EXAMINATION

BY MR. FAIRCLOTH:

Q    Mr. Kirkland, when Mr. Davis gave you this check for $4900.00 that was not the total of what you had agreed with him to do the job, was it?

A    It was up to that point.  There was an agreement I would make $4900.00 when we got to this point and stage of the building.

Q    But the total would have been around $6700.00?

A    Right.

Q    When this check was given, you had given him what was by your agreement $4900.00 worth?

A    Right.

Q    And you didn't supply any more labor after the check was given?

     No.

Q    Any more materials?

A    No.

Q    When Mr. Davis first contacted you, you entered an agreement with him?

A    Yes.

48

1   Q   A contract for you to do a certain amount of work

2       for a certain price which was $6780.00?

3   A   Right.

4   Q   Your promise was to do the work?

5   A   Right.

6   Q   That happened before you did any work?

7   A   Right.

8   Q   Now, you said it was Mr. Lewellyn's house you were

9       working on?

10   A   Yes.

11   Q   Are you familiar with how those, what's called

12      a construction loan, work?

13   A   Somewhat.

14   Q   Is it accurate to say that the contractor doesn't

15      get all the money at one time?

16   A   No, none of the subs or contractors get all the

17      money at one time.

18   Q   Right. So if the contractor doesn't get paid does

19      he pay the subs out of his own pocket?

20   A   If I agreed with the contractor to do the work and

21      get paid I expect him to pay me whether he gets

22      paid or not.

23   Q   I understand that. If the contractor doesn't get

24      his draw from the bank, the construction loan bank,

25      he's not getting paid, is he? Let's say he paid

49

1    you.  I'm not talking about this particular case

2    but theoretically, if the contractor didn't get his

3    money from the bank he would be digging in his own

4    pocket and maybe losing money to pay all the subs,

5    is that right?

6  A    That's right.

7  Q    And he might not even have any money.  Isn't that

8    right?

9  A    Shouldn't be writing checks if he don't.

10  Q    If he did, he would be breaching his contract with

11    you, wouldn't he?

12  A    Pardon me again.

13  Q    If he didn't pay you --

14  A    Right.

15  Q    -- he would be breaching that agreement to pay you

16    $6700.00, or whatever the agreement might be.  And

17    in fact Mr. Davis breached that contract with you,

18    didn't he, because he didn't pay you?

19  A    Right.  Right.

20  Q    Did you ever sue Mr. Davis for the money?

21  A    No, I didn't.  I brought the check down to the

22    District Attorney and he prosecuted on bad check

23    charges.

24  Q    So you did this in order to get your money back?

25  A    No, not necessarily I just wanted to do whatever

51

*OBTAIN*

1  A  Mr. Davis promised to meet me on two or three

2  occasions to either bring me a certified check or

3  cash money to cover the check.

4  Q  I'm not asking that. When did you go to the D. A.?

5  A  Probably two weeks after the check was written. I

6  don't have a date on that.

7  Q  How long after it would have been returned

8  "insufficient funds?"

9  A  Like I said about ten days.

10  Q  You said that he told you when he gave you the

11  check, this is the same thing as $4900.00?

12  A  No, he said "Here's a check. I appreciate the work

13  you've done."

14  Q  Isn't it true you went to Mr. Davis and said that

15  you're ready for a draw?

16  A  No, he came by the job and asked me if I was ready

17  for a draw.

18  Q  How long had you been working by the time this

19  check was given?

20  A  Probably somewhere between five and seven working

21  days.

22  Q  How long would it have taken you to complete the

23  job?

24  A  All the way to the total end of the job?

25  Q  Yes sir.

52

1 A   Probably four days, four to five days.

2 Q   Isn't it true that you sued Richard Lewellyn and the Bank?

4 A   No, it isn't. I placed a labor and materials lien on it.

6 Q   You never had a law suit against them at the bank?

7 A   No.

8 Q   But you did attempt to collect that money from them by the materialman's lien? Just answer my question. You did attempt to collect that money from them by the materialmen's lien?

12 A   Yes. Right. Right.

13 Q   Now, you didn't get paid at the beginning of this agreement, did you?

15 A   No.

16 Q   And that's customary, isn't it?

17 A   Right.

18 Q   You get paid after some work is done?

19 A   Right.

20 Q   And that agreement occurred prior to this check ever being written?

22 A   Yes.

23     MR. FAIRCLOTH: That's all I have. Your

24 witness.

25

53

<u>REDIRECT EXAMINATION</u>

<u>BY MR. EMERY:</u>

Q    Mr. Kirkland, after you discovered this check was worthless, you say you talked with the defendant?

A    Yes, I did.

Q    What did he tell you?

A    He told me that he would meet me I think at the Big/Little in Slocomb on a certain date and he would either -- he said he would bring cash money to cover the check.

Q    Did you go to the Big/Little Store?

A    Yes, I did.

Q    Was he there?

A    No. And then on another occasion a few days later we did about the same thing. I forget the meeting place we was supposed to go to there but he never showed at that time either.

Q    You went to this second rendezvous place and he failed to show again?

A    Right.

Q    Did he ever give you any reason why he said he was going to meet you and he didn't meet you?

A    Not that I can recall, no.

Q    You've never been able to collect your money?

A    No sir.

54

1   Q   Did he ever offer you any excuse why the check was
2       worthless?
3   A   It's been about a year and a half now. He may have
4       but I don't remember just exactly what the problem
5       was. I don't know.
6   Q   But he did on two occasions say he would make it
7       good and failed to show?
8   A   Right. He sid "I'll be there with the cash money.
9       Look for me at 7:00 o'clock or whatever." He never
10      called me to tell me he couldn't make it or
11      something had come up, or make it another date but
12      he just never showed. And it would be left up to
13      me to contact him then.
14  Q   So you're standing up there at the Big/Little Store
15      waiting for him.
16  A   Right.
17          MR. EMERY: That's all. Thank you.
18
19
20              CROSS EXAMINATION
21  BY MR. FAIRCLOTH:
22  Q   Did you ever receive a certified letter from Mr.
23      Davis?
24  A   Not that I'm aware of, no.
25  Q   Not that you're aware of. Now, you can remember

55

that the meeting place was the Big/Little Store
but you can't remember if Mr. Davis ever told you
why that check wasn't any good, is that right?

A   Right.

Q   But you knew Mr. Davis was on the Rick Lewellyn
job, didn't you?

A   Yes, I did.

Q   You knew exactly where that was.

A   Yes.

Q   You could have found him.

A   Well, uh --

Q   Yes or no. Could you have found Mr. Davis?

A   He was no longer on the job after all this
occurred.

        MR. FAIRCLOTH:  Thank you, Mr. Kirkland.

        MR. EMERY:  That's all. Thank you.

        THE COURT:  You may come down.  At this time
gentlemen we're going to take about a ten or
fifteen minute break.  Ladies and gentlemen of the
jury do not discuss this case among yourselves nor
allow anyone else to discuss it with you. Court
stands in recess for about fifteen minutes.


        (Whereupon,    a    fifteen
            minute    recess    was

56

1      declared, following which

2      the following occurred:

3

4          THE COURT:    Bring the jury in.  Court will

5      come to order.  You may proceed.

6

7

8                  ASHLEY JOE THOMAS

9      having been first duly sworn, was examined and

10     testified as follows, to-wit:

11

12                 DIRECT EXAMINATION

13     BY MR. EMERY:

14     Q     Would you introduce yourself to these Ladies and

15           Gentlemen, please.

16     A     I'm Ashley Joe Thomas.

17     Q     Mr. Thomas, where do you live?

18     A     Hartford.

19     Q     What kind of work do you do?

20     A     Construction work.

21     Q     How long have you been doing that?

22     A     About 30 or 35 years.

23     Q     Do you know Mr. Davis over here?

24     A     Yes sir.

25     Q     When did you meet him?

57

1    A    I don't know, two years ago or so.

2    Q    Was it the fall of '95?

3    A    I guess.   Whatever the date is on that check. I

4         really don't remember.

5    Q    This check I guess we'll call State's Exhibit 4.

6                        (Whereupon,   the   same   was

7                        marked as   State's Exhibit

8                        4   for   identification,

9                        following   which   the

10                       following occurred:

11   Q    This is  dated October  the 21st,  but you knew him

12        before that date right?

13   A    Yes sir.

14   Q    Did you use to work for him?

15   A    I did.

16   Q    How did that come about?

17   A    He offered me a job.

18   Q    Where at?

19   A    I worked for him over at Mr. Lewellyn's  house over

20        out of Slocomb.

21   Q    Was that construction of a new home?

22   A    It was.

23   Q    Did you  start working  on that  project right from

24        the beginning?

25   A    No sir.

58

1   Q    What state of construction was it in when you

2         started working there?

3   A    When I got there we were starting to put up the

4         vinyl siding.

5   Q    It had already been framed up then?

6   A    Yes sir.

7   Q    When was that?

8   A    About two or two and a half weeks prior to this.

9   Q    How many weeks did you work for Mr. Davis?

10   A    If I remember right I worked two weeks and two half

11         days.

12   Q    How much were you to be paid?

13   A    Twelve dollars an hour.

14   Q    Were you to be paid once a week?

15   A    Every Friday.

16   Q    So you worked the first week.

17   A    Yes sir.

18   Q    Were you paid?

19   A    Yes sir.

20   Q    How were you paid?

21   A    Cash.

22   Q    How much were you paid?

23   A    I don't remember the amount.

24   Q    Cash money for however many hours you worked?

25   A    Yes sir.

59

1   Q   And that was on the Lewellyn job?

2   A   Yes sir.

3   Q   Where was that job at?

4   A   It was off 103 out of Slocomb.

5   Q   North of Slocomb?

6   A   Yes sir.

7   Q   Is that in Geneva County?

8   A   I believe so.

9   Q   So you worked a week and you got paid cash money?

10   A   Yes sir.

11   Q   And you worked another week?

12   A   Yeah, I worked another week.

13   Q   Then what happened?

14   A   Well, it come around Friday and he wasn't there

15      to pay, and he called me and I met him across the

16      street over here, whatever the date was on this

17      check, and he wrote me this check.

18   Q   So you worked another week and Friday rolled

19      around and he wasn't there to pay you?

20   A   That's right.

21   Q   Did you talk to him on the telephone?

22   A   I did.

23   Q   And he told you to meet him over here at Elmore's

24      gas station?

25   A   Correct.

60

1    Q   Did you meet him over there?

2    A   I did.

3    Q   Were there other people there?

4    A   Yes sir.

5    Q   Who were they?

6    A   Employees.

7    Q   Other people that worked for him?

8    A   Yes sir, on the same job.

9    Q   Did he pay you by check then?

10    A   He paid me by check.

11    Q   That was on the date of the check, October 21st?

12    A   Yes.

13    Q   He paid you $372.00, at least on paper?

14    A   Right.

15    Q   ... ... ... check then?

16    A   Well, I called him a couple of times to give him

17        time to make it good and I just got tired of

18        waiting. I needed my money. So, I figured I

19        wasn't going to collect so I brought it over here.

20    Q   Did you know it was bad when he gave it to you?

21    A   No.

22    Q   Did he tell you it was bad?

23    A   No sir.

24    Q   It was supposed to be in payment for what work you

25        had done?

61

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | When did you find out it was bad? |
| 3 | A | I got my son-in-law to cash it and he put it in his |
| 4 | | account.  It must have been probably a week later, |
| 5 | | three or four days later, something like that. |
| 6 | Q | Did you do any more work for him? |
| 7 | A | Yes sir, I worked two more half days. |
| 8 | Q | And when was that? |
| 9 | A | The following Monday and Tuesday after  the date on |
| 10 | | this check. |
| 11 | Q | Did you get paid for those days? |
| 12 | A | No sir. |
| 13 | Q | And then  you of  course didn't do any more work on |
| 14 | | that job? |
| 15 | A | No sir. |
| 16 | Q | Is that check there  supposed to  be just  for your |
| 17 | | labor, or did you furnish any materials? |
| 18 | A | No, just labor. |
| 19 | Q | He told you he was going to pay you every Friday? |
| 20 | A | Yes sir. |
| 21 | | MR.  EMERY:  That's  all  I have to ask. Thank |
| 22 | | you. |
| 23 | | |
| 24 | | |
| 25 | | |

62

## CROSS EXAMINATION

BY MR. FAIRCLOTH:

Q    Mr. Thomas, when you were working on the Lewellyn job, was that the only job you were working on for Mr. Davis?

A    Yes sir.

Q    It was?

A    Uh huh.

Q    Do you know if Mr. Davis finished that Lewellyn job?

A    I have no idea.

Q    When you said you had worked a week and been paid, how?

A    The first week was cash.

Q    [illegible]

A    No.

Q    You worked another week and you were due another payment?

A    Right.

Q    And all of that was pursuant to an agreement you made before you ever started any work at all with him, wasn't it?

A    Yes.

Q    In fact when he hired you he agreed to pay you a certain amount per hour?

63

1   A    Right.

2   Q    And you agreed to provide the work?

3   A    Correct.

4   Q    And you were to be paid every week. Isn't that

5        right?

6   A    Correct.

7   Q    And all that was done before you ever supplied the

8        first hour of labor?

9   A    Right.

10   Q    Before ever any cash was paid or a check was paid,

11        isn't that right?

12   A    Yes sir.

13   Q    So when Mr. Davis gave you this check for $372.00,

14        that was for labor you had already provided?

15        That's right.

16   Q    This was not an enticement to do more labor?

17   A    No.

18   Q    Isn't it true that Mr. Davis told you he was

19        waiting on a draw from Mr. Lewellyn?

20   A    No sir, I don't think so.

21   Q    What happened -- now you say your son-in-law

22        cashed this check. What's your son-in-law's name?

23   A    Grady Tolley.

24   Q    Now you're aware -- what's your relationship with

25        him?

64

1   A   He's my son-in-law.

2   Q   How is he your son-in-law?

3   A   He married my step-daughter.

4   Q   That's what I'm trying to get out. Who was

5       involved. Now, are you aware of any work

6       that Mr. Davis was doing for Mr. Tolley?

7   A   As far as I know he never did any work. They were

8       talking about contracts on rebuilding his house.

9       That's all I know about it.

10  Q   Now, there's another name on the back of the check,

11      Marcia Case. Do you know what happened to it after

12      Mr. Tolley endorsed it?

13  A   Marcia Case is my step-daughter. Mr. Tolley's

14      wife.

15  A   They both endorsed it.

16  Q   How long was it from the time Mr. Davis gave you

17      the check until the time you gave it to Mr. Tolley

18      to cash?

19  A   I think it was the day after, Saturday or Sunday.

20      I don't know. I don't even know what date this was

21      on. I don't know if it was Saturday or Sunday it

22      has been so long.

23  Q   Were you giving the check to him in exchange for

24      something, or was he doing you a favor and going to

25      give you the cash for it?

65

1   A    He gave me the cash for it because the banks were

2        closed.

3   Q    Now, how long --when you found out the check was

4        returned, "insufficient funds," how long did you

5        wait before you went to the D. A. with it?

6   A    Quite a while.

7   Q    Do you have an estimate how long?

8   A    No, I don't. Its been two years ago.

9   Q    Now did you say you talked to Mr. Davis in between

10       that time?

11  A    Yes, I called him. I told him his check was bad.

12  Q    And you're saying he never did anything to make

13       that money good?

14  A    No sir.

15  Q    Didn't he give you some power tools?

16  A    Different story.

17  Q    But he did give you some?

18  A    That has nothing to do with this check.

19  Q    He didn't give you some power tools to cover the

20       value of that check?

21  A    No, he didn't give me anything. Can I answer this

22       in my own words?

23  Q    Just yes or no. He gave you the power tools?

24  A    No, he didn't give it to me. I have it but he

25       didn't give it to me.

66

1  Q  Isn't it true that Mr. Davis sent you a certified

2     letter telling you that the check would not be

3     good?

4  A  I never got such a letter to my knowledge.  I sure

5     don't remember it.

6  Q  Now, isn't it true that Mr. Davis has breached his

7     contract with you?  Hasn't he?

8  A  You mean as far as not paying me, or what?

9  Q  Yeah, you did some work but he hasn't paid you for

10    it?

11 A  Right.

12 Q  And that's a breach of that original agreement

13    you had.

14 A  Right.

15 Q  Now you've never sued Mr. Davis to recover that

16    money, have you?

17 A  No.

18 Q  Did you take it to the D. A. with the hope of

19    getting your money back?

20 A  Why, of course.

21 Q  Did you, as part of this arrangement, go to Dowling

22    Lumber Company and pick up materials and sign for

23    them?

24 A  No.

25 Q  You never did that?

1   A   No.

2   Q   If there's some receipts with your name on them

3       that would be a forgery?

4   A   Excuse me?

5   Q   Just answer my question.

6   A   I never went to Dowling Lumber Company.

7   Q   You never signed for any receipts for Dowling

8       Lumber Company?

9   A   I may have on the job but I never went to Dowling

10      Lumber Company.

11  Q   So you're saying if they delivered something you

12      might have signed for it there?

13  A   Exactly.  Everybody on the job did.

14          MR. FAIRCLOTH: That's all I have.  Your

15      witness.

16

17

18                  REDIRECT EXAMINATION

19  BY MR. EMERY:

20  Q   Your son-in-law gave you $375.00 for that piece of

21      paper there?

22  A   Whatever the amount is, $372.00.

23  Q   Three seventy-two?

24  A   Yes sir.

25  Q   Did you have to pay your son-in-law back?

68

1   A    I haven't, no.

2   Q    So he's out the money?

3   A    Correct.

4   Q    So in effect, he paid you the money but you have

5         never paid him back?

6   A    Correct.

7   Q    And Mr. Davis never made the check good in the last

8         two years?

9   A    No sir.

10       MR. EMERY: That's all I have to ask.

11       THE COURT:   Do you have further cross

12     examination.

13       MR. FAIRCLOTH:  Just a couple of questions.

14

15

16               CROSS EXAMINATION

17  BY MR. FAIRCLOTH:

18   Q    In the last two years, Mr. Thomas, the only thing

19         you did was file charges on Mr. Davis, isn't that

20         right?

21   A    Correct. That's all I did.

22   Q    To get your money back?

23   A    Correct.

24       MR. FAIRCLOTH: That's all.

25       THE COURT: From a record standpoint, I feel

1   like we need to see what is in the record. I

2   misconstrued something. Is State's 1 in evidence.

3       COURT REPORTER: I marked it when he offered

4   it, but then you said "Admit no. 2, but you did not

5   admit 1."

6       THE COURT: Then let one be admitted.

7       MR. EMERY: Number 1 is the check to Dowling

8   Lumber Company and 2 is the receipt from Dowling

9   Company.

10      COURT REPORTER: Yes but 3 and 4 is not in.

11      MR. EMERY: Number 3 is the check to Mr.

12  Kirkland, Lamar Kirkland's plumbing.

13      THE COURT: Let that be admitted.

14      MR. EMERY: Number 4 is the check to Mr.

15  Thomas we were just talking about. We offer that.

16      THE COURT: Let it be admitted. Anything else

17  been offered?

18      COURT REPORTER: Defendant's Exhibit 3 has

19  been offered and admitted.

20      MR. EMERY: That's all we have at this time.

21      MR. FAIRCLOTH: Does the State rest?

22      MR. EMERY: State rests at this time.

23      MR. FAIRCLOTH: May I approach, Your Honor.

24      THE COURT: Certainly.

25      MR. FAIRCLOTH: I have a couple of motions I

1    need to argue. Does the Court want to do that

2    outside the presence of the Jury?

3         THE COURT: If you will, Ladies and Gentlemen,

4    please follow my bailiff back here. This is a

5    portion that you cannot hear. Stand by pretty

6    close.

7                          (Whereupon the Jury retired to

8                          the Jury Room and the following

9                          occurred outside their

10                         presence:

11

12        MR. FAIRCLOTH: At this point we would move

13   for a judgment of acquittal. I will argue basically

14   what I have put in writing here. Your Honor, it is

15   my understanding on the elements of theft by

16   deception the State has to prove that the Defendant

17   obtained the property of another, and obtained it

18   by deception and intended to deprive the owner. By

19   the indictments that the State has -- is using, the

20   State also has to show that that deception was

21   accomplished by issuing a worthless check and

22   making false promises. In effect, that means that

23   whatever he received he had to <u>deceive</u> the <u>victims</u>

24   into giving him by making a <u>false promise</u> and

25   giving a <u>worthless check.</u>

74

Plaintiff
Exhibit
OI

CC 96-219
CC 96-220
CC 96-221

1    trial of this case.  I want to remind you again, it

2    is highly important that you not  discuss this case

3    among  yourselves  nor  allow  anyone to discuss it

4    with you. We are  not through  taking testimony, or

5    not in a position where you can begin deliberating.

6    So please, keep that  in  mind.  .  Let's  keep this

7    open, a fair trial.  Come back and be here promptly

8    at 1:00 o'clock p.m. in the jury room back here and

9    then we'll begin taking testimony.  Court stands in

10   recess until 1:00 o'clock.

11

12              (Whereupon, the noon recess was

13              declared,  following  which the

14              following occurred:

15

16

17              DONALD MAIR

18   having been  first  duly  sworn,  was  examined and

19   testified as follows, to-wit:

20

21        THE COURT: Bring the Jury in.  The witness has

22   been sworn. You may proceed.

23

24              DIRECT EXAMINATION

25   BY MR. FAIRCLOTH:

75

| | | |
|---|---|---|
| 1 | Q | State your for the Court, please sir. |
| 2 | A | Donald Mair. |
| 3 | Q | And how are you employed, Mr. Mair? |
| 4 | A | I'm employed at the City Bank of Hartford. |
| 5 | Q | Were you employed there in October  and November of |
| 6 | | '95? |
| 7 | A | Yes sir. |
| 8 | Q | And what is your position at the Bank? |
| 9 | A | I'm  Vice-Chairman  of  the  Board  and  CEO of the |
| 10 | | holding company. |
| 11 | Q | In '95 would  your  responsibilities  have included |
| 12 | | establishing  loans  for  clients  and that sort of |
| 13 | | thing? |
| 14 | A | Yes. |
| 15 | Q | Do you remember  in  early  October  of  '95 having |
| 16 | | some dealings  with Marcia and Grady Tolley and Mr. |
| 17 | | Davis here today? |
| 18 | A | Particularly with the Tolley's, yes. |
| 19 | Q | Was there an occasion where the three of  them came |
| 20 | | to the office in October? |
| 21 | A | Yes.  The three of them came in together. |
| 22 | Q | Could  you  explain  the  circumstance  of  that |
| 23 | | meeting, or conference, or whatever it was. |
| 24 | A | Mr. Tolley had a -- we had a  mortgage on  his home |
| 25 | | and  he  had  had  a  fire  and  the house had been |

76

1    damaged. And he came in to see about that.

2    Q    Now, do you know anything else about the

3         relationship between the Tolley's and Mr. Davis at

4         that time?

5    A    Not at that time, no sir.

6    Q    Had they gotten a payment from State Farm to begin

7         work on re-doing the house from the fire damage?

8    A    I don't think they had, but I really don't know at

9         that time.

10   Q    I'm going to show you I'll call Defendant's Exhibit

11        No. 5 I believe. This is a copy but if you could

12        just look at that and tell me if you recognize it?

13   A    Yes. I have seen the check. Yes.

14   Q    Okay and that's a check.

15   A    Yes.

16   Q    Would you just explain or describe for the Jury who

17        that's made out to?

18   A    It's made out to Grady L. Tolley, Marcia A. Tolley

19        and the City Bank of Hartford.

20   Q    Is there another name on there?

21   A    No. There's on -- yes Winifred (phon.) Davis is

22        crossed out.

23   Q    Now did -- was the check, I mean Mr. Davis's name

24        crossed out the first time you saw it?

25   A    I don't remember.

77

| | | |
|---|---|---|
| 1 | Q | Do you know why, on that occasion, that Mr. Davis |
| 2 | | was coming to the Bank with the Tolley's? |
| 3 | A | He came with them. They were talking about having |
| 4 | | Mr. Davis do the work on the house. |
| 5 | Q | Now, do you know if in fact Mr. Davis actually did |
| 6 | | the work on the house? |
| 7 | A | No, he did not. |
| 8 | Q | Do you know if he ever received any of that money |
| 9 | | from that State Farm check? |
| 10 | A | I know from talking with State Farm that I don't |
| 11 | | believe he did. |
| 12 | Q | Do you know if he ever did any of the work -- I |
| 13 | | just asked this but I want to make sure myself. As |
| 14 | | far as you know he didn't do any of the work on the |
| 15 | | Tolley's house? |
| 16 | A | No. |
| 17 | Q | Now, is Wallace Dowling on your Board of Directors? |
| 18 | A | Yes. |
| 19 | Q | And he was on the Board of Directors at the |
| 20 | | time that this was going on? |
| 21 | A | That's correct. |
| 22 | Q | He is the same Wallace Dowling that owns Dowling |
| 23 | | Lumber Company, is that correct? |
| 24 | A | That's correct. |
| 25 | | MR. FAIRCLOTH: That's all I have. Your |

1    witness.

2

3

4                    CROSS EXAMINATION

5    BY MR. EMERY:

6    Q    This check  for $10,000.00  is from State Farm Fire

7         and Casualty Company, right?

8    A    Yes.

9    Q    And it's an insurance check and it involves  a fire

10        you say at the Tolley's house?

11   A    There was a fire.  Yes, the house burned.

12   Q    They had a fire.  The Tolley's had a fire.

13   A    Yes.

14   Q    And they had insurance I take it?

15   A    Yes.

16   Q    And the  insurance company was going to repair

17        or pay for some of the repair for this fire?

18   A    Yes, that's true.

19   Q    Is your Bank involved because you had a mortgage on

20        the property?

21   A    That's correct.

22   Q    So the  insurance company is obligated to make sure

23        that the Bank is paid  as  well  as  the homeowner,

24        right?

25   A    Insurance companies  usually always put the name of

79

1    the mortgage holder on a check, yes, and in this

2    case City Bank.

3  Q  So this check was made payable to Grady L. Tolley,

4    Marcia A. Tolley and City Bank of Hartford because

5    your bank handled the mortgage on that house that

6  .  burned?

7  A  Yes.

8  Q  And this money was intended to be used to repair

9    the damage done by the fire?

10  A  That's correct.

11  Q  Now this check is dated September the 16th. Is

12    that about when you had this meeting you were

13    talking about?

14  A  I'm not sure of the exact date we had the meeting

15    but it was after the house burned. It was in that

16    area, yes.

17  Q  So it would stand to reason it would be sometime

18    after September the 16th of '95--

19  A  That would be correct.

20  Q  -- and fairly close to that date?

21  A  I would think so, yes.

22  Q  Now you said that it's your understanding that Mr.

23    Davis over here did no work on the Tolley house?

24  A  That's my understanding.

25  Q  So there would be no reason why he would receive

1    any of this money?

2  A   Repeat that please.

3  Q   There would be no reason why he would receive any

4    part of this $10,000.00 if he didn't do the work,

5    right?

6  A   All I know is to my knowledge he did not do any of

7    the work on the house.

8  Q   Is that why his name was scratched off the check

9    and a new check was issued?

10  A   I don't know why his name was crossed off.

11  Q   Did Mr. Davis do any other business at your Bank?

12  A   Not to my knowledge, no.

13  Q   So his only connection with you and your Bank that

14    you know of, is that he showed up with the Tolley's

15    with this check?

16  A   That's the first time I remember meeting Mr. Davis

17    is when he came in with the Tolley's.

18  Q   Is that the last dealings you had with him?

19  A   No sir.

20  Q   What other dealings have you had with him?

21  A   He came afterwards, some time after the Tolleys

22    told him they were using someone else.

23  Q   He came to see you?

24  A   Yes.

25  Q   What did he tell you?

81

1    A   He was very upset. He said I talked them out of

2        using him as a contractor.

3    Q   He lost the Tolley job and he was blaming you? He

4        didn't get to do the Tolley job so he was blaming

5        you?

6    A   He did not do the job, no.

7    Q   He was saying it was your fault?

8    A   He came in and told me it was my fault.

9    Q   Did he say why it was your fault?

10   A   He just said I caused it.

11   Q   Do you know when that was?

12   A   No. I have some records back at the Bank where I

13       kept notes, but I do not have them with me.

14   Q   Was it shortly after September the 16th of '95?

15   A   It was after, I would say several weeks after the

16       first time they were in.

17   Q   So would it have been then before October 1st?

18   A   I don't know.

19   Q   That would be two weeks later.

20   A   Without checking the records I don't know.

21   Q   Do you know who did the work at the Tolley home?

22   A   Yes, I know another man did it but I don't have the

23       name available to me right now without my records.

24   Q   Was another check made out after this one?

25   A   Yes.

82

1   Q   State Farm Fire and Casualty Company, they issued

2        another check to replace this one?

3   A   Yes, they issued another check.

4   Q   And who was it payable to?

5   A   To the Tolleys and the City Bank.

6   Q   Mr. Davis's name was not on that one?

7   A   No.

8   Q   Was that check cashed?

9   A   Yes, it was deposited into an account.

10   Q   And was the man or company that did the repairs to

11       the Tolley home paid out of those proceeds?

12   A   I assume it was, yes.

13   Q   You had no direct involvement in that?

14   A   Well, I was involved in it insofar as when the

15       Tolleys got the check it went into an account at

16       the Bank and it took their name and an officer of

        the Bank to take it out and as the work was done

18       and it was checked, then a check would be issued to

19       the Tolleys.

20   Q   As the work was done checks were paid out to the

21       Tolleys and whoever did that work?

22   A   That's correct.

23        MR. EMERY: That's all I have to ask. Thank

24       you.

25

<u>REDIRECT EXAMINATION</u>

1

2   BY MR. FAIRCLOTH:

3   Q    Mr. Mair, do you know why State Farm would issue a

4        check and include a name on there if he wasn't

5        supposed to get paid?

6   A    No, I talked to the Agent about it and he told me

7        what he thought, but it's hearsay.  I rally don't

8        know, no sir.

9   Q    Isn't it true that during this meeting while Mr.

10       Davis was present, you and the Tolleys, that one of

11       you marked his name out of this check?

12  A    I don't remember.  I don't think so, but honestly I

13       don't remember.

14  Q    Isn't it true that -- you said that Mr. Davis

15       claimed that you had something to do with it later

16       on.  Isn't it true that Mr. Davis later on in fact

17       filed suit against you and the bank related to that

18       incident?

19  A    He has since that's happened.  Well, I've been

20       subpoenaed by about four different attorney outfits

21       about a case that he has against the Bank and

22       myself.  But it keeps changing attorneys all the

23       time.

24  Q    Did you request a credit check on Mr. Davis?

25  A    Yes.

30  11

84

1    Q    Had he asked for a loan from your Bank?

2    A    Well he wanted $10,000.00 up front.

3    Q    For what?

4    A    For the work.

5    Q    So he was supposed to be doing the work on the

6         Tolley house?:

7    A    This is when we were first in and they came in and

8         was discussing it with the Tolleys.

9    Q    Isn't it true that he had already entered into a

10        contract with the Tolleys and was supposed to

11        start work and was supposed to receive a part of

12        this $10,000.00?

13   A    Not to my knowledge, no sir.

14   Q    But at the present there is a law suit pending

15        against the Bank which Mr. Dowling is on the Board

16        of Directors and is also the owner of Dowling

17        Lumber Company, would that be accurate?

18   A    That's correct.

19             MR. FAIRCLOTH:    Your Honor, I would like to

20        offer Exhibit 5.

21             THE COURT:  Let it be admitted.

22             MR. FAIRCLOTH:  That's all I have of this

23        witness.

24             THE COURT:  Anything further of this witness?

25             MR. EMERY:  I have nothing further.

1        THE COURT:  You are free to go.

2

3

4              <u>GRADY LEE TOLLEY</u>

5    having been  first  duly  sworn,  was  examined and

6    testified as follows, to-wit;

7

8            <u>DIRECT EXAMINATION</u>

9  <u>BY MR. FAIRCLOTH:</u>

10  Q   Would you state your name for the Jury, please sir.

11  A   Grady Lee Tolley.

12  Q   How are you employed Mr. Tolley?

13  A   Self.

14  Q   Self-employed?

15  A   Yes.

16  Q   What kind of work do you do?

17  A   I do concrete work.

18  Q   Do you know Mr. Davis here today?

19  A   Yes sir.

20  Q   How do you know him?

21  A   My house  burnt down  a couple  of years ago and we

22    come up one day and he was coming out of  the house

23    and he introduced himself.

24      MR. EMERY:  You're going to have to speak up.

25  Q   Speak up so the Jury can hear you.

86

1   A   My house  had burned down a couple of years ago and

2       we pulled up there one day and Mr.  Davis was there

3       coming out  of the house. And he introduced himself

4       and he said he had been  doing work  for State Farm

5       Insurance Company for 25 years and he would like to

6       give us an estimate.

7   Q   He wanted to enter  into an  agreement with  you to

8       fix  your  house,  to  fix the fire damage, is that

9       right?

10  A   He wanted to give us an estimate, yeah.

11  Q   Was part of his -- well, let me  ask you  this. Did

12      you come to some agreement with him?

13  A   Well,  we  told  him,  you know, that after he

14      done  the  estimate  and  everything  that  we

15      would have to talk it over with the Bank.

16  Q   Did he  in fact  go with  you to  a meeting between

17      you and your wife and Mr. Donald Mair at the Bank?

18  A   Yeah, we went up there.

19  Q   At that point had State Farm issued you  some money

20      on that damage?

21  A   Yeah, they had.  They wrote a check and it was made

22      out to  City Bank,  us, and  Mr. Davis  and we told

23      them it  was only supposed to be made out to us and

24      the Bank  because  we  still  had  not  come  to an

25      agreement  on  the  contract.  Even  with the check

87

1   being made out like that we still had to make an

2   agreement with the Bank because the Bank is the one

3   that had the mortgage on the house.

4   Q   Right.  Now isn't it true that Mr. Davis offered to

5   get you a settlement from State Farm and that if he

6   were able to do so that he would in fact be the

7   contractor for your work?  Was that the agreement?

8       MR. EMERY:  Your Honor, we're going to object

9   to Mr. Faircloth leading his own witness here.

10  He's suggesting the answers to him.

11      MR. FAIRCLOTH:  Permission to treat as

12  hostile.

13      MR. EMERY:  This is his witness.  I think he

14  would ask questions rather than telling answers.

15      MR. FAIRCLOTH:  Your Honor, Mr. Tolley has

16  endorsed a check that has been admitted into

17  evidence which is the basis of the complaint

18  against my client.  He's an adverse party in that

19  charge and he's an adverse party in a civil suit

20  and we ask permission to treat as hostile.

21      THE COURT:  I'll let him examine him as a

22  hostile witness.

23  Q   Was that the agreement?

24  A   Well, like I said, there was really, you know what

25  I mean, there was really, like I told him he was

88

1    going to have to meet with the Bank and we all had

2    to come to an agreement together. You know, it

3    didn't matter because I had done had estimates

4    written up from two or three different people. You

5    know, just because he done an estimate doesn't give

6    him the job.

7  Q  So you had to get Mr. Mair's approval?

8  A  Well, what we had to do was make sure the way, you

9    know, the house was going to be redone and

10   everybody was going to be paid.

11 Q  Is it accurate to say when you went to that

12   meeting with Mr. Mair that he declined to

13   accept Mr. Davis as your contractor on the

14   work?

15 A  I wouldn't say that. Mr. Davis wanted more up

16   front than what the check was to start with.

17 Q  How much did he want up front?

18 A  He wanted $10,500.00 to start.

19 Q  What was the total amount of the work that was

20   to be done?

21 A  Like $27,000.00 plus like it was a little extra

22   when it was done.

23 Q  I show you what has been marked Defendant's Exhibit

24   5 and that is the check form State Farm.

25 A  Uh huh.

89

1    Q    Do you recognize that?

2    A    Yeah.

3    Q    Or a copy of it. Who marked out Mr. Davis's name on

4         that?

5    A    You know, honestly, I can't say.

6    Q    Did it come marked out?

7    A    Huh?

8    Q    Was it issued by State Farm with a line

9         through Mr. Davis's name?

10   A    Well, no.

11   Q    So somebody marked it out?

12   A    Yeah.  It's marked out.

13   Q    Now, earlier --Now,  you're aware - I'll back up.

14        You're aware part of the reason that Mr. Davis is

15        in Court today is because of a check he wrote to

16        Joe Thomas?

17   A    But that's got nothing to do with this.

18   Q    This is State's Exhibit 4 and I'll ask if you

19        recognize that check?

20   A    Yeah.

21   Q    Now that's a check that's made out to Joe Thomas.

22        And if you'll look on the back I'll ask if you

23        recognize your signature on the back?

24   A    Yeah.

25   Q    When, in relation to Mr. Davis going with you to

90

```
 1        the Bank, did you endorse that check?
 2    A   This here?
 3    Q   Right.
 4    A   Uh, actually that may have been before.  I can't
 5        really recall.
 6    Q   Did you--
 7    A   It's been two years ago.
 8    Q   What's your relationship with Joe Thomas?
 9    A   He's my father-in-law.
10    Q   Did you go and ask him if you could have that
11        check?
12    A   No, he come to me because he got it on a Saturday
13        and he couldn't get it cashed.
14    Q   Did you give him the cash for it?
15    A   Yeah.
16    Q   Would it be accurate to say Mr. Tolley, that
17        Winston Davis was set to do the work on your house
18        and that after that meeting with Donald Mair at
19        City Bank of Hartford, he lost the job?
20    A   No sir.  When we was on our way back from Dothan
21        that day, when we took that check back, Winston was
22        fine with taking that check back to State Farm.
23        Okay, on our way back he stopped us on the side of
24        the road where they sell used cars on 52, right
25        outside Tabernacle, and he told us that him and Mr.
```

91

1    Mair couldn't come to an agreement and he quit. He

2    wanted his estimate back. He wasn't gong to do the

3    work. I give him his estimate back right then and-

4    -

5    Q    Now, I'm sorry, were you finished?

6    A    Yeah.

7    Q    Now, you say he told you that he and Mr. Mair

8    couldn't come to an agreement?

9    A    That's right.

10   Q    So Mr. Mair is in control of this whole deal, isn't

11   he?

12   A    Well, you know what I'm saying, the Bank, you know,

13   it's their house too.

14        MR. FAIRCLOTH: That's all. Your witness.

15

16

17                    CROSS EXAMINATION

18   BY MR. EMERY:

19   Q    Let's see if I got this straight.  You and your

20   wife -- what's her name?

21   A    Marcia.

22   Q    Marcia. You two own a home, but you don't own all

23   of it right?

24   A    Right, I'm paying on it.

25   Q    And the Bank here has the mortgage on your house.

92

1    How much, back in '95, did you owe the Bank?

2  A   Thirty-thousand dollars.

3  Q   You owed $30,000.00 on your home. Then you have a

4    fire, right?

5  A   Uh huh.

6  Q   When was the fire?

7  A   It was September 16, 1995.

8  Q   And it was a pretty bad fire, right?

9  A   Yeah.

10 Q   And you had insurance though right, with State

11   Farm?

12 A   Yeah.

13 Q   So State Farm was going to pay to have your house

14   repaired.

15 A   Yes.

16 Q   Am I right so far?

17 A   Yeah.

18 Q   And you wanted your house repaired, right?

19 A   Yeah.

20 Q   You didn't want to sell your house.

21 A   No.

22 Q   You didn't want the money, you wanted your house

23   fixed, right?

24 A   Yeah.

25 Q   And that's what the Bank wanted too, right?

93

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So they issued a check to accomplish that |
| 3 | | purpose, didn't they? |
| 4 | A | Yes sir. |
| 5 | Q | And you say the insurance company agreed to |
| 6 | | pay some $27,000.00? |
| 7 | A | Plus the profit and overhead to a contractor. |
| 8 | Q | Like $27,000.00 plus a percentage profit? |
| 9 | A | Right. |
| 10 | Q | Now, you didn't know Mr. Davis here before this |
| 11 | | fire? |
| 12 | A | No. |
| 13 | Q | You say he introduced himself at your home after |
| 14 | | the fire? |
| 15 | A | After the fire. |
| 16 | Q | Your house was burned and you had had to move out |
| 17 | | hadn't you? |
| 18 | A | Yeah. |
| 19 | Q | And then one day you showed back up at your burned |
| 20 | | home and there he was, the first time you had ever |
| 21 | | seen him, right? |
| 22 | A | Yeah. |
| 23 | Q | And he introduced himself to you as a State Farm |
| 24 | | Insurance Agent, didn't he? |
| 25 | A | Contractor. He said he had been doing their |

94

1    work for 25 years.

2  Q   He said he worked for State Farm, right?

3  A   Yeah.

4  Q   That was a lie, wasn't it?

5  A   Yes.

6  Q   But you didn't know it at the time, did you?

7  A   Right.

8  Q   You thought it was the insurance man, didn't you?

9  A   I thought it was their contractor.

10  Q   And he led you to believe that, didn't he?

11  A   Up until we went to State Farm that day and had

12    that meeting.

13  Q   And you had had some other estimates done?

14  A   Yeah.

15  Q   Were they at about the same price?

16  A   They was all around between $25,000.00 to

17    $30,000.00.

18  Q   And that's what the insurance company agreed

19    to pay?

20  A   Yeah.

21  Q   So all the estimates or contractors were able

22    to give you an estimate that was in the ball

23    park of what your insurance company was

24    willing to pay?

25  A   Yeah. His estimate to start with was about, close

95

1      to $45,000.00.

2   Q   He first told you $45,000.00 and then when he found

3      out the insurance company was only willing to pay

4      twenty-seven plus, he came down?

5   A   Yeah.  He was still higher than what they wanted to

6      pay though.

7   Q   But you  and your  wife went  to the  Bank with Mr.

8      Davis to  set up  the arrangements to get this done

9      and paid for, right?

10   A   Yes.

11   Q   State Farm had  agreed  to  pay  $10,000.00  to get

12      things started?

13   A   Yes sir.

14   Q   And that's this first check?

15   A   Yes.

16   Q   That we  have here,  or a  copy of it.  It was made

17      payable evidently to you  and your  wife, City Bank

18      of Hartford, and Winston Davis.

19   A   Yes.

20   Q   Did  Winston  Davis  ever  do any work on your

21      house?

22   A   No.

23   Q   Did you ever pay him any money?

24   A   No.

25   Q   Somebody else repaired your home?

96

1  A  Yes.

2  Q  Who is that?

3  A  Claude Barwick. (phon.)

4  Q  Barwick.  Is he another contractor?

5  A  Yes.

6  Q  How did you meet him?

7  A  I knew a boy that worked for him, James Shiver.

8     Now, about two weeks after --

9        MR. FAIRCLOTH:  Your Honor, I object, there

10    has not been a question asked.

11       THE COURT:  I sustain, if that's an objection.

12 Q  Let's deal with this check and then we'll get to

13    the two weeks later thing in a minute.

14 A  Okay.

15 Q  So you had a meeting at the Bank, right?

16 A  Uh huh.

17 Q  You and your wife, Mr. Mair and Winston Davis.

18 A  Uh huh.

19 Q  During the course of that meeting was it not

20    decided that another check had to be issued?

21 A  Yeah.

22 Q  Did you go to Dothan, you and your wife, and get

23    that check?

24 A  Yes.

25 Q  What happened to that check?

97

1   A   That check, it went back to the Bank.

2   Q   Was it a $10,000.00 check too?

3   A   It was a $10,000.00 check also.

4   Q   So the original of this check was never deposited

5       in the bank and it was never negotiated?

6   A   No, never signed, nothing.

7   Q   You went and got a different check.  Why was that

8       done?

9   A   Because the house was ours and the Banks, and the

10      check was to repair our house, you know, to pay for

11      it, to get it repaired.  And Winston Davis, you

12      know, he was just a contractor.  He was going to

13      get his money if he had done the work.

14  Q   But that never happened?

15  A   Right.

16  Q   The date on this check is September the 16th of

17      '95.  Is that the date that this meeting took

18      place?

19  A   No.

20  Q   What is this?

21  A   That's the date of the loss.

22  Q   The date what?

23  A   Of the loss, the fire.

24  Q   What date did you have the meeting at the

25      Bank?

98

1  A    Honestly, I can't recall.

2  Q    Did this check, or the other $10,000.00 check, or

3       any of the money from State Farm that was payable

4       to you and your Bank have anything to do with the

5       Lewellyn job?

6  A    No.

7  Q    Do you know anything about the Lewellyn job?

8  A    Just on this check right here.

9  Q    Now, you went to Dothan to get another check. Did

10      you get that check?

11  A    Yes.

12  Q    And then you were on your way back from Dothan

13      --

14  A    Yes.

15  Q    -- and you say he flagged you down?

16  A    Yes, he flashed his lights at us.

17  Q    That was on 52?

18  A    Yeah.

19  Q    What happened when you stopped?

20  A    He was real red in the face and he was upset

21      because they couldn't -- you know, he wanted more

22      money than what the check was to get started. He

23      wanted it all up front before any work was done.

24      And whenever -- he didn't want to get it on draws,

25      do the work and get the money. He just told me he

26 13

99

1    said, "If I can't get my money up front he said I'm

2    not going to do the work, I quit.    Give me my

3    contract back."

4  Q  So he told you he quits, he's through with the

5    job?

6  A  Yes sir.

7  Q  End of the project as far as you two are

8    concerned?

9  A  Yeah.

10  Q  Did you give him some contract back?

11  A  Yeah.

12  Q  Is it a contract or an estimate?

13  A  It was an estimate.

14  Q  So he wanted that back?

15  A  Yes.

16  Q  Did you give it to him?

17  A  Yeah.

18  Q  He told you that was it, he quits?

19  A  Yeah, he didn't want anybody else using the

20    estimate.  He didn't want us taking prices off his

21    estimate.

22  Q  Did you have any problem giving that back to him?

23  A  No.

24  Q  But you and/or the Bank were not willing to give

25    him $10,000.00 up front?

100

1   A   No.

2   Q   And that was the end of the deal?

3   A   Because, you know, if we had give him that money up

4       front, we probably wouldn't have a home today.

5            MR.    FAIRCLOTH:        Objection.      That's

6       speculation.

7            THE COURT:  I  sustain  an  objection  to that

8       response.

9            MR. FAIRCLOTH:  And move to strike.

10           THE COURT:  It is so stricken.

11  Q   When did actual work start on repairing your home?

12  A   I think it was around, right around October.

13  Q   Did you have any other dealings with Mr. Davis?

14  A   He called me on the phone one night and demanded

15      $2,000.00 for the estimate that he had prepared.

16  Q   He wanted $2,000.00 for what?

17  A   For that estimate that he prepared.  He said he

18      wanted his money or he was going to sue us.

19  Q   When did that happen?

20  A   The phone call?

21  Q   Yes.

22  A   It was about two weeks after that day at the Bank.

23  Q   Did you ever tell him you would pay him $2,000.00

24      for an estimate?

25  A   No.

101

1   Q   Did you have some other estimates done?

2   A   Yes.

3   Q   How many?

4   A   All together I had four.

5   Q   Did anybody charge you for them?

6   A   No.

7   Q   This check here that's been labeled State's Exhibit

8       4, now this is made out to Joe Thomas. Joe Thomas

9       -- how is he related to you now?

10  A   It's my wife's stepfather, my father-in-law.

11  Q   And you cashed his check for him?

12  A   Yes.

13  Q   Did you know it was a worthless check when you gave

14      him money for it?

15  A   No. I figured him being a contractor the check

16      would be good.

17      MR. EMERY: That's all I have to ask. Thank

18      you.

19

20

21              REDIRECT EXAMINATION

22  BY MR. FAIRCLOTH:

23  Q   Mr. Tolley, what's that date right up there on the

24      top of that check?

25  A   10/13.

102

1    Q    October 13th of '95.

2    A    Yeah.

3    Q    Is that when that meeting took place?

4    A    It could have been.

5    Q    It was at least after that.  That's the date the

6         check was issued, right?

7    A    Right.  It had to be the same day.

8    Q    Now, you say that Winston Davis identified himself

9         as a State Farm Agent?

10   A    No, I said he identified himself as doing State

11        Farm's work for 25 years.

12   Q    What did you take that to mean?

13   A    That he was a State Farm contractor.

14   Q    What did you understand was his responsibility?

15   A    Me and my wife assumed that State Farm had sent him

16        out to do an estimate.

17   Q    Did he tell you that?

18   A    Huh?

19   Q    Did he tell you that?

20   A    Well, whenever he said he had been doing State

21        Farm work for 25 years, we just assumed.

22   Q    Isn't it true that there are individuals who do

23        contracting work and they'll deal with the

24        homeowner's insurance company in trying to get a

25        larger settlement for the repair work?  Isn't that

40
14

103

1      true?

2   A   Well, I assume, yeah.

3   Q   Matter of fact that's what Mr. Davis was doing,

4      wasn't it?

5   A   Yeah.

6   Q   Matter of fact he met with you and State Farm

7      Agents on three different occasions, didn't he?

8   A   I can't recall.

9   Q   Are you saying it didn't happen?

10  A   No, I'm not saying it didn't happen. I'm just

11     saying I can't recall.

12  Q   Do you recall whether State Farm asked you on three

13     different occasions who was your contractor on this

14     work and you told them Winston Davis?

15  A   I told them he was probably going to do it, yeah.

16  Q   And that's why they made out the check to him,

17     isn't it?

18  A   Yeah.

19  Q   Isn't it a fact that Mr. Davis managed to get State

20     Farm to agree to pay you more money than they

21     originally had?

22  A   We ended up with about $2,000.00 more on the house.

23  Q   Was that because you fired Mr. Davis?

24  A   No.

25  Q   So, by the time that this meeting occurred and

104

1  Donald Mair decided Winston Davis wasn't going to

2  be your contractor, Mr. Davis had already done work

3  for you, hadn't he?

4  A  Mr. Mair didn't determine that he was not going to

5  be the contractor.  Winston determined he was not

6  going to be the contractor.

7  Q  Is that right?

8  A  Winston is the one that quit.

9  Q  Why would he quit if he wasn't already the

10  contractor, Mr. Tolley?

11  Q  Huh?

12  A  You said one time that Mr. Davis was never your

13  contractor.  Then you said he quit.

14  A  Yeah, that day we give him his estimate back.

15  Q  He had already done work for you.  He had

16  negotiated with State Farm for a higher settlement.

17  A  He took his estimate there and they compared them.

18  Q  He got you a higher settlement?

19  A  He got $2,000.00 more than -- because their prices

20  was lower on certain things.

21  Q  But he got you a higher settlement?

22  A  Yeah.

23  Q  He did what he said he was going to do?

24  A  Well, yeah.

25  Q  And you testified earlier that it was Mr. Mair's

105

1      decision.

2   A   I told him we had to come to an agreement.

3   Q   All right,  and you  said that during the course of

4      this meeting Mr. Mair  decided  that  another check

5      had to be issued.

6   A   Yeah.

7   Q   Who decided that?

8   A   Well, Mr.  Mair told us that the Bank's policy, you

9      know, the check should  be made  out to  us and the

10      Bank because it was ours and the Bank's house.

11   Q   And you're telling this Court, this Jury, that

12      Mr. Davis wanted all the money up front.

13   A   That check.

14   Q   All of that check?

15   A   Plus $500.00.

16   Q   Isn't it true that State Farm, by meeting  with you

17      and Mr. Davis on those occasions and looking at his

18      estimates, was  giving you  that money  to give Mr.

19      Davis to start work?  Isn't that true?

20   A   It was  supposed to go to the Bank to set up a draw

21      system, to get started, not to give to Mr. Davis.

22   Q   It would go to Mr. Davis eventually?

23   A   Yeah, eventually.

24   Q   Mr. Davis didn't want all the  money for  the total

25      job up front, did he?

106

1   A   He wanted this here.  (Indicating)

2   Q   The total job, $27,000.00 or whatever it was.  He

3       wasn't asking for all that up front?

4   A   Because State Farm was not going to give it

5       all up front.

6   Q   I understand that.  He wasn't asking for that, was

7       he?

8   A   Right.

9           MR. FAIRCLOTH:  That's all I have.

10

11

12              CROSS EXAMINATION

13  BY MR. EMERY:

14  Q   So the short of it is this, right, and correct me

15      if  I'm  wrong.   The  insurance  company  paid

16      $10,000.00 by check to get the project started?

17  A   Yes sir.

18  Q   You go to the Bank with Mr. Davis and the Bank says

19      and  maybe  you  say,  whoever  said it, they said,

20      we're not paying  Mr.  Davis $10,000.00 up front,

21      right?

22  A   Right.

23  Q   And Mr. Davis said, fine, I'm out of here.  I'm not

24      going to take the job?  Is that the short of it?

25  A   Yeah.

107

1    Q    And you got somebody else to do the work?

2    A    Yeah.

3         MR. EMERY:  Thank you.

4         MR. FAIRCLOTH:    That's  all  we  have, Your

5    Honor.

6         THE  COURT:    You  may  come  down.    Have  we

7    introduced that check?

8         COURT REPORTER:  Yes sir, it's in.

9         MR.  FAIRCLOTH:    That's  all  we  have, Your

10   Honor.

11        MR. EMERY:  Can we have a few minutes.  We may

12   have somebody else.

13        THE COURT:  Well, let's take  a couple minutes

14   break and  see where  we go  from here.  Ladies and

15   Gentlemen of the Jury,  please do  not discuss this

16   case.    We're  gong  to  take  a  break.  Follow the

17   Bailiff out.

18

19                       (Whereupon  a  short  recess was

20                       declared,  following  which the

21                       following occurred:

22

23        THE COURT:  Are you ready to proceed?

24        MR. EMERY:  Your  Honor,  what  I  think we're

25   going to  do is  probably have  Buddy Lee come over

108

1    and testify for some business doings with the

2    Lewellyn job and Southtrust Bank.

3         THE COURT:    Well, wait until he gets here

4    then.

5                              (Whereupon, a short recess

6                              was declared and the

7                              following occurred during

8                              the break:

9

10

11              CHARGE CONFERENCE

12         THE COURT:    I'm giving No. 1 and No. 2.  I

13   want you to tell me where to stop reading or if I

14   read it all.

15         MR. FAIRCLOTH:  I would think the whole thing.

16         THE COURT: Do all of them apply in this

17   situation or if we leave some of them out which

18   ones.

19         MR. FAIRCLOTH:    I was referring to the

20   deception, number 1.

21         MR. EMERY:  That would be A through F?

22         MR. FAIRCLOTH:  Right.

23         MR. EMERY:  Then he asked for definitions so

24   that would be -- you would read this too, half way

25   down the page.

1    THE COURT:  All right, 1 and 2.

2    MR. EMERY: And  then  the  sub-sections  are A

3    through F  and A  through E.  You can do either or,

4    you can do either one.

5    MR. FAIRCLOTH:    Everything  starting  with 1

6    down through the end of paragraph 2 right here.

7    THE COURT:   Then I am granting Charge 1 and 2

8    for the  Defendant and  will read  it straight from

9    the Code Section.

10   I am  also giving Defendant's Requested Charge

11   No. 10A and 10B and 10C.

12   I am  giving Defendant's  Requested Charge No.

13   12A, 12B and 12C.

14   All the rest of the written requested charges

15   made by the  Defendant  have  been  refused  by the

16   Court.

17   MR. FAIRCLOTH:  What was the State's objection

18   for those.

19   THE COURT:  I  don't know  that the  State has

20   any objection.  Most of these things as I read them

21   are totally argumentative.   They are  arguments of

22   the law.

23   MR.  FAIRCLOTH:   Your  Honor,  just  for  my

24   curiosity on these other requested charges --

25   THE COURT:   Get  it on  the record.   I'm not

110

1    trying to preclude you from getting it on the
2    record.
3        MR. FAIRCLOTH: Number 3, and I grouped these
4    by A, B and C because of the three charges, and
5    they are all dealing with the same thing, just
6    different. The request that if the Defendant did
7    not intend to deprive each of the respective
8    defendants of labor or services, you must find him
9    not guilty. Your Honor, that's one of the elements
10   of theft by deception as is in the Code. My
11   understanding is, that is a conjunctive requirement
12   that all those elements be proved. If one of them
13   is not proved then the State has failed its case.
14   That's why that is requested.
15       Singularly with number 4, A, B, and C, if
16   each of the prospective victims provided labor or
17   materials to the defendant without relying on
18   false promise, they must find him not guilty, is
19   also one of the elements as is put forth in Ex
20   Parte Day, reliance on false promise. So that's a
21   necessary part still of theft by deception.
22       With Request No. 5, that if the jury
23   determines that Defendant did not obtain each of
24   the respective victim's labor, or services, or
25   material by deceiving him you must find the

defendant not guilty, is based on the statutory elements of deception, the case law elements, and the State's own indictment of the defendant as put forth in ex parte Stinson. Same for 5A, B, and C.

Regarding Requested Charge 6A, B, and C, refers to whether the victims authorized the Defendant to use labor or material, and if you determine that he was authorized to use his labor or materials, then you cannot find him guilty, is also an element of the statutory requirement of theft by deception.

7A, B, and C comes from case law Benefield vs. State, that the charge would be that the defendant has promised to pay each of the alleged victims singularly but that he broke the promise, precludes finding of guilty is consistent with that case law.

With Requested Charge 8A, B, and C. that if Jury determined that Defendant merely failed to pay agent precludes finding of guilty. Also based on case law in Bullen vs. State.

Requested Charge No. 9A, B, and C is based on the case law Ex Parte Stinson and Benefield—prove beyond a reasonable doubt that the defendant never intended to pay any of the victims for their labor and material in order to find him guilty.

112

1    Requested Charge No. 11 is that before the

2    Jury can find the Defendant guilty of theft by

3    deception the State has to prove beyond a

4    reasonable doubt that he intended never to make it

5    good, is consistent with the requirement both of

6    theft by deception and underlying or lesser

7    included offense of negotiating a worthless

8    instrument; that he had knowledge, expectation or

9    intent that the instrument not be honored. That I

10   believe those charges are consistent with the case

11   law and an accurate statement of the law. With that

12   being said I understand the Court's ruling.

13

14

15                 IN OPEN COURT

16        THE COURT:  Bring the Jury in.  The witness

17   has been sworn.  You may proceed.

18

19

20                 HENRY LEE

21     having been first duly sworn, was examined and

22      testified as follows, to-wit:

23

24            DIRECT EXAMINATION

25   BY MR. EMERY:

113

1    Q    Would you introduce yourself to the Ladies and

2    Gentlemen, please.

3    A    My name is Henry Lee.    I'm called Buddy Lee

4    generally, and I'm a lawyer here in Geneva.

5    Q    How long have you been a lawyer?

6    A    Since 1972, about 25 years.

7    Q    And is one of your clients Southtrust Bank?

8    A    Yes sir, on occasion.

9    Q    In particular on Richard Lewellyn and the Bank,

10    were you involved in that?

11    A    Yes sir.    I was contacted by the "Bank" and by Mr.

12    Lewellyn and "requested that I handle the matter"

13    involving a construction problem that Mr. Lewellyn

14    was having on his home.

15    MR. FAIRCLOTH:    Your Honor, I'm going to

16    object.    May I approach?

17    (Whereupon, the following

18    occurred at the Bench outside

19    the hearing of the Jury:

20

21    MR. FAIRCLOTH:  Your Honor, I don't know what

22    personal knowledge he has with any of these checks

23    made the basis of the complaint in this case.

24    There's been no testimony offered by the defense

25    regarding the Lewellyn job.    The only mention of

114

1    the Lewellyn job was on cross examination of the

2    State's witness.    I fail to see how this is

3    material and I fail to see how it is relevant

4    unless the State can show some evidence relating to

5    the checks, how this witness is relevant.

6        MR. EMERY: Your Honor, "he's made reference

7    repeatedly the reason these checks were bad is

8    that the Lewellyn's breached their contract" and

9    didn't pay Mr. Davis and that is just simply not

10   true.

11       MR. FAIRCLOTH:    Your Honor, that's not been

12   admitted-- that's not been proposed by the defense

13   in it's case. The questions on cross examination,

14   his witnesses testified they had no knowledge of it

15   and its not been made a portion of this case as

16   regards these checks.

17       MR. EMERY:    Your Honor, this whole -- all

18   these checks have to do with the Lewellyn project.

19       THE COURT:    All right, I overrule your

20   objection.  We'll let him proceed.  You have your

21   exception.

22

23   Q   So you became involved in the Lewellyn construction

24       projection, we'll call it that, at about what time?

25   A   Initially, I think it was early November of 1995.

115

1   Q   So that was already in progress?

2   A   Yes sir.

3   Q   Had the Lewellyn's paid Mr. Davis money at that

4       time?

5   A   Yes sir.

6   Q   And how much had they paid him before the Bank got

7       involved?

8   A   Okay, now the Bank had gotten involved back

9       approximately the first of September. Prior to

10      that Mr. Lewellyn had advised, being presented me

11      with documents to support he had paid Mr. Davis

12      approximately I think it is $13,000.00 prior to the

13      Bank getting involved.

14   Q   You have copies of those checks with you?

15   A   Yes sir, I have copies of the checks written by Mr.

16      Lewellyn's mother-in-law to Mr. Davis for Mr.

17      Lewellyn, and then there was some documentation

18      which were direct deposits from -- withdrawals from

19      her savings record that it went to Mr. Davis. The

20      checks I have copies of total just slightly in

21      excess of $10,000.00. There was some additional

22      funds paid.

23   Q   So $10,000.00 or $13,000.00 was paid to Mr. Davis

24      before the Bank became involved?

25   A   Yes sir, between July 28th and August 16th of 1995.

116

1   Q    This was to start construction on a new home?

2   A    Yes sir.

3   Q    Now, did the Lewellyn's then borrow money from the

4        Bank?

5   A    Yes sir, not on this home. He borrowed on some

6        other property that he owned, a chicken farm, and

7        used that money to complete the construction

8        project.

9   Q    So he borrowed money using some chicken houses for

10       collateral?

11  A    Yes sir.

12  Q    To get money to build the new home?

13  A    Yes sir.

14  Q    And was that money held by the Bank?

15  A    Yes sir.

16  Q    And was that money to be paid out as work was done

17       on the new home?

18  A    Yes sir, I was furnished a contract that is

19       purportedly signed by Mr. Davis and Mr. Lewellyn

20       that set forth that it was to be paid according to

21       the Bank's inspection process.

22  Q    And what date was that contract made?

23  A    On August 15th, 1995.

24  Q    That's when the Bank got involved in it?

25  A    Yes sir.

117

1    Q    To the point where the Bank would pay out the

2         monies as they were satisfied the work was done?

3    A    Yes sir.

4    Q    Did the Bank pay out money as the work was done?

5    A    I was furnished copies of cancelled checks from

6         the Bank.

7    Q    Let me show you State's Exhibit 5 and 6. Are those

8         two of those checks?

9    A    Yes sir, those are the checks I was furnished.

10   Q    State's Exhibit 5 would appear to be a copy of the

11        cancelled check where Mr. Davis was paid $13,000.00

12        on September 1st of '95?

13   A    Yes sir.

14   Q    And then the second exhibit, State's Exhibit No. 6,

15        is where Mr. Davis and Richard Lewellyn were paid

16        $29,000.00?

17   A    Yes sir.

18   Q    So $42,000.00 was paid to Mr. Davis on the

19        Lewellyn job?

20   A    Yes sir, that's my understanding. Mr. Davis did

21        endorse the checks. Yes sir.

22   Q    And that was to be payment for work done?

23   A    Yes sir.

24   Q    What was the total price of the construction

25        contract that Mr. Davis took on?

118

1  A    $82,400.00.

2        MR. FAIRCLOTH: Your Honor, this may be

3  redundant at this point, but I have to object to

4  the substance of the testimony. This witness has

5  no direct knowledge of this contact, the Bank's

6  dealings on this contract. Mr. Lewellyn, those

7  individuals would be the ones to have direct

8  knowledge of what this witness is testifying to.

9        THE COURT: I overrule your objection and I

10  assume the attorney has --

11  Q    You have the contract there with you, don't you?

12  A    Yes sir, I have a signed contract. I believe it is

13  the original. I'm not positive of that.

14        MR. FAIRCLOTH: Your Honor, my objection is

15  this witness was not involved with the contract and

16  he's not involved with the inspections and not

17  involved with the dealings between Lewellyn and the

18  Bank. That is a matter between Lewellyn and the

19  Bank and Mr. Davis.

20        THE COURT: I overrule your objection.

21  Q    What's the date of the contract for $82,400.00?

22  A    August 15th, 1995. It's actually signed by Mr.

23  Lewellyn on the 14th and by Mr. Davis on the 15th.

24  Q    And did that $82,400.00 include the money that he

25  had already been paid by the Lewellyn's?

119

1    A    Yes sir, that's my understanding.

2    Q    So of that $82,420.00 some $12,000.00 or $13,000.00

3         had already been paid?

4    A    Yes sir.

5    Q    And then you say these two checks, the Bank paid

6         him $42,000.00.

7    A    Yes sir.

8    Q    Was the last money that the Bank paid to Mr. Davis

9         that September 29th payment?

10   A    Yes sir.

11   Q    Did he finish the job?

12   A    No sir.

13   Q    And you were involved in the termination of Mr.

14        Davis were you not?

15   A    Yes sir, I wrote Mr. Davis a letter for Mr.

16        Lewellyn early in November of 1995.

17   Q    Somebody else employed to finish that job?

18   A    Yes sir.

19   Q    Do you know who that was?

20   A    No sir, there was a bid that I was furnished but I

21        am just not aware of whether that bidder or another

22        bidder completed the job.

23   Q    Do you know the cost of the completion?

24   A    Again, I was advised $50,000.00.

25   Q    That was paid to somebody besides Mr. Davis?

120

1   A     Yes sir.

2   Q     Did you notify Mr. Davis of why he was being

3         terminated?

4   A     Yes sir. Mr. Davis had left the job because he was

5         demanding more money, and the Bank upon their

6         inspections was saying he hadn't earned the money

7         he had already been paid. That was the basis for

8         it and when Mr. Davis left the job numerous other

9         sub-contractors and suppliers were coming on to the

10        job and that's the reason I was initially brought

11        in to this matter. And we handled it with those

12        suppliers and sub-contractors.

13  Q     Those are people that had not been paid?

14  A     Yes sir.

15        MR. EMERY: That's all I have to ask. Thank

16  you.  We offer those checks, State's Exhibit 5 and

17  6.

18        MR. FAIRCLOTH:  And I object to the admission

19  of the checks.  This witness has not laid a

20  predicate on where these checks came from.  These

21  checks were not from this witness to the defendant

22  or anybody related to this case, and he can't

23  testify to these documents themselves.

24        THE COURT:  I am going to let the Jury retire

25  for just a minute.  If you will, please go out.

121

(Whereupon, the Jury retired
and the following occurred
outside their presence:

THE COURT: All right, at this point in time
I want the District Attorney and Defense Counsel,
for the record, to state their reasons for calling
this witness and their reasons -- legal reasons why
they should introduce these checks into evidence.
I want to get it cleared up right now.

MR. EMERY: Your Honor, of course the three
checks here that we have been trying, all center
around this Lewellyn job. Mr. Thomas was a worker
there. Dowling Lumber furnished materials for the
job, and Kirkland Plumbing actually laid the
foundation or the plumbing and electric into the
foundation on this particular job. The Defendant
has raised the issue that Lewellyn, or the people
that own the house here, breached the contract and
didn't pay the Defendant, and as a result these bad
checks came about. Well, as we're showing here,
Mr. Davis was in fact paid more than he was
entitled to. This money, these two checks plus

122

1    some other money that Mr. Lee testified to, some

2    $10,000.00 or $13,000.00 that are received directly

3    from the Lewellyns.

4           I would think Mr. Faircloth's objection is

5    that the best evidence rule would be the better

6    objection not that it's not relevant. We can get

7    into that as why he has copies and not the

8    originals but I don't think that's the issue he

9    raised. He's saying they aren't relevant, right?

10          MR. FAIRCLOTH: No, I say this witness can't

11   lay the predicate for these documents. The best

12   evidence doesn't apply.

13          MR. EMERY: I don't know why we would assume

14   he doesn't know what he's talking about.

15          MR. FAIRCLOTH: Well, this witness had nothing

16   to do with these checks.

17          MR. EMERY: He's the lawyer for the Bank and

18   the Lewellyn's. What do you mean he had nothing to

19   do with it?

20          MR. FAIRCLOTH: Well, there's been no

21   testimony that I've heard that he had ordered

22   these checks, that he cashed these checks, or

23   anything to that effect.

24          MR. EMERY: He didn't cash them.

25          MR. FAIRCLOTH: On your basis of argument

123

anybody who knows anything about it can testify to it and I don't think that's the rule.

MR. EMERY: Well, you can argue the credibility but--

MR. FAIRCLOTH: My argument about this witness, Judge, is that he has no personal knowledge as is contemplated by the Rules in that he is not a party to any of the checks that were written. He is not a representative of the Bank, not employed by the Bank to give that testimony. He didn't have dealings with Lewellyn in establishing the loan that is being discussed, and in that sense he does not have personal knowledge of these matters. And is not qualified to speak on them under my understanding of the Rules.

THE COURT: Are you going to attempt to verify the best evidence on the checks?

MR. EMERY: I can. Do you know where the original checks are?

MR. FAIRCLOTH: Let me clarify. My objection is not best evidence. My understanding that does not apply to the documents.

MR. EMERY: I didn't think it did.

MR. FAIRCLOTH: My objection is that he cannot lay the proper predicate for these documents.



DEFENDANT'S
EXHIBIT
6

*BEST POSSIBLE IMAGE*

*EXHIBIT 28*

CR 97-0367

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

WINSTON DAVIS,

APPELLANT,

VS.

STATE OF ALABAMA,

APPELLEE.

ON APPEAL FROM THE CIRCUIT COURT OF
GENEVA COUNTY, ALABAMA

---

BRIEF AND ARGUMENT

---

OF

BILL PRYOR
ATTORNEY GENERAL

AND

JEAN A. THERKELSEN
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300



## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF CASES AND AUTHORITIES ......................................... ii

STATEMENT OF THE CASE ...................................................... 1

ISSUES PRESENTED FOR REVIEW............................................. 3

STATEMENT OF THE FACTS...................................................... 4

ARGUMENT ........................................................................... 8

I.  THE TRIAL COURT PROPERLY DENIED DAVIS'S MOTION FOR
JUDGMENT OF ACQUITTAL......................................................... 8

II.  THE TRIAL COURT PROPERLY REFUSED DAVIS'S
REQUESTED JURY INSTRUCTIONS THREE THROUGH NINE, AND
ELEVEN, AS THEY WERE EITHER SUBSTANTIALLY COVERED IN
THE COURT'S ORAL CHARGE TO THE JURY, WERE CONFUSING,
OR MISLEADING, OR WERE NOT PREDICATED UPON A
CONSIDERATION OF THE EVIDENCE........................................ 22

III.  THE TRIAL COURT PROPERLY ALLOWED STATE'S WITNESS
HENRY LEE, THE BANK'S ATTORNEY, TO TESTIFY ON REBUTTAL
REGARDING BUSINESS DEALINGS BETWEEN HIS CLIENTS,
RICHARD LEWELLYN AND SOUTHTRUST BANK, AND THE
DEFENDANT, WINSTON DAVIS.................................................. 26

CONCLUSION .......................................................................... 31

CERTIFICATE OF SERVICE....................................................... 32

## TABLE OF CASES AND AUTHORITIES

**Cases**

Benefield v. State, 469 So. 2d 699 (Ala. Crim. App. 1985) ........... 16

Biddie v. State, 516 So. 2d 846 (Ala. 1987) ................................. 30

Borden v. State, 522 So. 2d 333 (Ala. Crim. App. 1988) ............. 27

Bryan v. State, 453 So. 2d 765  (Ala. Crim. App. 1984 ) ............. 27

Cagle v. State, 504 So. 2d 1224 (Ala. Crim. App. 1982) ............. 30

Crosslin v. State, 540 So. 2d 98 (Ala. Crim. App. 1988)............. 30

Ex parte Weaver, 530 So. 2d 258 (Ala. 1988) ............................. 30

Garner v. State, 606 So. 2d 177 (Ala. Crim. App. 1992) ............. 27

Hemphill v. State, 669 So. 2d 1020 (Ala. Crim. App. 1995) ......... 24

Jackson v. State, 553 So. 2d 647 (Ala. Crim. App. 1989)............. 29

Johnson v. State, 651 So. 2d 1085 (Ala. Crim. App. 1994) .......... 17

McCord v. State, 501 So. 2d 520 (Ala. Crim. App. 1986) ............. 16

McElroy v. State, 571 So. 2d 353 (Ala. Crim. App. 1986)............. 17

McMahon v. State, 560 So. 2d 1094 (Ala. Crim. App. 1989) ........ 27

McMurphy v. State, 455 So. 2d 924 (Ala. Crim. App. 1984)......... 17

Moore v. State, 415 So. 2d 1210 (Ala. Crim. App. 1982)............. 30

Newsome v. State, 570 So. 2d 703 (Ala. Crim. App. 1989)........... 27

Smith v. State, 665 So. 2d 1002 (Ala. Crim. App. 1995) ............. 16

Swinney v. State, 482 So. 2d 1326 (Ala. Crim. App. 1985) ........... 8

**Statutes**

Ala. Code §13A-2-2 (2) (1975) ........................................................ 11

Ala. Code §13A-8-1 (1) (f) (1975) .................................................. 11

Ala. Code §13A-8-2 (2) (1975) ........................................................ 11

Ala. Code §13A-8-3 (a) (1975) ........................................................ 9

Ala. Code §13A-8-4 (a)(1975) ........................................................ 9

**Rules**

Rule 21 ARCrP .......................................................................... 24

Rule 602, Alabama Rules of Evidence .......................................... 29

**Treatises**

C. Gamble, McElroy's Alabama Evidence,

§ 21.01 (6) (4ᵗʰ ed. 1991).............................................................. 27

## STATEMENT OF THE CASE

This is an appeal from the appellant's convictions of theft of property in the first degree and theft of property in the second degree, in the Circuit Court of Geneva County, Judge Charles L. Woods presiding.

On August 2, 1996, Winston Davis was indicted by the Geneva County Grand Jury in three indictments charging him with theft of property in the first degree and theft of property in the second degree as follows:

### CC-96-219

> The Grand Jury of said County Charge that, before the finding of this Indictment on or about 10-21-95, one Winston Davis did, knowingly obtain, by deception unauthorized control over labor and personal services, from Joe Thomas, by making a false promise to pay and presenting a worthless check, number 183, in the amount of $375.00, to Joe Thomas with the intent to deprive Joe Thomas of said labor and personal services, in violation of Section 13A-8-4 of the Code of Alabama, against the peace and dignity of the State of Alabama.

(C. 10-11)

### CC-96-220

> The Grand Jury of said County Charge that, before the finding of this Indictment on or about 10-20-95, one Winston Davis did, knowingly

obtain, by deception unauthorized control over plumbing supplies, work and labor from Kirkland Plumbing, by making a false promise to pay and presenting a worthless check, number 180 in the amount of $4,900.00, with the intent to deprive the owner of said property, in violation of Section 13A-8-3 of the Code of Alabama, against the peace and dignity of the State of Alabama.

(C. 12-13)

CC-96-221

The Grand Jury of said County Charge that, before the finding of this Indictment on or about 10-9-95, one Winston Davis did, knowingly obtain, by deception unauthorized control over building materials, from Dowling Lumber, by making a false promise to pay and presenting a worthless check, number 167, in the amount of $1,607.20, to Dowling Lumber with the intent to deprive Dowling Lumber of said building materials, in violation of Section 13A-8-4 of the Code of Alabama, against the peace and dignity of the State of Alabama.

(C. 115)

On December 5, 1996, Davis entered pleas of not guilty in cases CC96-219 through CC96-221. (C. 28-31) The three cases were consolidated for trial. (R. 14) On September 30, 1997, Davis came to trial. At the conclusion of trial, the jury returned verdicts finding the defendant guilty of theft of property in the first degree, and theft of property in the second degree, as charged in the

indictments. (C. 3, 5, 8, 132-134)    On October 31, 1997, Davis

was sentenced to four years in the state penitentiary in each case

by the Circuit Court of Geneva County.  (C. 3, 6, 9)  The sentences

were ordered to run concurrently, and  Davis was placed on three

years immediate probation.  (C. 3, 6, 9)  Notice of appeal was given

on November 4, 1997 (C. 152), and this action follows.


## ISSUES PRESENTED FOR REVIEW

### I.

WHETHER THE TRIAL COURT PROPERLY DENIED
DAVIS'S MOTION FOR JUDGMENT OF ACQUITTAL.

### II.

WHETHER THE TRIAL COURT PROPERLY REFUSED
DAVIS'S REQUESTED JURY INSTRUCTIONS THREE
THROUGH NINE, AND ELEVEN.

### III.

WHETHER THE TRIAL COURT PROPERLY ALLOWED
STATE'S WITNESS HENRY LEE, THE BANK'S
ATTORNEY, TO TESTIFY ON REBUTTAL REGARDING
BUSINESS DEALINGS BETWEEN HIS CLIENTS,
RICHARD LEWELLYN AND SOUTHTRUST BANK, AND
THE DEFENDANT, WINSTON DAVIS.

## STATEMENT OF THE FACTS

Winston Davis was hired to build a house for Richard Lewellyn in Geneva County, Alabama in the fall of 1995. During the course of the construction, Davis obtained $1607.20 worth of building materials from Dowling Lumber Company in Hartford, Alabama, which he gave the lumber company a check which was returned for insufficient funds. (R. 16, 22) Previously, Davis had made several purchases in September, 1995, under the following arrangement: Davis would give Dowling Lumber Company a signed, blank check, which the store would hold until the end of the month. At the end of the month, Dowling would fill out the check in the amount of Davis's monthly bill, and send him a receipt. (R. 17) Davis purchased supplies from Dowling Lumber Company several times during September and October under this arrangement, and his checks were good. (R. 22, 27) The blank check for supplies in the amount of $1607.20, which was given to Dowling by Davis on October 9, 1995, and endorsed by the defendant, was worthless. (R. 22, 36-38 )

Wallace Dowling, the owner of Dowling Lumber Company, called Davis and told him the check was worthless, but Davis did

not made things right.  (R. 22)  Davis never told Dowling to hold the check.  (R. 29)  When Davis did not contact him, Dowling sent him a registered letter informing him his check had been returned for insufficient funds.  Dowling never heard from Davis.  (R. 22)  Davis did not returned the materials, or  reimburse Dowling Lumber Company for the $1607.20 in supplies.  (R. 22)

Lamar Kirkland, owner of the Kirkland Plumbing and Electric Company in Slocomb, Alabama, was hired by Davis to do the plumbing and electrical work on the Lewellyn house. (R. 42-43) Kirkland did the work and bought the materials to complete the job.  (R. 44)  The total price of the job Kirkland was hired to do was $6700.00.  (R. 44)  On October 20, 1995, Davis wrote Lamar Kirkland a check in the amount of  $4900.00.  (R. 45)  The check was returned by the bank for insufficient funds.  Kirkland did not complete the job on the Lewellyn house.  (R. 45)  Davis never told him the check was not good, or ever asked Kirkland to hold the check.  (R. 45)  Kirkland was never reimbursed for his materials or labor.  (R. 45)  When the check bounced, Kirkland talked to Davis, who promised Kirkland several times he would meet him and give him cash to cover the bad check.  (R. 53)  Davis never showed up.

5

(R. 53)  Kirkland did not finish the job on the Lewellyn house.  (R.
46)  Davis was unable to complete his contract on the Lewellyn
house because of his financial problems.  (R. 55)

Joe Thomas was hired by Davis to work on the Lewellyn
house around October 7, 1995, at $12.00 per hour.  (R. 56-58)  At
the end of the first week, Davis paid Thomas in cash.  (R. 58)  At
the end of the next week, Davis told Thomas to meet him across
the street at a gas station, where he gave Thomas a check for
$372.00.  (R. 59)  The check, which was dated October 21, 1995,
was returned by the bank for insufficient funds.  (R. 59-60)
Thomas called Davis several times to give Davis the opportunity to
make cover the check.  (R. 60)  When it was clear he was not going
to get his money, Thomas reported the incident to the district
attorney.  (R. 60)  Davis never told Thomas the check was not
good.  (R. 61)  Furthermore, after Davis wrote the check to Thomas
which bounced, Thomas worked an additional two and a half days
on the Lewellyn job, for which he was never paid.  (R. 61)

The defense called two witnesses, Donald Mair and Grady
Tolley, whose testimony related to Davis's business dealings with
the Tolleys, a couple whose house was damaged in a fire.  (R. 75-

101)  Davis misrepresented himself to Mr. Tolley as a State Farm contractor.  (R. 86)  The Tolleys did not hire Davis to do the work on their house.  (R. 79-81, 90-91)  The Tolley matter was totally unrelated to the Lewellyn job.  (R. 98)

On rebuttal, Henry Lee, a lawyer who represented Southtrust Bank in the matter regarding the Lewellyn house, testified Lewellyn paid Davis $13,000 between July 28 and August 16, 1995, for construction work on their new home.  (R. 113-116)  The total amount of the job on the Lewellyn home was $82, 400.  Davis was paid a the sum of  $42,000 for his  work on the Lewellyn house.  (R. 117)

Davis did not complete the job on the Lewellyn house.  (R. 119)  The last payment to Davis by the bank was on September 29, 1995.  (R. 119)  Davis was terminated in a letter sent by the bank on November 17, 1995.  (R. 119)  Davis, however, had already stopped work on the job by the time the letter was sent.  (R. 135-136)  He quit work on the house when his demands for more money were refused by the bank.  The bank refused Davis's demands after it was  determined Davis had not earned the money he had *already* been paid.  (R. 120)  In short, Davis had not done

7

$42,000 worth of work, *and* his sub-contractors had not been paid. (R. 135)

## ARGUMENT

### THE TRIAL COURT PROPERLY DENIED DAVIS'S MOTION FOR JUDGMENT OF ACQUITTAL.

#### A.

In issue one, Davis claims the trial court erred in denying his motion for judgment of acquittal because: (1) the State failed to prove he obtained the materials, labor and personal services at issue from the victims by deception; (2) the State failed to prove he made a false promise to pay the victims for the materials, labor and personal services; and (3) his conviction is due to be reversed under the holding in Swinney v. State, 482 So. 2d 1326 (Ala. Crim. App. 1985). The trial court properly denied Davis's motion for judgment of acquittal, because his fraudulent intent could be inferred from his conduct and the circumstances surrounding the case. For the sake of brevity, subparts (1) and (2) of this issue will be addressed together as they both pertain to the element of intent.



Theft of property is a specific intent crime. Davis was convicted of two counts of theft of property in the first degree, pursuant to Ala. Code §13A-8-3 (a) (1975), and one count of theft of property in the second degree, pursuant to Ala. Code §13A-8-4 (a)(1975). Those sections provide as follows:

§13A-8-3. Theft of property in the first degree.
(a) The theft of property which exceeds $1,000.00 in value, or property of any value taken from the person of another, constitutes theft of property in the first degree.

§13A-8-4. Theft of property in the second degree.
(a) The theft of property which exceeds $250,00 in value but does not exceed $1,000.00 in value, and which is not taken from the person of another, constitutes theft of property in the second degree.

All of three indictments in this case charged Davis with theft by deception.

### CC-96-219

The Grand Jury of said County Charge that, before the finding of this Indictment on or about 10-21-95, one Winston Davis did, knowingly obtain, by deception unauthorized control over labor and personal services, from Joe Thomas, by making a false promise to pay and presenting a worthless check, number 183, in the amount of $375.00, to Joe Thomas with the intent to deprive Joe Thomas of said labor and personal services, in violation of Section 13A-8-4 of the

9

Code of Alabama, against the peace and dignity
of the State of Alabama.

(C. 10-11)

## CC-96-220

he Grand Jury of said County Charge that,
before the finding of this Indictment on or about
10-20-95, one Winston Davis did, knowingly
obtain, by deception unauthorized control over
plumbing supplies, work and labor from
Kirkland Plumbing, by making a false promise to
pay and presenting a worthless check, number
180 in the amount of $4, 900.00, with the intent
to deprive the owner of said property, in
violation of Section 13A-8-3 of the Code of
Alabama, against the peace and dignity of the
State of Alabama.

(C. 12-13)

## CC-96-221

The Grand Jury of said County Charge that,
before the finding of this Indictment on or about
10-9-95, one Winston Davis did, knowingly
obtain, by deception unauthorized control over
building materials, from Dowling Lumber, by
making a false promise to pay and presenting a
worthless check, number 167, in the amount of
$1,607.20, to Dowling Lumber with the intent to
deprive Dowling Lumber of said building
materials, in violation of Section 13A-8-4 of the
Code of Alabama, against the peace and dignity
of the State of Alabama.

(C. 115)

10

Davis was charged by indictment by knowingly obtaining by deception the materials, labor and personal services at issue.

Theft by deception is defined by Ala. Code §13A-8-2 (2) (1975), as follows:

> §13A-8-2. Theft of property - Definition.
> A person commits the crime of theft of property if he:
> (2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property.

A person acts "knowingly" with respect to conduct or to a circumstance described by statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists. See Ala. Code §13A-2-2 (2) (1975). Finally, Ala. Code §13A-8-1 (1) (f) (1975), states:

> §13A-8-1. Definitions generally.
> The following definitions are applicable in this article unless the context otherwise requires:
> (1) DECEPTION occurs when a person knowingly:
> (f). Promises performance which the defendant does not intend to perform or knows will not be performed. Failure to perform, standing alone, however, is not proof that the defendant did not intend to perform. The term "deception" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons.

11

"Puffing" means an exaggerated commendation
of wares or service.

Herein, the State presented evidence from which the jury could infer the requisite intent. At trial, evidence was presented by the State that the defendant, Winston Davis, was hired to build a house for Richard Lewellyn in Geneva County, Alabama, in the fall of 1995. During the course of the construction, Davis obtained $1607.20 worth of building materials from Dowling Lumber Company in Hartford, Alabama. Davis gave the lumber company a check for the $1607.20 in materials, which was returned for insufficient funds. (R. 16, 22) Previously, Davis had made several purchases in September, 1995, whereby he would give Dowling Lumber Company a signed, blank check, which the store would hold until the end of the month. At the end of the month, Dowling would fill out the check in the amount of Davis's monthly bill, and send him a receipt. (R. 17) Davis purchased supplies from Dowling Lumber Company several times during September and October under this arrangement, and his checks were good. (R. 22, 27) The blank check for supplies in the amount of $1607.20, which was endorsed and given to Dowling by Davis on October 9, 1995, by the defendant, was worthless. (R. 22, 36-38 )

12

Wallace Dowling, the owner of Dowling Lumber Company, called Davis and told him the check was worthless, but Davis made no effort to repay Dowling for the goods. (R. 22) Davis never asked Dowling to hold the check, or gave any indication whatsoever that the check would be worthless. (R. 29) When Davis did not contact him, Dowling sent him a registered letter informing him his check had been returned for insufficient funds. Dowling never heard from Davis. (R. 22) Davis did not return the materials, or reimburse Dowling Lumber Company for the $1607.20 in supplies. (R. 22)

Lamar Kirkland, owner of the Kirkland Plumbing and Electric Company in Slocomb, Alabama, was hired by Davis to do the plumbing and electrical work on the Lewellyn house. (R. 42-43) Kirkland did the work and bought the materials to complete the job. (R. 44) The total price of the job Kirkland was hired to do was $6700.00. (R. 44) On October 20, 1995, Davis wrote Lamar Kirkland a check in the amount of $4900.00. (R. 45) The check was returned by the bank for insufficient funds. Kirkland did not complete the job on the Lewellyn house. (R. 45) Davis never indicated the check was worthless, or ever asked Kirkland to hold

13

the check. (R. 45)  Kirkland was never reimbursed for his materials or labor. (R. 45)  When the check was returned for insufficient funds, Kirkland talked to Davis, who promised Kirkland several times he would meet him and give him cash to cover the bad check. (R. 53)  Davis never showed up. (R. 53) Kirkland did not finish the job on the Lewellyn house. (R. 46) Davis was unable to complete his contract on the Lewellyn house because of his financial problems. (R. 55)

Joe Thomas was hired by Davis to work on the Lewellyn house at $12.00 per hour. (R. 56-58)  At the end of the first week, Davis paid Thomas in cash. (R. 58)  At the end of the next week, Davis asked Thomas to meet him across the street at a gas station, where he gave Thomas a check for $372.00. (R. 59)  The check was returned by the bank for insufficient funds. (R. 59-60) Thomas called Davis several times to give Davis the opportunity to make cover the check. (R. 60)  Davis never made any effort to repay Thomas.  When it was clear he was not going to get his money, Thomas reported the incident to the district attorney. (R. 60)  Davis never told Thomas the check was not good. (R. 61) Furthermore, after Davis wrote the check to Thomas which

14

bounced, Thomas worked an additional two and a half days on the

Lewellyn job, for which he also was not paid. (R. 61)

On rebuttal, Henry Lee, a lawyer who represented Southtrust

Bank in the matter regarding the Lewellyn house, testified Lewellyn

paid Davis $13,000 between July 28 and August 16, 1995, for

construction work on their new home. (R. 113-116) The total

amount of the job on the Lewellyn home was $82, 400. Davis was

paid a the sum of $42,000 for his work on the Lewellyn house.

(R. 117)

Davis did not complete the job on the Lewellyn house. (R.

119) The last payment to Davis by the bank was on September 29,

1995. (R. 119) Davis was terminated in a letter sent by the bank

on November 17, 1995. (R. 119) Davis had, however, already

stopped work on the job by the time the letter was sent. (R. 135-

136) He quit work on the house when his demands for more

money were refused by the bank. The bank refused Davis's

demands after it was determined Davis had not earned the money

he had *already* been paid. (R. 120) In short, Davis had not done

$42,000 worth of work, *and* his sub-contractors had not been

paid. (R. 135)

15

Viewing all of the evidence in the light most favorable to the prosecution, the facts and circumstances of this case support the jury's finding the defendant knowingly obtained by deception property belonging to the victims. Sufficiency of the evidence has been defined as follows:

> The test to be applied in reviewing the sufficiency of circumstantial evidence is not whether the evidence excludes every reasonable hypothesis except that of guilt, but whether a jury might reasonably so conclude. *Dolvin v. State,* 391 So. 2d 133, 137-138 (Ala. 1980); *Cumbo v. State,* 368 So. 2d 871, 874 (Ala. Crim. App. 1978), cert. denied, 368 So. 2d 877 (Ala. 1978).

McCord v. State, 501 So. 2d 520, 529 (Ala. Crim. App. 1986).

Although failure to perform, standing alone, is not proof the defendant did not intend to perform, Smith v. State, 665 So. 2d 1002, 1003 (Ala. Crim. App. 1995), the defendant's fraudulent intent need not be proven by direct substantive evidence, but can be inferred from the accused's conduct and the circumstances of the case. Id, citing, Cotton v. State, 389 So. 2d 1169, 1174 (Ala. Crim. App. 1980); Benefield v. State, 469 So. 2d 699, 701 (Ala. Crim. App. 1985). In fact, "intent, . . . being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof,

16

and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence." McCord v. State, 501 So. 2d 520, 528-529 (Ala. Crim. App. 1986), citing *Pumphrey v. State, 47 So. 156, 157 (1908)*. See also Johnson v. State, 651 So. 2d 1085, 1086 (Ala. Crim. App. 1994).

Whether Davis knowingly by deception obtained control over the property of the victims was a question for the jury to decide. McMurphy v. State, 455 So. 2d 924, 928 (Ala. Crim. App. 1984). It was a question the jury decided in favor of the State. Viewing all of the evidence in the light most favorable to the prosecution, the there was evidence from which the jury could infer that the crime of theft by deception in the first degree, and theft by deception in the second degree, had occurred. Moreover, this Court has noted it is not the province of the appellate courts to reweigh the evidence. McElroy v. State, 571 So. 2d 353, 355 (Ala. Crim. App. 1986). There was sufficient evidence presented by the State to allow the jury to conclude beyond a reasonable doubt that Davis possessed the requisite intent to support his convictions of theft of property by deception in the first degree, and theft of property by deception in the second degree.

17

**B.**

In subpart (3) of issue one, Davis argues his convictions of theft of property by deception in the first degree, and theft of property by deception in the second degree are due to be reversed under the holding in <u>Swinney v. State</u>, 482 So. 2d 1326 (Ala. Crim. App. 1985). In <u>Swinney</u>, this Court held that the fact the defendant, a part owner of a crop storage corporation, *knew* he was having financial problems and did not inform the victim of that fact at the time the farmer delivered his soybeans to the corporation for storage, did not amount to "deception" and, thus, did not support the defendant's conviction. In rejecting the State's argument the defendant deceived the victim into placing his grain for storage with his company, the Court held:

> There is absolutely no evidence that the appellant deceived [as defined by §13A-8-1 (1)] Hudson into placing his wheat into storage in June, 1981. The only possible evidence of deception was that the appellant, Swinney, knew he was in default on his loan in September of 1981. This was before Hudson brought in his soybeans to S&R for storage in October, 1981. However, the mere fact that the appellant knew he was having financial problems and did not tell Hudson does not amount to deception as defined by the Alabama Code.

18

The State contends the appellant deceived Hudson by promising performance which he, Swinney, did not intend to perform or which he knew would not, or could not, be performed. While intent is a question for the jury, there must be some evidence of that intent. "Failure to perform, standing alone, however, is not proof that the defendant did not intend to perform." Ala. Code §13A-8-1 (1) (f) (1975). See also *Anderson v. State*, 418 So. 2d 967 (Ala. Crim. App. 1982).

It is entirely likely that, when the appellant obtained control of Hudson's wheat and later his soybeans, he intended to store the crops until Hudson was ready to sell same and pay Hudson for them when he did consummate the actual sale. This is especially true in light of the past dealings between these two parties.

The State failed to prove that the appellant "knowingly obtained by deception" the control over Hudson's wheat and later the soybeans with the necessary intent to deprive Hudson of his crops, as charged in the indictment.

Swinney v. State, 482 So. 2d at 1329-1330.

From the actions of the defendant in the instant case and the circumstances surrounding the worthless checks herein, the jury could infer that Davis wrote the bad checks knowing he had insufficient funds to cover them. For example, when contacted by the Dowling Lumber Company regarding the worthless check he had written, Davis made no effort to contact the owner, or to set

19

things right.  Davis never made any effort to reimburse the lumber

company for  the materials he took, or even contacted the owner.

Likewise, Davis's actions regarding victim Lamar Kirkland

created an inference of guilt.  Davis wrote a  check to Kirkland in

the amount of  $4900.00, which was  returned by the bank for

insufficient funds.  Davis promised Kirkland several times he

would meet him and give him cash to cover the bad check, but

never showed up.  (R. 53)  Davis did not tell Kirkland the check

was not good, nor did he ever ask Kirkland to hold the check.  (R.

45)  Kirkland was never reimbursed for his materials or labor.  (R.

45)

Davis's actions regarding the worthless check he wrote to

construction worker Joe Thomas, also supported the jury's finding

Davis knowingly obtained Thomas's property by deception.  At the

end of the first week, Davis paid Thomas in cash.  (R. 58)  At the

end of the next week, Davis asked Thomas to meet him across the

street at a gas station, where he gave Thomas a check for $372.00.

(R. 59)  The check was returned by the bank for insufficient funds.

(R. 59-60)  Thomas called Davis several times to give Davis the

20

opportunity to cover the check. (R. 60) Davis, however, never made any effort to repay Thomas.

This evidence contrasts with the evidence in <u>Swinney</u>, where the only evidence of deception on the part of the defendant was that Swinney knew he was in default on his loan in September of 1981. <u>Swinney</u>, 482 at 1329. The farmer in <u>Swinney</u> brought his wheat to S&R for storage in June, 1981, and his soybeans for storage in October, 1981. Around the first of October, 1981, the bank attached the Swinney's personal bank account. In December, 1981, the same bank seized all of the wheat which S&R had, as well as some of their equipment. Another bank seized the soybeans in S&R's possession, their accounts receivable, as well as the rest of the company's assets. There was evidence presented, however, that Swinney tried to recompense the victim for at least part of his loss. There is no such evidence present in the instant case. Furthermore, in <u>Swinney</u>, there was an intervening action by the bank, which is not present in Davis's case. In other words, the defendant in <u>Swinney</u> was the victim of financial woes, but did not knowingly deceive the victim. Unlike the defendant in <u>Swinney</u>,

21

Davis has made no showing that he was the victim of financial circumstances, which were beyond his control.

Accordingly, the trial court properly denied Davis's motion for judgment of acquittal, and should be affirmed.

## II.

**THE TRIAL COURT PROPERLY REFUSED DAVIS'S REQUESTED JURY INSTRUCTIONS THREE THROUGH NINE, AND ELEVEN, AS THEY WERE EITHER SUBSTANTIALLY COVERED IN THE COURT'S ORAL CHARGE TO THE JURY, WERE CONFUSING, OR MISLEADING, OR WERE NOT PREDICATED UPON A CONSIDERATION OF THE EVIDENCE.**

Davis claims in issue two, the trial court erred in refusing the following jury instructions requested by the defense:

No. 3:  If you determine that Winston Davis did not intend to deprive [the victim] of his labor at the time he received it, then you must find him not guilty. (C. 104-106)

No. 4:  If you determine that [the victim] provided labor to Winston Davis without relying upon a false promise by Winston Davis if there was one, then you must find Winston Davis not guilty. (C. 86-88)

No. 5:  If you determine that Winston Davis did not obtain [the victim's] labor by deceiving him, then you must find Winston Davis not guilty. (C. 89-91)

No. 6:  If you determine that [the victim] authorized Winston Davis to use his labor, [and/or property] then you must find Winston Davis not guilty.  (C. 92-94)

No. 7:  If you determine that Winston Davis's promise to pay [the victim] was sincere when he made it, but that he later broke that promise, you must find Winston Davis not guilty.  (C. 95-97)

No. 8:  If you determine that Winston Davis merely failed to pay a debt due [the victim], you must find Winston Davis not guilty.  (C. 98-100)

No. 9:  Before you can find Winston Davis guilty of theft by deception, the state must prove, beyond a reasonable doubt, that at the time Winston Davis hired [obtained property from] [the victim] that he never intended to pay him for his labor [and/or property]. (C. 101-103)

No. 11:  Before you can find Winston Davis guilty of theft by deception, the state must prove, beyond a reasonable doubt, that at the time the check was written the defendant intended to never make it good.  (C. 82)

Following a charge conference between the court, defense counsel and the prosecutor, defense counsel objected to the trial court's refusal of the charges at issue.  (R. 110-112)

The trial court properly refused the requested charges at issue, because they were either substantially covered by the court's

23

oral charge to the jury, or were confusing, misleading, or were not predicated upon a consideration of the evidence.

> A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. . . . When requested charges are either fairly and substantially covered by the trial court's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges.

Hemphill v. State, 669 So. 2d 1020, 1021 (Ala. Crim. App. 1995), citing, Ex parte Wilhite, 485 So. 2d 787 (Ala. 1986).

The trial court's jury charge on the elements of theft by deception was thorough and substantially covered Davis's requested charges. "The refusal of a requested written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge, or in other charges given at the request of the parties." Rule 21 ARCrP. In its charge to the jury, the trial court gave substantially the same rules of law as stated in Davis's requested charges, when the court instructed the jury on the elements of theft by deception

24

in the first degree, and theft by deception in the second degree,

reasonable d<u>o</u>ubt and <u>intent</u>.

> No. 3:  Covered by the trial court's charge to the jury on the elements of the offenses charged, the definition of deception, and reasonable doubt. (R. 147-149, 150-152, 156-157)

> No. 4: Covered by the trial court's charge to the jury on the elements of the offenses charged, and the definition of deception.  (R. 147-149, 150-152, )

> No. 5: Covered by the trial court's charge to the jury on reasonable doubt. (R. 150-152, )

> No. 6: Covered by the trial court's charge to the jury on the elements of the offenses charged, the definition of deception, and reasonable doubt. (R. 147-149, 150-152, 156-157)

> No 7: Covered by the trial court's charge to the jury on the elements of the offenses charged, the definition of deception.  (R. 147-149, 150-152)

> No. 8: Covered by the trial court's charge to the jury on the elements of the offenses charged, the definition of deception, and reasonable doubt. (R. 147-149, 150-152, 156-157)

> No. 9: Covered by the trial court's charge to the jury on reasonable doubt.  (R. 156-157)

> No. 11: Covered by the trial court's charge to the jury on reasonable doubt. (R. 156-157)

The requested charges at issue were *also* properly refused by the

trial court, because they were misleading, confusing,

25

ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law. Hemphill v. State, 669 So. 2d at 1021.

Accordingly, the trial court properly refused requested jury instructions 3 through 9 and 11, and should be affirmed.

### III.

**THE TRIAL COURT PROPERLY ALLOWED STATE'S WITNESS HENRY LEE, THE BANK'S ATTORNEY, TO TESTIFY ON REBUTTAL REGARDING BUSINESS DEALINGS BETWEEN HIS CLIENTS, RICHARD LEWELLYN AND SOUTHTRUST BANK, AND THE DEFENDANT, WINSTON DAVIS.**

Davis claims in issue three, the trial court improperly allowed the State to call attorney Henry Lee on rebuttal to testify regarding business dealings between his clients, Richard Lewellyn and Southtrust Bank, and the defendant Winston Davis, because: (1) such testimony was irrelevant and improper, as it was not offered in rebuttal of earlier testimony offered by the defense; (2) Lee was incompetent to testify, as he had no personal knowledge of the contractual relationship between Lewellyn and the defendant; and, (3) Lee's testimony was improper hearsay. The State disagrees.

26

Generally, the test of relevance is whether the offered testimony bears any logical relationship to the ultimate inference for which it was offered. Garner v. State, 606 So. 2d 177, 182 (Ala. Crim. App. 1992); C. Gamble, McElroy's Alabama Evidence, 21.01 (6) (4th ed. 1991). Questions concerning the materiality and relevance of evidence lie within the sound discretion of the trial court. McMahon v. State, 560 So. 2d 1094, 1096 (Ala. Crim. App. 1989); Borden v. State, 522 So. 2d 333, 335 (Ala. Crim. App. 1988). Evidence is relevant if it has *any* probative value to the issue at bar, however slight. Newsome v. State, 570 So. 2d 703, 715 (Ala. Crim. App. 1989).

> The determination of the relevance of a particular line of questioning lies within the sound discretion of the trial court. Evidence is considered relevant if it has "any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration." McLain v. State, 46 Ala. App. 627, 247 So. 2d 383 (1971). Any fact having a logical relation or a causal connection with another fact and which makes the other fact either more or less probative is relevant to prove it. Austin v. State, 434 So. 2d 289 (Ala. Crim. App. 1983).

Bryan v. State, 453 So. 2d 765, 767 (Ala. Crim. App. 1984 ).

27

The evidence at issue was relevant because it supported the State theory Davis knowingly obtained the victims' property through deception. Lee testified the last payment to Davis by the bank was on the Lewellyn house was on September 29, 1995. (R. 119)  Therefore, Davis was *already* in breach of his contractual obligations on the Lewellyn house and having financial difficulties by the time he got the materials from Dowling, and hired Kirkland and Thomas.  This evidence was relevant to rebut the defense's inference on cross-examination of the State's witnesses that Davis did not knowingly deceive the victims.  Davis did not complete the job on the Lewellyn house, and was terminated in a letter sent by the bank on November 17, 1995. (R. 119)  Davis, however, had already stopped work on the job by the time the letter was sent. (R. 135-136)  He quit work on the house when his demands for more money were refused by the bank.  The bank refused Davis's demands after it was  determined Davis had not earned the money he had *already* been paid.  (R. 120)  In short, Davis had not done $42,000 worth of work, *and* his sub-contractors had not been paid.  (R. 135)  These facts show the defendant knowingly obtained the victim's properties and labor by deception.

28

Furthermore, Lee was competent to testify regarding the matters at issue, because he personally represented both the bank, and the Lewellyns during the contractual dispute with the defendant. He was handled the case, was familiar with the file, and personally wrote a termination letter to Davis removing him from the Lewellyn construction project. (R. 113, 119, 120) Lee was competent to testify regarding the matters at issue under Rule 602, Alabama Rules of Evidence, because he had personal knowledge regarding the business dealings between Richard Lewellyn and the defendant.

Finally, Davis claims Lee's testimony regarding the business dealings between Richard Lewellyn and the defendant was inadmissible hearsay. No objection was made at trial by defense counsel on grounds Lee's testimony was inadmissible hearsay, although counsel *did* object on grounds Lee was not competent to testify, the evidence was irrelevant, and no proper predicate had been laid for the admission of the checks from the Lewellyn/Davis dealings. (R. 112-143) The trial court cannot be placed in error on grounds not asserted, and those not asserted are waived. Jackson v. State, 553 So. 2d 647, 650 (Ala. Crim. App. 1989), citing

29



Johnson v. State, 421 So. 2d 1306 (Ala. Crim. App. 1982).

Furthermore, an objection must be made with sufficient clarity to

allow the trial court to make an informed decision; otherwise an

alleged error is not preserved for appellate review. Ex parte

Weaver, 530 So. 2d 258, 259 (Ala. 1988). Thus, Davis's hearsay

claim is not preserved for appellate review. Biddie v. State, 516 So.

2d 846, 847 (Ala. 1987). Even constitutional issues may be waived

on appeal if they are not presented to the trial court. Crosslin v.

State, 540 So. 2d 98, 99 (Ala. Crim. App. 1988); Cagle v. State, 504

So. 2d 1225, 1226 (Ala. Crim. App. 1982); Moore v. State, 415 So.

2d 1210, 1217 (Ala. Crim. App. 1982).

　　　Accordingly, the trial court properly allowed the State to call

Henry Lee on rebuttal to testify regarding the business dealings

between Lewellyn and the defendant, and should be affirmed.

<u>CONCLUSION</u>

Davis's convictions of theft by deception in the first degree and theft by deception in the second degree, are due to be affirmed.

Respectfully submitted,

BILL PRYOR
ATTORNEY GENERAL
BY:

JEAN A. THERKELSEN
ASSISTANT ATTORNEY GENERAL

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 1998, I did serve a copy of the foregoing on the attorney for the Appellant, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

Hon. Robert C. Faircloth
P. O. Box 489
Troy, Alabama  36081


JEAN A. THERKELSEN
ASSISTANT ATTORNEY GENERAL


ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300

32

No. 3

(9)

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

WINSTON DAVIS, #207010          )
                                )
        PETITIONER,             )
                                )
vs.                             )  CIVIL NO. 00-A-343-S
                                )
BILLY OWENS, et al.,            )
                                )
        RESPONDENTS.            )

## ANSWER OF RESPONDENTS

Come now the Respondents, by and through the Attorney

General for the State of Alabama, and in response to this

Honorable Court's Order issued April 19, 2000, make the following

answer:

1. In his federal petition, Winston Davis attacks the action

of the Geneva County Circuit Court in revoking his probation on

the following grounds:

(1) That he was unable to perfect an appeal from
    the denial of his probation due to the trial
    court's refusal to grant his request for a
    copy of the transcript of the revocation
    proceedings;

(2) That the trial court's order revoking his
    probation was insufficient, because it did
    not state the evidence relied upon;

PETITIONER WINSTON DAVIS'S
EXHIBIT 29.

(3) That he is the victim of malicious prosecution
      by the Geneva County District Attorney's
      Office; and,
(4) That he was denied of his right of appeal
      following the revocation of his probation.

(Davis's federal petition, pages 8-11)

2.  Respondents admit Davis is in state custody serving

concurrent four-year sentences of imprisonment in the state

penitentiary pursuant to his conviction of theft of property in the

first-degree, and theft of property in the second-degree in the

Geneva County Circuit Court, but aver that Davis's convictions

and sentence are valid and constitutional under the laws and

treaties of the United States and the State of Alabama.

3.  Respondents deny each and every material allegation of

the petition and demand strict proof thereof.

## PROCEDURAL HISTORY

4.  On August 2, 1996, the Geneva County Grand Jury

indicted Winston Davis in three indictments charging him with

theft of property in the first-degree and theft of property in the

second-degree as follows:

### CC-96-219

The Grand Jury of said County Charge that,
before the finding of this Indictment on or about

2

10-21-95, one Winston Davis did, knowingly obtain, by deception unauthorized control over labor and personal services, from Joe Thomas, by making a false promise to pay and presenting a worthless check, number 183, in the amount of $375.00, to Joe Thomas with the intent to deprive Joe Thomas of said labor and personal services, in violation of Section 13A-8-4 of the Code of Alabama, against the peace and dignity of the State of Alabama.

CC-96-220

The Grand Jury of said County Charge that, before the finding of this Indictment on or about 10-20-95, one Winston Davis did, knowingly obtain, by deception unauthorized control over plumbing supplies, work and labor from Kirkland Plumbing, by making a false promise to pay and presenting a worthless check, number 180 in the amount of $4,900.00, with the intent to deprive the owner of said property, in violation of Section 13A-8-3 of the Code of Alabama, against the peace and dignity of the State of Alabama.

CC-96-221

The Grand Jury of said County Charge that, before the finding of this Indictment on or about 10-9-95, one Winston Davis did, knowingly obtain, by deception unauthorized control over building materials, from Dowling Lumber, by making a false promise to pay and presenting a worthless check, number 167, in the amount of $1,607.20, to Dowling Lumber with the intent to deprive Dowling Lumber of said building materials, in violation of Section 13A-8-4 of the Code of Alabama, against the peace and dignity of the State of Alabama.

3

(Exhibit A)

5. On December 5, 1996, Davis entered pleas of not guilty in case numbers CC96-219 through CC96-221. (Exhibit A)  The three cases were consolidated for trial. (Exhibit A)  On September 30, 1997, Davis came to trial.  At the conclusion of trial, the jury returned verdicts finding Davis guilty of theft of property in the first-degree and theft of property in the second-degree, as charged in the indictments. (Exhibit A)   On October 31, 1997, Davis was sentenced to four years in the state penitentiary in each case by the Circuit Court of Geneva County. (Exhibit A)  The sentences were ordered to run concurrently and Davis was placed on three years immediate probation. (Exhibit A)  Notice of appeal was given on November 4, 1997. (Exhibit A)

6. On direct appeal to the Alabama Court of Criminal Appeals, Davis raised the following issues:

    I. The trial court erred in denying his motion for judgment of acquittal because:

        (1.) The State failed to prove he obtained the materials, labor and personal services at issue from the victims by deception;

(2.) The State failed to prove he made a false promise to pay the victims for the materials, labor and personal services; and

(3.) His conviction was due to be reversed under the holding in Swinney v. State, 482 So. 2d 1326 (Ala. Crim. App. 1985).

II. The trial court erred in refusing the defendant's requested jury instructions numbers three through nine and eleven.

III. The trial court improperly allowed the State to call attorney Henry Lee on rebuttal to testify regarding business dealings between his clients, Richard Lewellyn and Southtrust Bank, and the defendant Winston Davis, because:

(1) Such testimony was irrelevant and improper, because it was not offered in rebuttal of earlier testimony offered by the defense;

(2) Lee was incompetent to testify, because he had no personal knowledge of the contractual relationship between Lewellyn and the defendant; and,

(3) Lee's testimony was improper hearsay.

(Exhibits A and B)

7. On August 28, 1998, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming Davis's convictions. (Exhibit C) the Alabama Court of Criminal Appeals issued certificate of final judgment was on September 15, 1998.

5

On September 29, 1999, Davis's probation was revoked by the Geneva County Circuit Court, following a hearing on the matter. Evidence was presented at the hearing that Davis had violated the terms of his probation by committing a new offense, namely, theft of property in the first-degree. Specifically, at the hearing, the victim, Alice Kelly, testified that Davis had stolen thirty-five thousand dollars from her. On March 8, 2000, Davis filed a petition for writ of mandamus with the Alabama Court of Criminal Appeals. Therein, Davis claimed that he had been denied his right to an appeal from the revocation of his probation. The Alabama Court of Criminal Appeals denied Davis's petition for writ of mandamus on March 17, 2000, on grounds the petition failed to state a claim upon which relief could be granted. (Exhibit D) Davis filed the instant petition on March 22, 2000, and this action follows.

## EXHAUSTION

8. Davis has not exhausted his remedies in state court regarding the revocation of his probation. Davis still has a potential remedy regarding this matter under Rule 32 ARCrP. To date, he has not filed a Rule 32 petition in the Geneva County

Circuit Court attacking the trial court's action in revoking his

probation.  Therefore, Davis has not exhausted his state remedies

pertaining to the revocation of his probation.

## STATUTE OF LIMITATIONS

9.  Title 28 U. S. C. §2244(d)(1), enacted by Title I of the

Antiterrorism and Effective Death Penalty Act of 1996, pub. L. No.

104-132, 110 Stat. 1214, provides for a one-year statute of

limitations applicable to a writ of habeas corpus by a person in

custody pursuant to the judgment of a state court.  This law

became effective April 24, 1996, prior to the revocation of Davis's

probation.  The section specifically provides the following:

> (d) (1) A 1-year period of limitation shall apply to
> an application for a writ of habeas corpus by a
> person in custody pursuant to the judgment of a
> State court.  The limitation period shall run from
> the latest of - -
>
> (A) the date on which the judgment became final
>     by the conclusion of direct review or the
>     expiration of the time for seeking such
>     review;
>
> (B) the date on which the impediment to filing an
>     application created by State action in
>     violation of the Constitution or laws of the
>     United States is removed, if the applicant
>     was prevented from filing by such State
>     action;

7

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The *time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.* (Emphasis added.)

10. The Geneva County Circuit Court revoked Davis's probation on September 29, 1999. Under Title 28 U.S.C. §2244 (d)(1), Davis has one year from the expiration of the time for seeking appellate review from the revocation of his probation in which to file a federal petition. Under Rule 4 (b) (1) ARAP, notice of appeal by a defendant in a criminal case shall be filed with the clerk of the trial court within 42 days after pronouncement of sentence or judgment. Therefore, under Title 28 U.S.C. §2244 (d) (1) and Rule 4 (b) (1) ARAP, Davis has until November 10, 2000, in which to file a timely federal habeas petition. It does not appear that the statute of limitation has run in Davis's case.

## MEMORANDUM BRIEF

### I.

DAVIS'S CLAIMS REGARDING THE TRIAL COURT'S
REVOCATION OF HIS PROBATION HAVE NOT BEEN
EXHAUSTED.

11. Winston Davis has failed to exhaust his state remedies
as required by 28 U.S.C. §2254 (c).  See generally, Walker v. Zant,
693 F. 2d 1087, 1088 (11th Cir. 1982); Rose v. Lundy, 455 U. S.
509, 518 (1982).  Specifically, Davis has not raised his claims
regarding the revocation of his probation and/or the denial of an
appeal from the revocation of his probation in a Rule 32 ARCrP
petition in the Geneva County Circuit Court.  Davis had the right
to appeal the denial of his probation revocation to the Alabama
Court of Criminal Appeals.  Thomas v. State, 675 So. 2d 1341
(Ala.Cr.App.1994) ("It is clear that a defendant may appeal from a
trial court's judgment revoking his probation.").  Davis claims,
however, that he was prevented from taking an appeal from the
revocation of his probation through no fault of his own.  Davis may
have issues that entitle him to an out-of-time appeal, if he can, in
fact,  show that his failure to appeal was through no fault of his
own.

Rule 32.1 (f), ARCrP, states:

> Subject to the limitations of Rule 32.2, any
> defendant who has been convicted of a criminal
> offense may institute a proceeding in the court
> of original conviction to secure appropriate relief
> on the ground that:

> (f) The petitioner <u>failed to appeal within the
> prescribed time and that failure was without
> fault on petitioner's part.</u>

<u>See</u> <u>Parker v. State</u>, 719 So. 2d 259, 260 (Ala. Crim. App. 1997).

12.   Under Alabama law, all post-conviction petitions seeking

relief from a conviction or sentence shall be treated as a proceeding

under Rule 32, ARCrP.  <u>Patton v. State</u>, 623 So.2d 452, 452

(Ala.Crim.App.1993).  <u>See also</u>, <u>Welborn v. State</u>, 586 So.2d 256,

257 n. 1 (Ala.Crim.App.1991).  ("We recognize that we are implicitly

holding that [Rule 32 ARCrP] encompasses collateral review for

revocation of probation.  A petitioner under Rule 32 is seeking

relief from a sentence.  See Rule 32.4.").

13.   Pursuant to Rule 32.2 (c) (2), Davis has 2 years and 42

days from the date of the revocation of his probation (November 10,

2001) to file a Rule 32 petition.  He has not, as of this date, filed a

Rule 32 petition attacking the revocation of his probation.

14. Davis should be required to fulfill his exhaustion requirements in the state courts before presenting his claims regarding the revocation of his probation in the federal court. He has failed to present these claims to the trial court in a properly filed Rule 32 petition. Davis's remedy lies not in federal habeas corpus, but in Rule 32 ARCrP. Under the state procedural rules of Alabama, Davis must first present his allegations to the Alabama state courts. Davis has not complied with Rule 32 regarding the claims raised in the instant federal petition.

15. The doctrine of comity requires that the State of Alabama be given an opportunity to address the wrongs alleged by the petitioner before federal habeas relief is sought. In fact, before a habeas petitioner can seek relief in federal court, he must exhaust the remedies available to him in state court, i.e. Davis must exhaust his remedies under Rule 32 ARCrP. Rose v. Lundy, 455 U. S. 509, 518 (1982). According to U. S. C. §2254 (c), a claim is not deemed exhausted as long as the petitioner "has a right under the law of the state to raise, by any available procedure, the question presented."

16.  In <u>Castille v. Peoples</u>, 489 U. S. 346, 350 (1989), the United States Supreme Court noted "ordinarily, this language appears to preclude a finding of exhaustion if there exists any possibility of further state court review."  Davis has not presented the claims relating to the revocation of his probation in a properly filed Rule 32 ARCrP petition.  Under state and federal law, Davis is required to first exhaust his state remedies before seeking relief in federal court.  Davis is attempting to circumvent the state courts, the rules pertaining to appellate procedure, the rules pertaining to Rule 32 petitions, the rules under §2254, and the principles of comity by such action.

> Comity concerns dictate that the mere statement of a federal claim in state court does not satisfy the requirement of exhaustion.  Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits.

<u>Keeney v. Tamayo-Reyes</u>, 504 U. S. 1, 10, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992), citing <u>Picard v. Conner</u>, 404 U. S. 270, 275 (1971).

17.  Davis has not exhausted his state remedies, because he still has potential relief under Rule 32 ARCrP. The doctrine of

comity requires that the State of Alabama be given an opportunity to address Davis's claims regarding the revocation of his probation and the alleged denial of appeal, before federal habeas corpus relief is sought. Davis should be required to first exhaust his remedies under Rule 32 before he is allowed to seek relief under §2254.

Accordingly, the Respondents request that Davis's federal petition be dismissed without prejudice to allow him to exhaust his state remedies.

## CONCLUSION

Based upon the foregoing, Davis's federal habeas corpus petition regarding the propriety of the trial court's revocation of his probation and the denial of appeal are due to be dismissed for failure to exhaust.

Respectfully submitted,

BILL PRYOR
ATTORNEY GENERAL
BY:

JEAN A. THERKELSEN
ASSISTANT ATTORNEY GENERAL

14

## EXHIBITS



Exhibit A  - State's brief on direct appeal.

Exhibit B – Davis's brief on direct appeal.

Exhibit C – Memorandum opinion of the Alabama Court of
Criminal Appeals affirming Davis's conviction.

Exhibit D – Order of the Alabama Court of Criminal Appeals
denying Davis's petition for writ of mandamus.

## CERTIFICATE OF SERVICE

I hereby certificate that on May 8th, 2000, I did serve a copy of the foregoing on the attorney for the Petitioner, by placing the same in the United States mail, first class, postage prepaid and addressed as follows:

Winston Davis
AIS #207010
Hamilton A & I
P. O. Box 1568
Hamilton, Alabama 35570

JEAN A. THERKELSEN
ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, ALABAMA 36130
(334) 242-7300

ACS0020   A L A B A M A ·   U D I C I A L   I N F O . . A T I O N   C E N T

## CASE ACTION SUMMARY
## CIRCUIT CRIMINAL

CASE: CC 96 000219

IN THE CIRCUIT COURT OF     GENEVA   COUNTY
ATE OF ALABAMA              VS                            JUDGE:
                                        DAVIS WINSTON
.SE: CC 96 000219.00                    4399 OLD FREEPORT    126 Deer Ru
                                        205-430-4499
                                        HARVEST, AL  35742 0000

DOB: 04/17/49   RACE: W  SEX: M
SSN:417561373   ALIAS NAMES:          M        HT:  5 11  WT: 200  HR:  GRY  EYE:

CHARGE:: THEFT/DECEPTION 2ND                CODE1: T002 LIT.THEFT/DECEPTION  TYP
CHARGE::                                    CODE2:                          TYP
CHARGE::                                    CODE3:                          TYP
MORE?:        OFFENSE DATE: 10/21/95   AGENCY/OFFICER: GCSO    NAPC

DATE WAR/CAP ISS:
DATE    INDICTED: 08/02/96            DATE ARRESTED: 11/04/96
DATE    RELEASED: 11/04/96            DATE    FILED: 11/04/96
        BOND AMOUNT:      $1,000.00   DATE  HEARING:

DATE 1: 12/17/96 DESC: APPO          TIME: 0900 A
DATE 2:          DESC:               TIME: 0000                SURETIES: FORFEL
           ~~~~~~~~~~~~              (C)
PROSECUTOR: EMERY, DAVID C                                              TYPE

CTH CASE:  0054000
COURT REPORTER:              CHK                              GRAND JURY: 001
DEF STATUS: BOND             DEMAND:                          OTCE MEA

DATE Fa:cc3      ACTION, JUDGMENTS, CASE NOTES

| | |
|---|---|
| 12/3/96 | NOTICE OF APPEARANCE FILED BY SHEETS. |
| 12/3/96 | REQUEST OF DEFENDANT FOR PRODUCTION BY STATE FILED BY SHEETS. |
| 12/5/96 | PLEA OF NOT GUILTY AND WAIVER OF ARRAIGNMENT. |
| 12/10/96 | ORDER OF DISCOVERY. |
| 1/23/97 | Motion t Continue |
| 1/22/97 | Cont f D. M atty not req |
| 3/7/97 | Motion to Withdraw. (w/Proposed Order |
| 3/7/97 | New One copy t Sheits |
| 3/6/97 | copy to Sheits |
| 3/14/97 | Motion to Extend Court date by df, |
| 3/19/97 | Cont'ing Sh & S Rule |
| 5/16/97 | Def's atty Sheets allowed to withdraw Cond. for t Writ of retrest - Ce |
| 5/23/97 | Alias (conditional forfeiture t alic for service), |
| 6/3/97 | ALIAS WARRANT AND CONDITIONAL FORFEITURE SET ASIDE PER JUDGE CHARLES L. WOO CIRCUIT JUDGE. |
| 6/3/97 | PLACE ON JUNE 9, 1997 TRIAL DOCKET.  CLW |
| 6/3/9 | COPY OF CAS TO EMERY, DAVIS, HUGHES, SHERIFF.  mw |

PETITIONER WINSTON DAVIS'S
EXHIBIT 30

ACS00369  A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 96 00021
JUDGE ID:  CLW

STATE  OF  ALABAMA                    VS    DAVIS  WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 6/5/97 | Entry of Appearance — Motions to Continue by Faircloth |
| 6/9/97 | Warrant Recall |
| 6-11-97 | Cont'd for Def. - CLW |
| 6/10/97 | Motion to Produce of Defendant |
| 7/3/97 | Order of Discovery to DA Petty |
| 8/26/97 | MOTION TO DISMISS AND/OR OBJECTION TO SUPOENA DUCES TECUM FILED BY ELDRIDGE ATTORNEY FOR CITY BANK OF HARTFORD.  mw |
| 9/2/92 | Motion to Dismiss and/or Objection to Supoena Duces Tecum set for hearing on Fri-Sept 5, 1997 at 10:00 A.M. notify CLW |
| 9/2/97 | Copy to DA, Faircloth, Hughes & Fil. |
| 9/2/97 | Copy of CAS to Eldridge Atty for 1st National Bank of Hartford. |
| 9/2/97 | PER JUDGE WOODS MOTION TO DISMISS AND/OR OBJECTION TO SUPOENA DUCES TECUM WILL NOT BE HEARD FRIDAY SEPT. 5, 1997.  CLW  NOTIFY |
| 9/3/97 | NOTIFIED MR. FAIRCLOTH BY PHONE AND MAIL.  mw |
| 9/3/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF.  mw |
| 9/3/97 | COPY OF CAS TO ELDRIDGE ATTORNEY FOR 1ST NATIONAL BANK OF HARTFORD.  mw |
| 9-5-97 | T.D. Hearing on Motion set for 9-16-97 at 1:15 p.m. - CLW. |
| 9/15/97 | Defendants Supplemental Motion for Discovery, Motion in Limine, Motion for Disclosure |
| 9/26/97 | MOTION IN LIMINE FILED BY FAIRCLOTH ATTY. FOR DEF. |
| 9/29/97 | Jury Struck. CLW |
| 9/30/97 | Case tried to Jury. Jury return verdict of "We the Jury find the Defendant guilty of Theft of Property in the second degree as charged in the indictment" |
| | Clyde Thomas Foreman |
| | Def to report to probation officer for pre-sentence investigation. Sentence hearing to be set. CLW |

AC000367  A L A B A M A    U D I C I A L   I N F C  A T I O N   C E N T

## CASE ACTION SUMMARY
## CONTINUATION

CASE: CC 96 00021
JUDGE ID:  CLW

ATE OF ALABAMA              VS    DAVIS WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 9/29/97 | JURY STRUCK.  CLW |
| 9/30/97 | CASE TRIED TO JURY.  JURY RETURNS VERDICT OF "WE THE JURY FIND THE DEFEND |
| | GUILTY OF THEFT OF PROPERTY IN THE SECOND DEGREE AS CHARGED IN THE INDICT |
| | CLYDE THAMES, FOREPERSON |
| 9/30/97 | DEFENDANT TO REPROT TO PROBATION OFFICER FOR PRE-SENTENCE INVESTIGATION. |
| | SENTENCE HEARING TO BE SET.    CLW |
| 10/2/97 | COPY OF CAS TO EMERY, FAIRCLOTH AND HUGHES.  MH |
| 10/10/97 | Report of Investigation filed by Hughes |
| 10-31-97 | Def. sentenced to 4 yrs. in St. Pen. Def. placed on 3 yrs. immediate supervised probation. Sentence to run concurrent in cases CC-96-CC-96-220 & CC-96-221. Def. to pay CC, $50.00 VCF & restitution per Restitution Order. Def. to set up payment plan throu probation officer - Clw. |
| 11/4/97 | Copy of CAS DA, Faircloth, Hughes + Sheriff. |
| 11/5/97 | Probation Order to Hughes. |
| 10/31/97 | DEFENDANT SENTENCED TO 4 YEARS IN THE STATE PENITENTIARY.  DEFENDANT PLACED |
| | ON 3 YEARS IMMEDIATE SUPERVISED PROBATION.  SENTENCE TO RUN CONCURRENT IN C |
| | CC-96-219, 220, 221.  DEFENDANT TO PAY COURT COSTS, $50.00 V.C.F. AND REST1 |
| | PER RESTITUTION ORDER.  DEFENDANT TO SET UP PAYMENT PLAN THROUGH PROBATION |
| | OFFICER.  /S/ CHARLES L. WOODS, CIRCUIT JUDGE |
| 11/4/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF.  mw |
| 11/5/97 | PROBATION ORDER TO GREG HUGHES, PROBATION OFFICER.  mw |
| 11/7/97 | Notice of Appeal filed by Faircloth (Copies sent) |
| 8/10/98 | Letter from Def. |
| 9/7/98 | For good reason shown restitution payment is delayed until Def. reports.  Notify CLW |
| 11/12/98 | Copy of Letter from Veterans Affairs |
| 12/1/98 | Letter showing proof of Surgery |
| 2/24/99 | Letter requesting restitution payments be reduced for next 3 months to $40.00 |

18

ACS0367   A L A B A M A.   J U D I C I A L   I N F O R   A T I O N   C E N T E

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 96-800219.
JUDGE ID: CLW

CA

STATE OF ALABAMA                    VS     DAVIS WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 9/29/97 | JURY STRUCK.  CLW |
| 9/30/97 | CASE TRIED TO JURY.  JURY RETURNS VERDICT OF "WE THE JURY FIND THE DEFENDAN |
| | GUILTY OF THEFT OF PROPERTY IN THE SECOND DEGREE AS CHARGED IN THE INDICTME |
| | CLYDE THAMES, FOREPERSON |
| 9/30/97 | DEFENDANT TO REPROT TO PROBATION OFFICER FOR PRE-SENTENCE INVESTIGATION. |
| | SENTENCE HEARING TO BE SET.    CLW |
| 10/2/97 | COPY OF CAS TO EMERY, FAIRCLOTH AND HUGHES.  MB |

10/2/97  Report of investigation filed by Hughes
10-31-97  Def sentenced to 4 yrs in St pen
          with placed on 3 yrs immediate
          supervised probation  Sentence
          to run concurrent in cases CC-96-21
          CC-96-220 & CC-96-221.  Def to
          pay CC, $50.00 VCF + restitution
          per Restitution Order.  Def to
          set up payment plan throug
          probation officer - CLW
11/4/97   Copy of CASS DA, Faircloth, Hughes & Sheriff
11/5/97   Probation Order to Hughes

| 10/31/97 | DEFENDANT SENTENCED TO 4 YEARS IN THE STATE PENTENTIARY.  DEFENDANT PLACED |
| | ON 3 YEARS IMMEDIATE SUPERVISED PROBATION.  SENTENCE TO RUN CONCURRENT IN CAS |
| | CC-96-219, 220, 221.  DEFENDANT TO PAY COURT COSTS, $50.00 V.C.F. AND RESTITU |
| | PER RESTITUTION ORDER.  DEFENDANT TO SET UP PAYMENT PLAN THROUGH PROBATION |
| | OFFICER.   /S/ CHARLES L. WOODS, CIRCUIT JUDGE |
| 11/4/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF.  mw |
| 11/4/97 | PROBATION ORDER TO GREG HUGHE   PROBATION OFFICER.  mw |

STATE OF ALABAMA
COUNTY OF GENEVA
This is to certify that the foregoing is a true and correct
copy of the Document on file in my office.

Witness my hand and seal this ___30th___ da

___June___ 20__00__

_____ Clerk/Regi

*19*

ACS0370  A L A B A M A    U D I C I A L    I N F O    A T I O N    C E N T

CASE ACTION SUMMARY
CIRCUIT  CRIMINAL                    CASE: CC 96 000220.

IN THE CIRCUIT COURT OF    GENEVA  COUNTY                          JUDGE:
STATE OF ALABAMA          VS    DAVIS WINSTON
  SE: CC 96 000220.00              4358 OLD RAILROAD BED
                                   205-430-4497
                                   HARVEST, AL  35749 0000

DOB: 04/17/43  RACE: W  SEX:  M        HT:  5 11  WT: 200  HR: GRY  EYE:
SSN:417561378  ALIAS NAMES:

CHARGE1:THEFT OF PROP 1ST              CODE1: TOD1 LIT:THEFT OF PROP 1 TYPE
CHARGE2:                              CODE2:                        TYPE
CHARGE3:                              CODE3:                        TYPE
MORE?:        OFFENSE DATE: 10/20/95  AGENCY/OFFICER: GCSO    WARD

DATE WAR/CAP ISS:
DATE    INDICTED: 08/02/96      DATE ARRESTED: 11/04/96
DATE   RELEASED: 11/04/96       DATE   FILES: 11/04/96
     BOND AMOUNT:    $2,500.00  DATE HEARING:
                                       SURETIES: PERSONAL

DATE 1: 12/12/96 DESC: ARRG           TIME:  0900 A
DATE 2:          DESC:                TIME:  0000
DEF ATTY: KENNETH SHEETS, P. O. BOX 2093, DOTHAN, AL 36302               TYPE
PROSECUTOR: EMERY, DAVID C
OTH CSE: 9600053900     CHK/TICKET NO:                    GRAND JURY: 002
COURT REPORTER:         SID NO:
DEF STATUS: BOND        DEMAND:                           OPID: MES

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 12/3/96 | NOTICE OF APPEARANCE FILED BY SHEETS. |
| 12/3/96 | REQUEST OF DEFENDANT FOR PRODUCTION BY STATE FILED BY SHEETS. |
| 12/5/96 | PLEA OF NOT GUILTY AND WAIVER OF ARRAIGNMENT. |
| 12/10/96 | ORDER OF DISCOVERY. |
| 1/23/97 | *Motion to Continue* |
| | *Cont. L.R. - all nay req* |
| 3/7/97 | *Motion to Withdraw* |
| 3/17/97 | *Reul GM* |
| 3/6/97 | *Copy to Sheets* |
| 3/14/97 | *Motion to Extend Court date by def.* |
| 3/17/97 | *Set 4.2.19* |
| 5-16 | *Same as 219 - Clu* |
| 5/23/97 | *Alias & Venditters of Arrestw re LtJ* |
| 6/5/97 | *Entry of Appearance by Hair Clerk* |
| | *Motion to Sentence* |
| 6/9/97 | *Warrant Recall* |
| 6-11-97 | *Cont'd for Def. - Clw* |

*19,*

ACS0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 96 000220.
JUDGE ID:  CLW

ATE  OF  ALABAMA                VS    DAVIS WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 6/10/97 | *Motion to Produce of Defendant.* |
| 9/3/97 | *Order of Discovery to L.A. + atty.* |
| 8/26/97 | MOTION TO DISMISS AND/OR OBJECTION TO SUPOENA DUCES TECUM FILED BY ELDRIDGE |
|         | ATTORNEY FOR CITY BANK OF HARTFORD.  mw |
| 9/2/97 | *Same order on CC 96 - 219 - Clw* |
| 9/2/97 | PER JUDGE WOODS MOTION TO DISMISS AND/OR OBJECTION TO SUPOENA DUCES TECUM |
|        | WILL NOT BE HEARD FRIDAY SEPT. 5, 1997.  CLW  NOTIFY |
| 9/3/97 | NOTIFIED MR. FAIRCLOTH BY PHONE AND MAIL.  mw |
| 9/3/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF.  mw |
| 9/3/97 | COPY OF CAS TO ELDRIDGE ATTY. FOR 1ST NATIONAL BANK OF HARTFORD.  mw |
| 9-5-97 | *Same as CC-96-19 - Clw* |
| 9/15/97 | *Defendants Supplemental Motion re Discov* |
|         | *Motion in Limine  Atty for Discover* |
| 9/26/97 | *Motion in Limine filed by Faircloth* |
|         | *atty for def.* |
| 9/29/97 | *Jury Struck  Clw* |
| 9/30/97 | *Case tried to Jury  Jury return verdict "We the* |
|         | *Jury find the def I A guilty of Theft of Property* |
|         | *In the First Degree as charged in the indictment"* |
|         | *Clyde Thames* |
|         | *Foreperson* |
|         | *Def to report to Probation Officer for pre-sent* |
|         | *investigation. Hearing to be set  Charles L. Woods* |
|         | *Judge* |
| 9/29/97 | JURY STRUCK.  CLW |
| 9/30/97 | CASE TRIED TO JURY.  JURY RETURNS VERDICT OF "WE THE JURY FIND THE DEFENDA |
|         | GUILTY OF THEFT OF PROPERTY IN THE FIRST DEGREE AS CHARGED IN THE INDICTME |
|         | CLYDE THAMES, FOREPERSON |
| 9/30/97 | DEFENDANT TO REPORT TO PROBATION OFFICER FOR PRE-SENTENCE INVESTIGATION. |
|         | HEARING TO BE SET.    CHARLES L WOODS, JUDGE |
| 10/2/97 | COPY OF CAS TO EMERY, FAIRCLOTH AND HUGHES.  MH |
| 10-31-97 | *Same as CC-96-219 - Clw* |

ACS0389   A L A B A M A      U D I C I A L   I N F O R   A T I O N   C E N T E

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 96 C00280.0
JUDGE ID: CLW

STATE OF ALABAMA                  VS     DAVIS WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 10/31/97 | DEFENDANT SENTENCED TO 4 YEARS IN THE STATE PENITENTIARY.  DEFENDANT PLACED ON 3 YEARS IMMEDIATE SUPERVISED PROBATION.  SENTENCE TO RUN CONCURRENT IN CASE CC-96-219, 220, 221.  DEFENDANT TO PAY COURT COSTS, $50.00 V.C.F. AND RESTITUT PER RESTITUTION ORDER.  DEFENDANT TO SET UP PAYMENT PLAN THROUGH PROBATION OFFICER.  /S/ CHARLES L. WOODS, CIRCUIT JUDGE |
| 11/4/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF.  mw |
| 11/4/97 | PROBATION ORDER TO GREG HUGHES, PROBATION OFFICER.  mw |

STATE OF ALABAMA
COUNTY OF GENEVA
This is to certify that the foregoing is a true and correct
copy of the Document on file in my office.

Witness my hand and seal this _____30th_____ day of
_____June_____ 20 00

_____Gloria Howden_____ Clerk/Register

AC080820   A L A B A M A   U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CIRCUIT   CRIMINAL                    CASE: CC 96 000221.0

IN THE CIRCUIT COURT OF   GENEVA   COUNTY                    JUDGE: F
STATE OF ALABAMA              VS        DAVIS WINSTON
                                        4958 OLD RAILROAD BED
.SE: CC 96 000221.00                    205-430-4497
                                        HARVEST, AL  35749 0000

DOB: 04/17/43  RACE: W  SEX:  M        HT:  5 11  WT: 200  HR:  GRY  EYE: B
SSN:417561375  ALIAS NAMES:

CHARGE1: THEFT OF PROP 1ST              CODE1: TOD1 LIT: THEFT OF PROP 1 TYPE:
CHARGE2:                                CODE2:                          TYPE:
CHARGE3:                                CODE3:                          TYPE:
MORE?:          OFFENSE DATE: 10/20/95  AGENCY/OFFICER: GCSO    WAR?

DATE WAR/CAP ISS:                       DATE ARRESTED: 11/04/96
DATE   INDICTED: 08/02/96               DATE   FILED: 11/04/96
DATE   RELEASED: 11/04/96               DATE   HEARING:
        BOND AMOUNT:       $2,500.00                 SURETIES: PERSONAL

DATE 1: 12/19/96 DESC: ARRG            TIME: 0900 A
DATE 2:                                TIME: 0000                               TYPE:
DEFATTY:                               _____
PROSECUTOR: ENERY, DAVID C             _____              _____  GRAND JURY: 004
OTH CSE: 960050890                     CIT/TICKET NO:
COURT REPORTER:                            SID NO:                            SP_____ MGR
DEF STATUS: BOND                      DEMAND:

DATE            ACTION, JUDGMENTS, CASE NOTES

12/3/96  Notice of Appearance filed by Gurt
12/3/96  Request of Affidavit of Indigence
         and Such filed by Gurt
12/10/96 Order of Indigency
12/5/96  Plea of not guilty + waiver of arraign
1/22/97  Motion to Continue
12/17/97 Cont. J D - City - M/L
12/17/97 Motion to Withdraw
3/12/97  Cont. W
3/12/97  Cont to State
3/5/97   Motion to Extend Court date Such
2/11/7   Same 96-219
5/6/97   Same as 219 - Clu
5/23/97  Alias + Conditions of setting & Sh.
6/5/97   Entry of Appearance filed Sanchez
         Motion to Continue
6/9/97   Warrant Recall
6-11-97  Cont'd for Def. - Clu.

ACSD349   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 96 000221
JUDGE ID: CLW

ATE OF ALABAMA                    VS    DAVIS WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------|
| 6/10/97 | *Motion to Produce of Defendant* |
| 6/13/97 | *Order of Discovery to D.A. + Atty.* |
| 8/26/97 | MOTION TO DISMISS AND/OR OBJECTION TO SUPOENA DUCES TECUM FILED BY ELDRID |
|  | ATTORNEY FOR CITY BANK OF HARTFORD. mw |
| 9/2/97 | *Same order as CC 96-219. CLW* |
| 9/2/97 | PER JUDGE WOODS MOTION TO DISMISS AND/OR OBJECTION TO SUPOENA DUCES TECUM |
|  | WILL NOT BE HEARD FRIDAY SEPT. 5, 1997. CLW NOTIFY |
| 9/3/97 | NOTIFIED MR. FAIRCLOTH BY PHONE AND MAIL. mw |
| 9/3/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF. mw |
| 9/3/97 | COPY OF CAS TO ELDRIDGE ATTY. FOR 1ST NATIONAL BANK OF HARTFORD. mw |
| 9-9-97 | *Same as CC-96-96-119. CLW.* |
| 9/15/97 | *Defendants Supplemental Motion for Discov* |
|  | *Motion in Limine Motion for Disclosure* |
| 9/26/97 | *Motion in Limine filed by Faircloth* |
|  | *Atty. for Def.* |
| 9/29/92 | *Jury Struck. CLW* |
| 9/30/97 | *Case tried to Jury. Jury return Verdict* |
|  | *"We the jury, find the Def guilty of* |
|  | *Theft of property in the First Degree as* |
|  | *Charged in the indictment."* |
|  | *Clyde Thames Foreman* |
|  | *Def ordered to Probation Office for presentence investigation* |
|  | *Sentence hearing to be set. Charles L. Woods, Judge* |
| 9/29/97 | JURY STRUCK. CLW |
| 9/30/97 | CASE TRIED TO JURY. JURY RETURNS VERDICT OF "WE THE JURY, FIND THE DEFEN |
|  | GUILTY OF THEFT OF PROPERTY IN THE FIRST DEGREE AS CHARGED IN THE INDICT |
|  | CLYDE THAMES, FOREPERSON |
| 9/30/97 | DEFENDANT ORDERED TO REPORT TO PROBATION OFFICER FOR PRE-SENTENCE INVESTIC |
|  | SENTENCING HEARING TO BE SET. CHARLES L. WOODS, JUDGE |
| 10/2/97 | COPY OF CAS TO EMERY, FAIRCLOTH AND HUGHES. MH |
| 10-3- | *Same as CC-96-219. CLW.* |

ACS0369    A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 96 000221
JUDGE ID:  CLW

STATE  OF  ALABAMA                    VS    DAVIS  WINSTON

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 10/31/97 | DEFENDANT SENTENCED TO 4 YEARS IN THE STATE PENITENTIARY.  DEFENDANT PLACED ON 3 YEARS IMMEDIATE SUPERVISED PROBATION.  SENTENCE TO RUN CONCURRENT IN CA CC-96-219, 220, 221.  DEFENDANT TO PAY COURT COSTS, $50.00 V.C.F. AND RESTII PER RESTITUTION ORDER.  DEFENDANT TO SET UP PAYMENT PLAN THROUGH PROBATION OFFICER.  /S/ CHARLES L. WOODS, CIRCUIT JUDGE |
| 11/4/97 | COPY OF CAS TO EMERY, FAIRCLOTH, HUGHES, SHERIFF.  mw |
| 11/4/97 | PROBATION ORDER TO GREG HUGHES, PROBATION OFFICER.  mw |

STATE OF ALABAMA
COUNTY OF GENEVA
This is to certify that the foregoing is a true and correct
copy of the Document on file in my office.

Witness my hand and seal this _____ 30th _____ day of
_____ June _____ 20 00

_____ Clerk/Register

227

PETITIONER'S EXHIBIT 31

NOV 16 2000

*[signature]*
CLERK

IN The Circuit Court of Geneva County, Ala

IN RE: Winston Davis

Appellant,

V.                                    CR ___-___

STATE of Alabama        @ Circuit Court

Appellee        CASE No 99-0126

Motion For Supplemented Record
ON Appeal to specifically include
those portions omitted under Rule 10

Comes Now Appellant, Winston Davis, and mov
this Court pursuant to Rule of Appellate Procedur
Rule 10 (c) (1) to Include the following specifically

(1) The record of Organization
of the grand Jury which
found the indictment

(2) The record of evidence
and testimony presented
to the grand Jury which
found the indictment

(3) The Order of the Court
for service of the copy
of the indictment upon
the defendant.

(4) A Copy of the Complaint
    signed by Alice Kelley

(5) A Copy of the Indictment

(6) A Copy of the Arrest Warrant

Appellant shows these documents are
essential to certain Issues to be
raised on Direct Appeal, and the
failure to be included in the Record
will deprive Appellant of his Federal
Constitutional Rights under the Fifth
and Fourteenth Amendments.

Respectfully Submitted

Done on this 13th day of Dec. 2006     x Winston Davis

                                       Winston Davis
                                       AIs # 202010
                                       E.C.F
                                       P.O Box 8
                                       Elmore, AL
                                            36025

Certificate of Service

I hereby certify that I have served a cof
of ') Motion for Supplemented Record on Appeal
on the person's whos Addresses are below by
placing in the Prison Mail Box at Elmore
Correctional Facility postage pre-paid

Geneva County Circuit Clerk
P.O Box 86
Geneva, AL 36340

Alabama Court of Criminal Appeals
Clerk of Court
P.O Box 301555
Montgomery, AL
36130-1555

Done on this 13th day of Nov 2000  x Winston Davis
Winston Davis
AIS# 207010-
E.CF
P.o Box 8
Elmore, AL
36025

IN THE SUPREME COURT OF ALABAMA
June 22, 2001

1001258

Ex parte Winston Davis.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS (In re:  Winston Davis v. State of Alabama) (Geneva
Cir.Ct.No.: CC-99-126) (Low'r.App.Ct.No.: CR-00-0344)

CERTIFICATE OF JUDGMENT
Writ Denied

---

The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED
that the petition for writ of certiorari is denied for lack of compliance with
Rule 39, Alabama Rules of Appellate Procedure.  NO OPINION.

MOORE, C.J. - See, Brown, Harwood, and Stuart, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 22nd day of June, 20 01

Clerk, Supreme Court of Alabama

1 PETITIONER'S
WINSTON DAVIS
EXHIBIT 32

CONVICTED FELON REGISTRATION CARD
THE STATE OF ALABAMA
HOUSTON COUNTY

NAME Winston Davis

ADDRESS 519 Santolina Rd.,

Dothan,                                    AL  36303
            CITY                              STATE

SEX Male      RACE White     DATE REGISTERED 03-01-04

HGT 5'l0"   EYES Brn     COMPLXN Light

WGT 160    SS# 417561376  DOB 06-17-43

Sheriff Lamar Glover by VMD
            SHERIFF OF HOUSTON COUNTY

## CITY OF DOTHAN
## POLICE DEPARTMENT

3/1/04
        Date
This Certifies that Winston Davis , who

resides at 519 Santolina Rd ,Dothan,
Alabama has registered with the Dothan Police
Department this date as provided for in Sec. 62-2 Code of
Ordinances, City of Dothan.

John White
        CHIEF OF POLICE

PETITIONER WINSTON DAVIS'S

" EXHIBIT 33